1

2

3

4                        UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    STEVEN C. JOHNSON,                    Case No. 20-cv-08807-WHO

              Plaintiff,

8

9         v.                              **ORDER ON MOTION FOR CLASS
                                          CERTIFICATION AND MOTIONS TO
10   GLOCK, INC., et al.,                 STRIKE [REDACTED]**

              Defendants.                 Re: Dkt. Nos. 145, 146, 147, 148, 156, 158,
11                                        159, 160, 161, 167, 169

12

13        Plaintiff Steven C. Johnson moves to certify a class of consumers who purchased Glock

14   pistols designed to shoot identified calibers of ammunition.  Plaintiff's Motion for Class

15   Certification, Dkt. No. 145 ("C.C. Mot.").  Plaintiff's theory is that all of these pistols have an

16   unsupported chamber ("unsupported chamber defect" or "UCD") that creates a "propensity" for

17   these guns to "catastrophically fail and explode" with ammunition that is charged at or over 200%

18   of the recommended pressure or has casing weaknesses, that according to plaintiff "can occur

19   during normal use with factory ammunition as Glock directs."  Plaintiff's Reply ISO Class

20   Certification, Dkt. No. 169 ("C.C. Reply") at 3.  Plaintiff contends that defendants[1] have known

21   about this defect since 1992, and indeed intentionally designed these guns with the unsupported

22   chamber but have concealed from consumers the safety risk caused by the interaction of the UCD

23   and over-pressurized or weak brass casings.  *Id.* at 1.  The interplay between the UCD and the

24   brass cartridges in these situations, according to plaintiff, creates excessive deformation of the

25

26   ─────────────────────

27   [1] Plaintiff alleges defendants Glock Ges.m.b.H and Glock, Inc. are interrelated entities, that
     together "design, test, manufacture, market, and sell Glock branded handguns. Glock Ges.m.b.H.
28   designs, tests, and manufactures the component parts of the handguns. Glock, Inc. assembles,
     markets, sells, and distributes Glock guns in California."  C.C. Mot. at 3. Defendants are referred
     to collectively as "Glock."

United States District Court
Northern District of California

United States District Court
Northern District of California

1    brass cartridge, "exposing them to increased likelihood of case rupture and pistol explosion." *See*

2    Opposition to Motion to Strike Declaration of David Bosch (Dkt. No. 167-4, "Oppo. MTS

3    Bosch") at 18.

4         Glock opposes class certification, primarily arguing that there is no defect and no safety

5    risk to users of its pistols.  It admits that the pistols identified in the proposed class each have an

6    intentionally designed area in the barrel that plaintiff calls unsupported but which Glock calls the

7    "safety valve."  Glock argues that the safety valve functions as designed.  Specifically, the safety

8    valve forces gases down and away from a user's face into the handle of its pistols when the

9    ammunition fails; the problem occurs when ammunition is pressurized at or over the 200%

10   recommended by SAAMI[2] and the brass casing was either reloaded contrary to Glock's directions

11   or was otherwise defective.  Glock also moves to strike the declarations of plaintiff's experts –

12   John Nixon, David Bosch, Colin B. Weir, and Steven Gaskin – proffered in support of class

13   certification.  Dkt. Nos. 158-162.

14        The central theme of Glock's opposition is one based on the merits.  First, it contends that

15   plaintiff's theory of defect is unsupported given plaintiff's experts' inability to identify exactly

16   when Glock pistols will fail and because the fault, if any, is the result of defective ammunition.

17   Second, it argues that plaintiff's theory of harm is implausible in light of the millions of satisfied

18   and repeat Glock purchasers.  When analyzed under the standards required for the California

19   consumer protection claims at issue, Glock's defenses are common questions that can be resolved

20   on a classwide basis.  Glock may well prevail on the merits, but plaintiff has shown enough

21   evidence in support of his theories as well as the existence of predominant, common questions, to

22   satisfy the requirements of Rule 23.

23                                    **BACKGROUND**

24        Plaintiff's theory is that 30 Glock models contain a design defect; the "unsupported

25   chamber defect" or "UCD."  Glock admits these models have an intentionally designed

26

27   _____

     [2] SAAMI is the Sporting Arms and Ammunition Manufacturers' Institute.  *See* Declaration of
28   Emanuel Kapelsohn (Dkt. No. 156-6) ¶ 131.

unsupported area, but refers to it as the "special safety valve."  Under plaintiff's theory, the design

of the UCD causes the guns to occasionally fail, even when factory made ammunition

recommended by Glock is used, because factory ammunition can occasionally be over pressurized

(at or above 200% above SAAMI recommended pressure) or have weak casings.  C.C. Mot. at 1-

2.  Plaintiff's theory of an undisclosed safety risk is supported by its two proposed experts (David

Bosch and John Nixon) and opposed by Glock's experts (Emanuel Kapelsohn, Marlin R. Jiranek,

II, and Derek Watkins).  *See* Dkt. No. 145-9 ("Nixon Decl."); 145-10 ("Bosch Decl."); 156-6

("Kapelsohn Decl."); 156-8 ("Jiranek Decl."); Dkt. No. 156-7 ("Watkins Decl.").[3]  Plaintiff

contends, relying not only on Bosch and Nixon but as admitted by Glock in Glock's internal

documents and deposition testimony, that the design of unsupported chamber/safety valve is

intended to cause the cartridge of defective ammunition[4] to burst at a specific location so that the

gasses are forced down through the safety valve into the handles and away from a user's face.  *See*

Nixon Decl. ¶¶ 21, 23.

According to plaintiff, Glock knows that high-quality "factory ammunition"[5] that Glock

recommends gun owners use[6] can suffer from both of these issues.  And when ammunition with

those issues is used in the pistols the design of the unsupported chamber/safety valve forces

75,000 psi of pressure into the plastic handles of the guns, a process that plaintiff refers to as

"exploding" or "bursting."  Bosch Decl. at 142 & 14.2; Nixon Decl. ¶¶ 15, 23; *see also* Oppo. to

MTS Bosch (Dkt. No. 167-4) at 13-15.  According to Bosch, all Class Guns have a materially

similar unsupported chamber/safety valve – a design choice that is unique to Glock – and all Class

Guns were designed to "'burst' at 200 percent pressure regardless of the caliber."  Bosch Decl. ¶

[3] Glock moves to strike the opinions of these experts. Dkt. Nos. 156-4, 156-5.  The motions to strike will be addressed below.

[4] Meaning that the ammunition is over pressurized at or above 200% SAAMI max pressure or has a weak casing.  C.C. Mot. at 1.

[5] "Factory Ammunition" refers to ammunition produced by major manufacturers and uses all new components, including new and not previously fired cartridge cases, distinguishing it from "reloaded ammunition" using components included cases that have previously been fired. Kapelsohn Decl. ¶¶ 130, 135.

[6] Kapelsohn Decl. ¶ 154.

14.2; Bosch Rebuttal Decl. (Dkt. No. 169-9) ¶¶ 1, 2.

Plaintiff alleges – and Glock does not contest – that Glock does not advertise or disclose the existence of the unsupported chamber/safety valve to consumers, although Glock contends that it does train "Glock Armorers" on its existence.  The armorer courses, however, are restricted to law enforcement, military officers, private security personnel, and Glock dealers.  Nixon Decl. ¶¶ 43, 44; Bosch Supp. Decl. ¶ 3.

Glock contends that the "defect" plaintiff identifies with the unsupported chamber is no defect at all.  Instead, it is a safety mechanism intentionally designed – when ammunition is defective or otherwise fails – to force powerful gases down and away from a user's face and "effectively manage the energy generated from that failure as safely as possible."  Reply MTS Bosch (Dkt. No. 172) at 1; *see also* Watkins Decl. ¶¶ 28-29, 33, 35-36.  Glock relies heavily on its experts and the extensive testing of its pistols, and that despite billions of rounds of ammunition being deployed and the adoption of Glock pistols by security forces and police departments throughout the United States, only a minuscule number of true pistol "explosions" have occurred that were caused by defective ammunition or other causes unrelated to the design and function of the safety valve.  *See* Kapelsohn Decl. ¶¶ 12, 50, 54.

That said, this is not a summary judgment motion in a product defect case.  It is a class certification motion that seeks to certify a class to pursue consumer protection claims for: (1) violations of the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ("CLRA"); (2) fraudulent omissions; (3) violations of California's Unfair Business Practices Act, Cal Bus. & Prof. Code § 17200 *et seq.* ("UCL"); and (4) false advertising, under Cal. Bus. & Prof. Code § 17500 *et seq.* ("FAL").  *See* Third Amended Complaint ("TAC"), Dkt. No. 60.  Under those statutes, the question is whether a reasonable consumer would have found that the undisclosed safety risk caused by the interaction of the unsupported chamber and over pressurized or weak casing factory ammunition was material when purchasing a pistol.

Plaintiff argues that Glock violates the consumer protection statutes and common law by failing to disclose and concealing the serious safety issue caused by the design of the UCD when over-pressurized ammunition or ammunition with weak cases are used.  Plaintiff seeks to recover

as damages or restitution either the full value of the guns purchased or the difference in the price of the gun had Glock disclosed the safety risk to consumers at the time of purchase.

## LEGAL STANDARD

### I.      CLASS CERTIFICATION

Federal Rule of Civil Procedure 23 governs class actions.  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663–64 (9th Cir. 2022) (en banc). "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis,'" that the requirements of Rule 23 are met.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982)).  "[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." *Olean*, 31 F.4th at 665.

A "plaintiff[] must make two showings" to certify its purported class.  *Olean*, 31 F.4th at 663.  "First, the plaintiffs must establish 'there are questions of law or fact in common to the class,' as well as demonstrate numerosity, typicality, and adequacy of representation." *Id.* (quoting Fed. R. Civ. Proc. 23(a)).[7]  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" and the "claims must depend upon a common contention." *Wal-Mart*, 564 U.S. at 349–50 (quoting *Falcon*, 457 U.S. at 157).

"Second, the plaintiffs must show that the class fits into one of three categories" as provided in Rule 23(b).  *Olean*, 31 F.4th at 663.  Under Rule 23(b)(3), a class may be certified if "questions of law or fact common to class members predominate over the questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Proc. 23(b)(3). In deciding this, courts

---

[7] Rule 23(a) provides:
> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

United States District Court
Northern District of California

consider:

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun
> by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in
> the particular forum; and
> (D) the likely difficulties in managing a class action.

*Id.*

Under Rule 23(b)(2), a class can be certified where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. Proc. 23(b)(2). To establish standing for prospective injunctive relief, a plaintiff must demonstrate that she "has suffered or is threatened with a concrete and particularized legal harm . . . coupled with a sufficient likelihood that [s]he will again be wronged in a similar way." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (internal quotation marks and citations omitted). A plaintiff must establish a "real and immediate threat of repeated injury." *Id.* (internal quotation marks and citations omitted). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).

"[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence. In carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any admissible evidence." *Olean*, 31 F.4th at 665 (citing *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 454-55 (2016)). While the class-certification analysis "may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (internal citations and quotation marks omitted). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (citation omitted).

In considering a motion for class certification, the substantive allegations of the complaint

6

are accepted as true, but "the court need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action." *Hanni v. Am. Airlines*, No. C-08-00732-CW, 2010 WL 289297, at *8 (N.D. Cal. Jan. 15, 2010). The court may also "consider supplemental evidentiary submissions of the parties." *Id.* "[T]he 'manner and degree of evidence required' at the preliminary class certification stage is not the same as 'at the successive stages of the litigation'—*i.e.*, at trial." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

## II.   DAUBERT MOTIONS TO EXCLUDE AND STRIKE

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

>   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

>   (b) the testimony is based on sufficient facts or data;

>   (c) the testimony is the product of reliable principles and methods; and

>   (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Federal Rule of Evidence 702 (as amended).[8]

Courts apply the *Daubert* standard "in evaluating challenged expert testimony in support class certification." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018). Under *Daubert*, courts "must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)). The testimony is "relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Id.* at

---

[8] Rule 702 was amended effective December 1, 2023, "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Glock assumes the amended version of Rule 702 applies. Plaintiff notes application of the amendment to the expert testimony here, at this juncture, is "debatable," as the expert opinions were disclosed in October 2023, months before the amendment became effective. *See, e.g.*, Oppo. to Gaskin MTS (Dkt. No. 167-2) at 6 n.5. However, I find plaintiff's expert opinions – in so far they are relevant to class certification – satisfy amended Rule 702.

United States District Court
Northern District of California

1044 (quoting *Primiano*, 598 F.3d at 565). It is "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* (quoting *Primiano*, 598 F.3d at 565).

For reliability, the test looks at the "soundness of [the expert's] methodology" rather than the correctness of the opinions. *Id.* (citation omitted); *see also* Fed. R. Evid. 702. Courts "must act as a 'gatekeeper' to exclude 'junk science' that does not meet Rule 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Cooper v. Brown*, 510 F.3d 870, 943 (9th Cir. 2007). "Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." *Id.*

# DISCUSSION

## I.      MOTION FOR CLASS CERTIFICATION

Plaintiff seeks to certify "a class of consumers who purchased any Glock pistol designed to shoot the following calibers: (1) 10mm, (2) 40 S&W, (3) 9mm, (4) 45 ACP, (5) 45 GAP, (6) .380, and (7) .357 Sig. in the State of California since introduced into the stream of commerce by Defendants ('Class Guns')." C.C. Mot. at 1.[9]

### A.      Rule 23(a)

Rule 23(a) requires that plaintiff show numerosity, commonality, typicality, and adequacy. Fed. R. Civ. Proc. 23(a).[10]

---

[9] Glock complains that this class definition is broader than the definition included in the Third Amended Complaint ("TAC"). C.C. Oppo. at 10-11. The TAC seeks certification of: "All current and former owners of a Class Gun that was purchased in the State of California" and Class Guns are defined as including "but are not limited to the following models/series: Model 22, 22 Gen 4, 23, 23 Gen 4, 24, 27, 27 Gen 4, 35, 35 Gen 4, 35 Gen 4 MOS, 21 Gen 4, 21 SF, 30 Gen 4, 30s, 30 SF, 36, 41 Gen 4, 41 Gen 4 MOS, 37, 38, 39, 20 Gen 4, 20 SF, 29 Gen 4, 29 SF, 40 Gen 4 MOS, and all gun models with a similar chamber design and feed ramp length." TAC ¶¶ 21, 69. The three additional calibers that plaintiff specifically identifies in the Motion for Class Certification that are not specifically identified in the TAC are, according to plaintiff, similar models with materially similar chamber design and feed ramp length. C.C. Reply at 3. Glock does not specifically address why these guns are not materially similar to the other guns identified in the TAC with respect to the function or operation of the UCD.

[10] Glock also argues the class is not ascertainable because the class definition of "purchasers" is "fatally overbroad." C.C. Oppo. at 9-11. However, Glock's overbreadth argument is better considered "as part of the Rule 23(b)(3) analysis." *Hilario v. Allstate Ins. Co.*, 642 F. Supp. 3d

United States District Court
Northern District of California

### 1. Numerosity

The class here "is so numerous that joinder of all members is impracticable." Fed. R. Civ. Proc. 23(a)(1). "[C]ourts within the Ninth Circuit generally agree that numerosity is satisfied if the class includes forty or more members." *Hilario v. Allstate Ins. Co*., 642 F. Supp. 3d 1048, 1059 (N.D. Cal. 2022), *aff'd*, No. 23-15264, 2024 WL 615567 (9th Cir. Feb. 14, 2024) (citations omitted). Glock does not dispute numerosity and plaintiff's evidence shows that half a million of the Class Guns have been sold since 2001. *See* Declaration of Robert K. Lewis (Dkt. No. 145-1) ¶ 40 (attaching records from the California Department of Justice Bureau of Firearms). This factor is satisfied.

### 2. Typicality

Plaintiff has shown that his "claims or defenses . . . are typical of the claims or defenses of the class." A. *B. v. Hawai'i State Dep't of Educ*., 30 F.4th 828, 839 (9th Cir. 2022) (quoting Fed. R. Civ. Proc. 23(a)(3)). The "test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992). A plaintiff's claims are considered typical if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020). A plaintiff may not be typical if she is "subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508. However, "[d]iffering factual scenarios resulting in a claim of the same nature as other class members does not defeat typicality." *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 985 n. 9 (9th Cir. 2011) (citing *Hanon*, 976 F.2d at 508).

Glock challenges Johnson's typicality, arguing first that Johnson is subject to "unique defenses" because his pistol contained an "excessive amount of lead" build-up that, in Glock's view, caused or contributed to the failure of Johnson's pistol. Kapelsohn Decl. ¶¶ 94-96; Watkins Decl. ¶¶ 93-100. But the issue in this case is whether the UCD/safety valve creates a safety risk for those who use the gun with factory ammunition, as Glock recommends. That other issues may

---

1048, 1064 (N.D. Cal. 2022), *aff'd*, No. 23-15264, 2024 WL 615567 (9th Cir. Feb. 14, 2024).

9

make that risk more likely to occur does not impact plaintiff's claim that Glock was required to disclose the safety risk to consumers at the time of purchase. *See, e.g., Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 479 (C.D. Cal. 2012) ("the harm for which Plaintiffs sue is not the actual manifestation of [the mold and odor condition] but for Defendant's failure to disclose the Washers' propensity to develop [the condition]. Thus, Defendant's arguments and evidence about alternative explanations for the actual manifestation of [the condition] in Plaintiffs' Washers is simply a red herring.").

Glock also contends that Johnson's personal claims are barred by the applicable statute of limitations unless he can rely on equitable tolling, and that those issues preclude a finding of typicality as many members of the class would not suffer from a statute of limitations defense. But Johnson has introduced evidence that Glock has concealed the safety risk created by the UCD/safety valve that would toll the statute for the class.[11]   In addition, he has shown that given the length of the class period, a significant percentage of the class – 69% – would face the purported statute of limitations defense.[12]   That "lengthy class period means that some significant portion of the class may also face statute of limitations defenses. That supports typicality." *Rushing v. Williams-Sonoma, Inc.*, No. 16-CV-01421-WHO, 2024 WL 779601, at *4 (N.D. Cal. Feb. 21, 2024).

Next, Glock challenges typicality because each purchaser of a Glock pistol has "different reasons" for purchasing their pistols.  That gun purchasers unsurprisingly have different reasons to purchase specific models and different justifications for their purchase does not preclude a finding of typicality in this consumer protection case where the question is whether the omitted information was material.  That is especially true here, where the omitted information is connected to an allegedly serious safety risk.  *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, 609 F. Supp. 3d 942, 962 (N.D. Cal. 2022 (different reasons for purchasing product not material

---

[11]  Nixon Decl. ¶ 43 (citing testimony from Glock).

[12]  Plaintiff estimates that given the long class period, 69% of the class would face a statute of limitations defense.  Lewis Decl. ¶ 40 (relying on California Department of Justice Bureau of Firearms records).

1    and did not undermine typicality where "Plaintiffs' claims are based on the theory that had

2    defendants disclosed the safety and addiction risks of using JUUL products, they would have paid

3    less or purchased different products."); *see also Johnson v. Nissan N. Am., Inc.*, No. 3:17-CV-

4    00517-WHO, 2022 WL 2869528, at *14 (N.D. Cal. July 21, 2022 (where plaintiff's theory was

5    that product created safety issue under "normal" operation, materiality satisfied both because

6    failure would require requirement but also because it was an "obvious safety issue").[13]

7        Finally, Glock challenges Johnson's typicality because he – unlike theoretical other

8    members of the class – did not rely on any specific Glock advertisements or materials before

9    purchasing his G30SF model pistol.  According to Glock, Johnson would not have been aware of

10   any allegedly omitted material information regarding the UCD had Glock disclosed it.  However,

11   the Ninth Circuit recently confirmed that what a named plaintiff may have seen or not have seen,

12   reliance or non-reliance "'is not a basis for denial of class certification' and reliance is more

13   appropriately considered at the merits stage." *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223,

14   1239 (9th Cir. 2024) (quoting *Hanon*, 976 F.2d at 509).  In addition, plaintiff points to deposition

15   evidence regarding the investigation Johnson took before the purchase of his first pistol and

16   second pistol in 2016.  C.C. Reply at 9-10.  At most, there is a dispute of fact for determination at

17   the merits stage.

18       Typicality has been satisfied.

19           **3.    Adequacy**

20       Plaintiff and his counsel are adequate.  To meet the Rule 23(a)(4) requirement, "the

21   plaintiff must show that (1) the named plaintiff and her counsel do not have conflicts of interests

22   with other class members," and that (2) the named plaintiff and plaintiffs' counsel "will prosecute

23   the action vigorously on behalf of the class, which includes a showing that class counsel is

24   competent and qualified."  *Hilario*, 642 F. Supp. 3d at 1062 (citation omitted).

25   ───────────────

26   [13] Relatedly, Glock also challenges typicality because each caliber of Glock pistol included in the
     proposed class definition is "different" – for example in feed ramp length or chamber dimension.

27   As a result, it contends that Johnson's claims related to the two pistols he owns, are not typical of
     the other pistols included in the proposed class definition.  That argument is addressed below,

28   when considering commonality.  *See infra* at 13-15, citing *In re: MacBook Keyboard Litigation*,
     No. 5:18-CV-02813-EJD, 2021 WL 1250378, at *11 (N.D. Cal. Apr. 5, 2021).

United States District Court
Northern District of California

United States District Court
Northern District of California

Glock argues that Johnson is not adequate because in his deposition Johnson showed he was "startlingly unfamiliar" with this case and has "ceded" control to his counsel. *See Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004), *amended in part*, 2012 WL 3070863 (N.D. Cal. July 26, 2012) ("The threshold of knowledge required to qualify a class representative is low; a party must be familiar with the basic elements of her claim[ ], and will be deemed inadequate only if she is 'startlingly unfamiliar' with the case."). Johnson passes that low bar because he was in frequent, if brief, communication with the plaintiff firms and he fully understands the duties of being a class representative. *See* Deposition of Stephen Johnson, Dkt. No. 157-18, at 31-33, 319-320.

To determine whether class counsel is adequate, I look to: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. Proc. 23(g)(1)(A). Glock does not challenge counsel's adequacy and based on their litigation of this case to date and their submissions in support of class certification, I found counsel adequate.

Adequacy is satisfied.

### 4. Commonality

Finally, "[t]he commonality requirement of Rule 23(a)(2) requires plaintiffs seeking class certification to show that their claims 'depend upon a common contention' that 'is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *A.B.*, 30 F.4th at 839 (quoting *Wal-Mart*, 564 U.S. at 350). "In determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial. While such an analysis may 'entail some overlap with the merits of the plaintiff's underlying claim,' the '[m]erits questions may be considered [only] to the extent [ ] that they are relevant to determining whether the Rule 23 prerequisites for class certification are

satisfied.'" *Olean*, 31 F.4th at 666-67 (first quoting *Wal-Mart*, 564 U.S. at 351; then quoting *Amgen*, 568 U.S. at 466; and then citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011)).

Common questions here include:

- **Existence of a defect.**

Glock argues that there is no defect in the UCD/safety valve, defeating class certification. Whether or not the design of the UCD/safety valve is a defect in Glock pistols is a common question. Glock may well persuade a jury or submit evidence showing no possible dispute of fact over whether the UCD/safety valve violates the consumer protection laws at issue because there is no defect or such an insignificant safety risk that no reasonable consumer would find it material to a purchasing decision. At this juncture, plaintiff has submitted sufficient evidence supporting his theory for purposes of class certification. *See, e.g., Johnson v. Nissan N. Am., Inc.*, No. 3:17-CV-00517-WHO, 2022 WL 2869528, at *22 (N.D. Cal. July 21, 2022) ("But that is a merits question: whether the PSRs were designed as the plaintiffs contend. If Nissan is right and the plaintiffs cannot show that defect exists, it means the plaintiffs lose on the merits, not that common issues do not predominate—indeed, that their claims could fall in one fell swoop by failure to demonstrate a defect shows that they are amenable to class treatment, rather than the reverse.").[14]

Even if there were theoretically a defect in Johnson's pistols or others, Glock contends that it is not *common* because the class is defined to include many different types of Glock pistols, each of which have different design elements such as feed ramps and chambers dimensions. It presents no evidence that any of the alleged differences correlate with or impact the functioning of the UCD/safety valve or otherwise contribute to whether the UCD/safety valve may fail. Absent evidence that shows how these differences undermine plaintiff's theory of common defect (based on the failure of the UCD/safety valve when ammunition with weak brass or that is over pressurized is used in all models that have the UCD/safety valve), they are immaterial to the merits of plaintiff's theory and do not undermine commonality. *In re: MacBook Keyboard*

---

[14] Glock moves to strike the opinions of plaintiff's defect experts, Bosch and Nixon. Those motions are denied for the reasons explained below.

United States District Court
Northern District of California

*Litigation*, No. 5:18-CV-02813-EJD, 2021 WL 1250378, at *11 (N.D. Cal. Apr. 5, 2021) ("Thus, the question is whether the 'material elements' or 'relevant components' of the device at issue are the same across models.").[15]

- **Glock's knowledge/alleged concealment.**

Glock does not dispute its knowledge of the intentionally designed UCD/safety valve. Watkins Decl. ¶¶ 35-36.  It also admits that it does not call attention to the safety-valve feature in its sales and marketing materials (so as to not encourage potential misuse of its pistols), although it does disclose the safety valve feature and function in its "Glock Armorer" courses.  Deposition Transcript of Carlos Guevara (Dkt. No. 145-6) at 224-225; Deposition Transcript of Josef Kroyer (Dkt. No.145-4) at 108-109.  These admissions demonstrate that what Glock knew, its intents in designing the UCD/safety valve, and its disclosures regarding the intended purpose of the safety valve and any risks it represents, *are* all common questions.  The same is true of whether and how Glock disclosed or addressed instances of pistol failures that plaintiff contends were caused by the interaction of the UCD and over pressurized ammunition or ammunition with weak casings but that Glock contends were caused or impacted by other issues.  These are common questions.

- **Materiality of the risk created by UCD to a reasonable consumer.**

Glock argues that whether the safety defect alleged would be "material" to California consumers will vary from consumer to consumer so that this question is not common.  It relies on the declarations of its experts – Kapelsohn and Dr. J. Andrew Peterson (Dkt. No. 156-16) – to show that pistol buyers are not uniform and rely on different sources of information, not just materials produced by Glock.  Oppo. C.C. at 14-15.  But that is not the relevant question under California law.  Instead, the question is whether the information that Glock failed to disclose – regarding the safety risk caused by the interaction of the UCD/safety valve with ammunition that is over pressurized or has weak casings – would be material to a reasonable consumer.  *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 407 (N.D. Cal. 2021) (common question under California

---

[15]  Plaintiff points to deposition testimony of Glock's Rule 30(b)(6) design deponent that his role was to "make the safety valve exactly the same" across models and to "make the safety valve in the new guns the same as with the 9mm guns," and that the valve has remained "substantially similar" over time.  Deposition Transcript of Josef Kroyer (Dkt. No.145-4) at 39-40, 75.

consumer protection statutes is whether "statement was material to, and likely to deceive, a reasonable consumer" and that question predominates "over individual questions").  In cases where there is a safety issue that was not disclosed, the information is presumed to be material. *Milstead v. Gen. Motors LLC*, No. 21-CV-06338-JST, 2023 WL 4410502, at *6 (N.D. Cal. July 6, 2023) (viewing the allegations in the "light most favorable to Plaintiffs, GM's failure to disclose the alleged defect was material because the alleged defect creates an unreasonable safety risk"). That other, disclosed considerations go into a particular consumer's decision to buy a particular gun does not impact the materiality of an undisclosed defect which is assessed at the time of purchase.  *See In re JUUL Labs*, 609 F. Supp. 3d at 991 ("Additionally, that a consumer may consider many factors in determining whether to purchase a product does not mean that misrepresented or omitted information cannot be material.")[16]

- **Damages.**

  Glock also argues that plaintiff has not shown that damages can be determined on a classwide basis because plaintiff's first theory – seeking a full refund – is not supported where thousands of users gain value from continued use of these pistols, even if there might be some slim risk with use.  It also challenges the conjoint analysis conducted by plaintiff's economic and survey experts, Weir and Gaskin.  These challenges will be addressed more thoroughly below in conjunction with Glock's motion to exclude Weir and Gaskin, but at this juncture plaintiff has shown how damages can be determined based on common evidence.

  Numerous significant, common questions have been identified.  Plaintiff has satisfied the Rule 23(a) requirements.

**B.**  **Rule 23(b)(3)**

  **1.**  **Predominance**

  "[T]he predominance requirement" of Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."

---

[16] Whether there was enough information in the market about the UCD to put consumers on adequate notice, C.C. Oppo. at 15, is disputed and simply raises a different common question to be resolved by the trier of fact.

United States District Court
Northern District of California

*Lytle v. Nutramax Lab'ys, Inc.*, No. 22-55744, 2024 WL 1710663, at \*5 (9th Cir. Apr. 22, 2024) (quoting Fed. R. Civ. Proc. 23(b)(3)). "This requirement presupposes satisfaction of the commonality requirement of FRCP 23(a)(2), which itself tests 'the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Id.* (quoting *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1052 (9th Cir. 2015)). "But the predominance inquiry goes further and 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

"In order for the plaintiffs to carry their burden of proving that a common question predominates, they must show that the common question relates to a central issue in the plaintiffs' claim." *Id.* at 665 (citing *Wal-Mart*, 564 U.S. at 349-50). "Therefore, '[c]onsidering whether "questions of law or fact common to class members predominate" begins, of course, with the elements of the underlying cause of action.'" *Id.* (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)).

As noted above, Glock argues that the allegedly common questions about defect and materiality of the design of the UCD/safety valve cannot be predominant as a matter of law because: (1) each Glock pistol has different design elements and (2) each consumer purchases Glock pistols for a host of different and individualized issues. Those individualized issues are not material to the legal claims at issue in this case for purposes of class certification.

Glock makes a number of other arguments regarding the issues it contends raise predominant individualized questions, which I address below.

### a.      Erratic Failure

Glock argues that the evidence, construed in favor of Johnson, shows only that the pistols that fall within the Class definition "may" fail if a confluence of factors are in play, but will not necessarily fail. The admittedly "erratic" nature of when and why a Class pistol may fail, according to Glock, depends on numerous individualized questions: those include the physical condition of the gun and the ammunition/powder used, *see* Kapelsohn Decl. ¶ 162 & Watkins Decl. ¶91, which can be determined only by individualized investigation, precluding

predominance.  But this is not a product defect case.  There is a question whether the pistol's UCD/safety valve creates a safety risk that would be unacceptable – or impact the price – of a pistol to a reasonable consumer.  Under established California law, that is a common, predominant question.

Glock may introduce evidence at summary judgment and trial to dispute the identified mechanism of the failures identified by plaintiff's experts and attribute them to causes other than a combination of the UCD/safety valve with factory ammunition recommended by Glock.  It may also present evidence that the number of failures caused in whole or part by the alleged defect are too small to be significant to reasonable consumers.  These, too, are common predominant issues. *Johnson v. Nissan N. Am., Inc.*, No. 3:17-CV-00517-WHO, 2022 WL 2869528, at *14 (N.D. Cal. July 21, 2022)  ("Nissan argues that the risk of shattering is "minuscule." [] That, however, is a matter for the jury. A reasonable jury could find that Nissan still should have disclosed the risk— at least because any consumer might fall within that group, even if it is small.").

### b.  Materiality

Another common, predominant question is materiality.  Whether the jury believes the UCD/safety valve is a defect that creates a safety risk when used with factory ammunition – satisfying the materiality showing – is subject to common evidence and will result in a common determination.  *See Rushing v. Williams-Sonoma, Inc.*, No. 16-CV-01421-WHO, 2024 WL 779601, at *12 (N.D. Cal. Feb. 21, 2024) ("Whether the jury accepts plaintiffs' evidence to find that thread count is material and WSI's representations were deceptive, or accepts WSI's counter evidence, will be determined at trial. These questions are subject to common predominant evidence."); *see also Johnson v. Nissan N. Am., Inc.*, No. 3:17-CV-00517-WHO, 2022 WL 2869528, at *20 (N.D. Cal. July 21, 2022) ("The jury will be asked whether a reasonable consumer would find the nondisclosure material. The jury will also be asked whether Nissan knew of the alleged defect, which also turns on common proof, rather than anything individualized. This is all reinforced by the nature of the alleged problem with the PSRs here: that something in their design renders them unsuitable for normal driving conditions."); *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 407 (N.D. Cal. 2021) ("Courts routinely hold that if a plaintiff shows by a

17

preponderance of the evidence that the questions of materiality and likelihood of deception can be resolved with common evidence based on the objective reasonable consumer standard, then common questions predominate over individual ones with respect to claims under the UCL, CLRA, and FAL.").

### c.      Damages

Plaintiff relies on its two damages experts, Gaskin and Weir, to show how its second theory of damages, "Overpayment Damages," can be calculated.  They propose a conjoint survey where, at the end of their analysis, consumers would receive a portion of the price they paid that reflects the reduction in value of the Class Guns attributable to Glock selling the Class Guns with the UCD.  Gaskin and Weir worked together to suggest the design of a conjoint survey that  Weir would use to estimate the classwide overpayment damages.  Glock moves to exclude these experts in full.  For the reasons described below, those motions to exclude are DENIED.

Plaintiff has met his burden to show how class wide damages can be shown through common proof through Gaskin and Weir.

### 2.      Superiority

Plaintiff must also show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. Proc. 23(b)(3).  The Federal Rules provide four considerations for courts assessing superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. Proc. 23(b)(3)(A)-(D).  Each consideration favors finding that the superiority requirement is met.

Glock argues that treating this case as a class action is not superior given Glock's right to test class members on the statute of limitations defense, each class member's reliance on representations made by Glock, and each class member's intended and actual use of their pistols.

United States District Court
Northern District of California

But as discussed earlier, equitable tolling is subject to common proof for the class members who might be subject to a statute of limitations defense, individual class member reliance is not relevant if plaintiff convinces the trier of fact that the withheld information was material, and class members' intended and actual use is not relevant to the consumer protection claims that will be based on common proof.  Similarly, while Glock argues that the class definition of "purchasers" is fatally overbroad because ownership of a Glock is not a "fair proxy for market price" given the different methods by which gun ownership is transferred or purchases reimbursed by employers or others, those issues are readily manageable through a claim administration process if plaintiff prevails and damages are established through the common evidence described above and below.

### C.    RULE 23(b)(2)

Plaintiff also seeks certification under Rule 23(b)(2).  But, as Glock points out, plaintiff seeks monetary relief – as damages or restitution – that as shown by plaintiff's economic experts is not merely incidental to the injunctive or declaratory relief plaintiff also seeks.  In those circumstances certification under Rule 23(b)(2) may be improper and unnecessary.  *See, e.g., Hilario v. Allstate Ins. Co*., 642 F. Supp. 3d 1048, 1066 (N.D. Cal. 2022), *aff'd*, No. 23-15264, 2024 WL 615567 (9th Cir. Feb. 14, 2024 ("But for now, because Hilario seeks money damages as a fundamental remedy in this case, and because she can still receive her desired injunctive relief via certification under Rule 23(b)(3), I decline to certify the class separately under Rule 23(b)(2).").

That does not mean that injunctive or declaratory relief is off the table, however.  Plaintiff may seek injunctive or declaratory relief under Rule 23(b)(3).  What relief, if any, is appropriate will be determined later.

## II.    MOTION TO STRIKE TESTIMONY AND DECLARATION OF DAVID BOSCH

David Bosch, Ph.D. is a forensic engineer retained by plaintiff "to provide an independent forensic engineering investigation of the safety of Glock pistols."  Engineering Investigation Report and Declaration of David Bosch, Dkt. No. 145-10, at 1.  His opinions include:

> 16.09 Glock's "special safety valve is a "defect" that impacts its customer's' safety.

United States District Court
Northern District of California

16.10 Glock has clearly known of this defect and its consequences for at least two decades.

16.11 The discovery documents show that Glock's "special safety valve" has been the cause of many injuries, and the source of litigation against the company for decades.

16.12 This report shows that there are safer alternative designs that do not utilize Glock's "special safety valve."

16.13 The Glock "special safety valve" design is a hidden defect that is not apparent to the average consumer.

16.14 The discovery shows that Glock has continuously and intentionally concealed the "special safety valve" design from the public which runs afoul of the expectations of the industry and the consumer.

Bosch Decl. at 159; *see also* Rebuttal Declaration and Report of David Bosch PhD, Dkt. No. 169-6.

Glock moves to strike Bosch's opinions, arguing that: (i) he is not qualified to testify about pistol design, (ii) he fails to disclose sufficient data and ignores contrary facts and data; (iii) his defect theory is subjective and unreliable; and (iv) his opinion does not support plaintiff's theory of defect. Motion to Strike Declaration and Testimony of David Bosch ("MTS Bosch"), Dkt. No. 156-4. The motion to exclude is DENIED.

### A.        Bosch is Qualified

Glock argues first that Bosch is unqualified to opine about firearm design because he has no "professional experience designing, testing, evaluating, selling, or manufacturing firearms" and no "specific education on firearms." MTS Bosch at 4. He is a materials expert, however, who has studied firearms and ammunition design for at least the past decade and has been qualified to testify in at least two cases. Declaration of David Bosch PhD (Dkt. No. 145-10) at 1-2.[17] In support of his opinions in this case he relies not only on his materials background and a decade-long study of pistol and ammunition design, but also on: (i) his review of Glock's design, testing,

---

[17] Glock points out that Bosch's opinions were recently excluded from a federal district court case, not because he was unqualified, but because "basic manipulations" of a gun and "deduction of context" were an insufficient method to allow him to opine that a gun could "fire without a trigger pull." *Winingham v. Sig Sauer Inc.*, No. CV-22-01037-PHX-JJT, 2024 WL 1652788, at *3 (D. Ariz. Apr. 17, 2024). The question in that case is markedly different from the materials-based question in this case, and unlike here, in the other case Bosch performed no testing.

20

and warranty documents (that he believes supports his opinions, but which Glock's experts contend undermine his theory); (ii) his review of third-party testing (subject to the same dispute between experts); (iii) measurements of and models made from some of the Class Guns; (iv) calculations of stress on brass ammunition casings and testing of Class Guns and competitor guns; and (v) his evaluation of after-market replacement barrels that remove the UCD/safety valve.

Glock characterizes Bosch's opinions and testimony as showing a "lack of understanding about firearm and ammunition industry design standards," Reply MTS Bosch at 4, but those are grounds for cross-examination, not exclusion. Bosch is qualified, by training and experience, to testify concerning his conclusions for purposes of class certification. Bosch Decl. at 1-2, Appendix 1.

### B.        Sufficient Data and Treatment of Contrary Facts

Glock argues that even if qualified, all of Bosch's opinions should be excluded because he offers a "comparative opinion without comparative data" and "ignores" facts and data showing the Glock pistols are safe. MTS Bosch at 5-8. It focuses on one specific opinion of Bosch: that failure "is not possible in the evaluated competitors' pistols with nearly or fully supported chambers." *Id*. at 5 (citing Bosch Decl. at 142). It contends that this is a "comparative" opinion which required Bosch to present data and analysis from tests showing relative failure rates between different pistols. MTS Bosch at 5-6 (citing *Sonneveldt v. Mazda Motor of Am., Inc*., 2023 WL 2292600, *8 (C.D. Cal. Feb. 23, 2023) (excluding comparative opinion of different products, where expert failed "to show either the fact of accelerated degradation or that degradation is accelerated such that failures happen more often or earlier")). But determining what Bosch may or may not be allowed to testify to with respect to the design, operation, or failure of *other* pistols on the merits is premature.

The question for now is whether plaintiff has presented sufficient evidence to support his theory that the unsupported chamber creates an undisclosed safety risk when over pressurized or weak ammunition is used. *See Milstead v. Gen. Motors LLC*, No. 21-CV-06338-JST, 2023 WL 4410502, at *6 (N.D. Cal. July 6, 2023) (distinguishing *Sonneveldt* based on theory that "GM's failure to disclose the alleged defect was material because the alleged defect creates an

1   unreasonable safety risk, i.e., that airbags in the Class Vehicles will not deploy in specific

2   categories of moderate-to-severe accidents, which can result in injuries or death. [] Accordingly,

3   Plaintiffs are not required to allege that the airbag non-deployment rates for the Class Vehicles are

4   higher than expected or those for other vehicles."). Plaintiff contends that cannot be in dispute

5   because evidence shows that ████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████████ current

7   design that forces gasses into the pistol handle when over pressurized or weak ammunition causes

8   ammunition casings to explode. Kroyer Depo. Tr. (Dkt. No. 156-10)  92-100; Nixon Decl. ¶¶ 35-

9   36.

10          Bosch relied on that internal testing data, external testing reports, injury and warranty

11   reports, and the existence of an aftermarket product that does not contain an unsupported chamber,

12   to reach his conclusions. Whether or not the UCD is an acceptable but largely undisclosed safety

13   valve designed to protect users – as Glock contends – or a design choice that puts users at more

14   risk and is therefore *material* to a reasonable consumer such that it would impact purchasing

15   decisions or the price a consumer would pay – as plaintiff contends – are merits issues.

16          Glock argues that Bosch ignored decades of internal and third-party testing showing that

17   its pistols do not have a tendency to explode or fail and can withstand significantly over

18   pressurized ammunition. But that testing was not ignored by Bosch. Instead, and not surprisingly,

19   the parties draw different conclusions from that testing. Similarly, both sides draw different

20   conclusions from the failure reports and whether the warranty claims, lawsuits, and other

21   complaints show a sufficient pattern of Glock guns "exploding" or injuries caused by the

22   operation of the safety valve, despite use of the factory-made ammunition recommended by

23   Glock, to be material to a reasonable California consumer. Those are merits matters in dispute,

24   but not grounds to exclude Bosch's opinions.

25          **C.          Subjectivity and Reliability**

26          Finally, Glock moves to exclude Bosch's theory that the UCD is a defect because that

27   opinion is too subjective and unreliable. It notes that Bosch did not measure the size of the UCD

28   in each Glock Class Gun or quantify the differences in the sizes of the UCDs between the Bosch

Class Guns, despite acknowledging that the feed ramps in the Class Guns vary to accommodate different calibers of ammunition.  However, each of the Class Guns has a feed ramp/barrel with an unsupported chamber.  That Bosch's stress calculations (supporting his opinion that the unsupported chambers results in higher stress on the brass casings, increasing the likelihood of case rupture) did not determine failure rates for each slightly differently sized unsupported chamber is a ground for cross-examination, not exclusion.  He relied on his materials stress calculations, testing, and observations, as well as the internal and external testing and reports discussed above, to conclude that the unsupported chamber causes a weakening or deformation in the brass casings and that the more unsupported chamber area there is, the greater the risk of failure of brass casings even when factory ammunition is used per Glock's recommendation.  That Bosch did not, at this juncture, calculate how long is too long or whether the shorter/small unsupported chambers fail as frequently as the longer/larger unsupported chambers is not a reason to exclude his opinions at class certification.  Similarly, that Glock's experts disagree that the weaknesses (as described by Bosch) or "flow folds" (as described by Glock's experts) that can occur in factory ammunition can lead Class Guns to explode or that such explosions would be extremely rare – and therefore not material to reasonable consumers – are matters for cross-examination and to be weighed by the jury.

Glock's motion to strike and exclude all opinions of Bosch is DENIED.

### III.     MOTION TO STRIKE TESTIMONY AND DECLARATION OF JOHN NIXON

John Nixon is a mechanical engineer and ballistics engineer with almost four decades of experience in firearms, ammunition, and explosives.  Declaration of John Nixon, Dkt. No. 145-9, ¶¶ 3, 5.  He was retained as a "firearms & ammunition expert" and opines that "all Glock pistol models, except one [], have an 'unsupported chamber defect,'" and that UCD is a "design feature that departs from design and safety standards in the industry and creates an unreasonable risk of harm for the users of these Glock pistols."  Nixon Decl. ¶ 15.  He opines that the "defective design has resulted in hundreds, if not thousands, of explosions that have caused serious injury to US consumers – many residing in California.  Further, by their own admissions, Glock Inc. and Glock Austria took deliberate steps to conceal this defect feature from US consumers."  *Id*. ¶ 15; *see also*

1    *id*. ¶ 47.

2        Glock moves to strike Nixon as an expert, arguing that: (i) Nixon did not employ reliable

3    principles and methods to formulate his opinions; (ii) he cannot support his opinions with

4    "objective" testing or data; (iii) his opinions hinge on interpretations of subjects on which he has

5    no knowledge or experience,; and (iv) he is not qualified to testify about "weak casings."  Motion

6    to Strike Declaration and Testimony of John Nixon ("MTS Nixon"), Dkt. No. 156-5.  Glock

7    asserts that Nixon's opinions regarding the unsupported chamber are "the same" as Bosch and that

8    Nixon "piggybacks" on Bosch's reasoning.  *Id.* at 1. It moves to exclude Nixon on the same

9    grounds as it moves to exclude Bosch.  *Id.*  Those arguments fail with respect to Nixon's opinions

10   for the same reasons they did with respect to Bosch's.[18]

11       Glock's arguments that Nixon relies on a "patchwork of misrepresented service orders and

12   claims" and misinterprets deposition testimony of Glock's witnesses are matters for cross-

13   examination, not exclusion. *See In re Juul Labs, Inc. Mktg., Sales Pracs. & Prod. Liab. Litig*., No.

14   19-MD-02913-WHO, 2022 WL 1814440, at *4 n.5 (N.D. Cal. June 2, 2022).  Whether or not

15   Nixon's review of Glock's internal documents is appropriate for expert testimony at trial (*e.g*.,

16   whether jurors can understand those documents without the assistance of an expert) and whether

17   or not Nixon is misrepresenting witness testimony are arguments that do just justify exclusion on

18   class certification.  These arguments are more appropriately raised pretrial or during trial to protect

19   the jury from misleading testimony.  And Glock's argument that Nixon's experience with Glock's

20   pistols "establish that Glock pistols exceed both industry standards and Nixon's own criteria for

21

22   ───────────────────
     [18] I note that Glock challenges Nixon's testing of Glock pistols with ammunition at levels that far
23   exceed 200% SAAMI max pressure, finding that Glock's pistols catastrophically fail/explode at
     levels before other manufacturers' pistols that did not have unsupported chambers.  Nixon
24   contends that these extreme pressures, which far exceed the 200% SAAMI standard that Glock
     designed its pistols to withstand, can exist in ammunition that is factory made.  *See* Nixon Depo.
25   Tr. (Dkt. No. 157-16) 269.  Glock disputes whether those extreme pressure levels exist in the
     factory ammunition Glock recommends and argues that the pistols in Nixon's test failed not only
26   because extremely over pressurized ammunition was used, but also weakened reloaded
     ammunition.  MTS Nixon at 4-5; Reply MTS Nixon (Dkt. No. 171) at 6.  At this point in the case,
27   Nixon's testimony is admissible.  Whether extremely over pressurized factory ammunition occurs
     with such frequency that Glock's failure to disclose the risk presented with the UCD/safety valve
28   becomes material to a reasonable consumer will be tested at summary judgment or trial.  Whether
     Nixon may testify about tests run with "reloaded" ammunition that is not recommended by Glock
     may be raised as a basis for exclusion at that time.

United States District Court
Northern District of California

pistol performance" is grist for cross-examination, not exclusion.

The motion to exclude Nixon is DENIED.

## IV.    MOTION TO STRIKE TESTIMONY AND DECLARATION OF STEVEN GASKIN & COLIN B. WEIR

Plaintiff relies on the testimony of two experts to show how classwide damages can be determined, supporting commonality and predominance.  One is Steven Gaskin, "an independent survey expert" who was asked "to design and describe a market research survey and analysis that would enable [him] to assess the reduction in market value (measured in dollars and/or percentage terms) resulting from the disclosure of the Unsupported Chamber Defect, meaning the reduction in the market value of the Class Guns with the Unsupported Chamber Defect compared to the market value of the Class Guns without the Unsupported Chamber Defect."  Declaration of Steve Gaskin, Dkt. No. 145-33, ¶¶ 1, 9.  Gaskin describes how he would construct and run a "web-based conjoint analysis" to survey potential pistol purchasers about "features and feature levels" for semi-automatic pistols that would allow him to "calculate the reduction in market value (measured in dollars and/or percentage terms) resulting from the disclosure of the Unsupported Chamber Defect."  *Id.* ¶ 50.

The other is Colin B. Weir, the President at Economics and Technology, Inc. ("ETI"), a research and consulting firm specializing in economics, statistics, regulation and public policy."  Declaration of Colin B. Weir, Dkt. No. 145-34.  Weir was retained by plaintiff to "ascertain whether it would be possible to determine damages arising from Plaintiff's theory of liability on a class-wide basis using common evidence, and if so, to provide a framework for the calculation of damages suffered by the proposed class of consumers as a result of the use of the Defect."  *Id.* ¶ 8. Weir opines that "it is possible to determine class-wide damages in this case using Defendants' own available business records, third-party records, industry resources, and the conjoint analysis that has been designed by Mr. Gaskin."  *Id.* ¶ 12.  He proposes and explains how the use of conjoint analysis can  "calculate any Overpayment Damages (wherein consumers would receive back a portion of the price they paid that reflects the reduction in value of the Class Pistols at the point of purchase that is solely attributable to Glock's conduct of selling Class Pistols with the

1   Chamber Defect)."  *Id.*  Weir describes how, after Gaskin uses a conjoint analysis to determine

2   "the reduction in market value at the point of purchase resulting from the Defect," he will be able

3   to estimate classwide damages.  *Id*. ¶¶ 52-54.

4       Glock moves to strike the testimony and declarations of both Gaskin and Weir, arguing

5   that these experts have "defined the alleged defect inconsistently with Plaintiff's liability

6   witnesses" and that while conjoint analysis might be appropriate in some cases, it is not

7   appropriate here where its application rests on significant flaws that results in unreliable opinions.

8   *See* Motion to Strike Gaskin, Dkt. N0. 158 ("MTS Gaskin"), at 2.

9       **A.      Gaskin**

10      Glock contends that: (i) Gaskin's proposed conjoint analysis does not "fit" the facts of this

11  case; (ii) results in unavoidable "segmentation" of the proposed class; (iii) would produce

12  unreliable results; and (iv) is not based on "adequate" facts and data.  Motion to Strike Declaration

13  of Steven Gaskin ("MTS Gaskin"), Dkt. No. 158.

14      Glock says there is a lack of fit between plaintiff's theory of defect – the design of the

15  UCD/safety valve when defective ammunition is used – and the proposed conjoint analysis

16  focusing on the defective design only.  MTS Gaskin at 3-5.  It argues that because Gaskin's

17  proposed survey asks respondents solely about the design defect – separate from the needed use of

18  over pressurized or weak-cased ammunition – the conjoint model fails.  But the crux of plaintiff's

19  allegations and showing on class certification is that it is the *design* of the UCD/safety valve that

20  creates the (disputed) safety risk to users *when* factory ammunition is used as Glock recommends.

21  Plaintiff has alleged and shown that Glock knows that factory ammunition can be over pressurized

22  or have weak casings, leading to casings bursting and damage to guns or users as an express result

23  of the intentionally designed safety valve.  Gaskin's proposed conjoint study sufficiently fits that

24  theory but may be attacked at summary judgment or on cross-examination at trial.[19]

25

26  _____

    [19] To be clear, Glock may still challenge the materiality of the alleged failure to disclose the safety

27  risk caused by its design when used with defective but factory made ammunition.  For example, if
    plaintiff cannot show that the safety risk is significant to some extent – quantitively or

28  qualitatively – then it may not be "material" to a reasonable consumer.  That is an issue to be
    fleshed out at summary judgment or trial.

United States District Court
Northern District of California

Glock also argues that conjoint analysis is not appropriate in a "case like this."  Its position, based on its expert Dr. J. Andrew Peterson, is that conjoint analysis is not appropriately used in a hidden defect or failure to disclose case.  MTS Gaskin at 6.  That argument has been rejected repeatedly by numerous courts and does not succeed here.  The methodology of applying a conjoint model to an undisclosed product attribute is a well-accepted methodology that passes the Rule 702 bar.  *See, e.g., Johnson v. Nissan N. Am., Inc*., No. 3:17-CV-00517-WHO, 2022 WL 2869528, at *9 (N.D. Cal. July 21, 2022) (rejecting Rule 702 challenge to conjoint methodology in a failure to disclosure safety risk case); *see also Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 575 (N.D. Cal. 2020) ("The design, structure, and methodology Gaskin used to conduct the analysis in support of the Consumer Impact Model also fits plaintiffs' theory of damages. Similar conjoint surveys and analyses have been accepted against *Comcast* and *Daubert* challenges by numerous courts in consumer protection cases challenging false or misleading labels.").

Next, Glock argues that Gaskin's conjoint analysis is fatally defective because he does not provide adequate support for his selection of the "attributes," the factors real-life consumers consider when purchasing pistols.  MTS Gaskin at 6-8.  In support, it points to the Peterson Declaration, where its expert opines that the attributes Gaskin suggests using are not sufficiently relevant to gun purchase decisions, and that factors Gaskin omits are significant.  It argues that Gaskin ignores attributes that Johnson testified were important to his gun purchase.  *Id*. at 7 (citing Peterson Report (Dkt. No 156-16) ¶ 42).  That said, Gaskin has explained the many, facially reliable sources that he reviewed to select attributes.  Gaskin Decl. ¶¶ 25-31.  Glock (and Peterson) may challenge Gaskin at trial on why he included or excluded different attributes.  But Gaskin's showing is sufficient at this juncture.  *See Orshan v. Apple Inc*., No. 5:14-CV-05659-EJD, 2023 WL 3568079, at *2 (N.D. Cal. Mar. 31, 2023)  (reviewing Ninth Circuit precedent holding that "challenges to survey methodology go to the weight" and not admissibility) (internal quotation omitted); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1108 (N.D. Cal. 2018) (same).

Finally, Glock contends that other errors require exclusion, including: using misleading "choice levels" to rank attributes; failing to "segment" the class according to the different models of Class Guns or differently situated users; impermissibly framing the defect as a negative "focal

attribute" which will make the results unreliable; and failing to support his proposed model with sufficient evidence of "external validity."  MTS at 9-12.  The choice level and segmentation issues have not been shown by Glock and its expert to impact the validity of the model Gaskin proposes in a way that would lead to unreliable results.  For example, the UCD/safety valve is present in every Class Gun and, according to plaintiff, carries a similar safety risk.  Glock has not shown that unidentified differences in models, different intended uses, or different attributes generally considered by pistol buyers would impact the materiality of the undisclosed safety risk for a reasonable consumer.  Any negative focal attribute is addressed, in part, by the randomization of the order and appearance of the attributed in the survey, but also reflects in part the nature of this case.  *See* Gaskin Decl. ¶¶ 16-17.  In any event, the "focalism bias objection goes to the weight, and not to the admissibility, of Gaskin's proposed conjoint analysis."  *Hadley*, 324 F. Supp. 3d at 1110.  The remaining critiques are grounds for cross-examination and not exclusion.  *See, e.g., Johnson v. Nissan N. Am., Inc.*, No. 3:17-CV-00517-WHO, 2022 WL 2869528, at *8 (N.D. Cal. July 21, 2022 ("in general, purported flaws in survey design and attribute selection will usually go to the weight a jury accords the survey, not whether the jury can be shown it in the first place.").

The motion to exclude Gaskin is DENIED.

### B.      Weir

Glock argues that: (i) Weir (like Gaskin) misapprehends the nature of plaintiff's allegations; (ii) as his work rests on Gaskin's, it too is unreliable and not based on sufficient data or facts; and (iii) his damage estimates are unvalidated, over simplified and faulty because they fail to address appropriate supply-side concerns.  Motion to Strike Declaration of Colin B. Weir ("MTS Weir"), Dkt. No. 159.

The main thrust of the motion to exclude Weir is that he relies on Gaskin.  MTS Weir at 3-6, 8-9.  I reject these arguments for the same reasons discussed above.  Separately, Glock challenges Weir's failure to adequately account for supply-side concerns or validate his assumptions.  MTS Weir 6-8.  But Weir describes how he accounted for supply-side considerations.  Weir Decl. ¶¶ 33-47.  *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106 (N.D. Cal. 2018) (rejecting motion to exclude where "Gaskin's proposed conjoint analysis

adequately accounts for supply-side factors and does not merely measure demand-side willingness-to-pay.").  Disputes between the experts on whether specific supply-side factors were appropriately considered or improperly ignored go to weight, not admissibility.

Glock's final argument, that Weir's analysis fails because it does not take into account variations in purchase price or individual preferences, is misplaced.  As noted above, conjoint analyses have routinely been approved as an appropriate methodology to determine class wide damages in similar consumer protection cases, irrespective of the individual preferences and variations in purchase price that exist for every consumer product.

The motion to exclude Weir is DENIED.

## V.      MOTIONS TO SEAL

The parties have asked to file under seal significant portions of the pleadings and exhibits filed in connection with the motions for class certification and to strike.  *See* Dkt. Nos. 145, 146, 147, 156, 167, 169.  These motions are GRANTED in part and DENIED in part.

There are some narrow categories of information within these filings that may remain under seal under the compelling justifications standard, *e.g.,* trade secrets of Glock that are protected by Glock, not publicly known, and where continued sealing outweighs the public interest.  However, much of the information that is currently conditionally under seal may not merit continued sealing under that strict standard, including but not limited to information that was discussed on the public record during the hearing on the motions.  In addition, the information conditionally filed under seal by plaintiff was material designated as confidential by Glock or non-parties.  Under this Court's Standing Order on Administrative Motions to Seal and Civil Local Rule 79-5, the designating party was required within seven days after the filing of the documents conditionally under seal to file a declaration based on personal knowledge justifying the continued sealing.  *See* https://cand.uscourts.gov/who-standing-on-administrative-motions-to-seal-september-2022/; s*ee also* Civ. L.R. 79-5(c) & (f).  No such declarations have been filed.

Therefore, within twenty (20) days of the date of this Order, the parties and any designating third-party shall submit a joint chart identifying by docket number and exhibit (*e.g*., Dkt. No. 169-3, Ex. 1-C) the portions of each document that should remain under seal under the

1  compelling justifications standard.  That chart should reference, for each item of information that a

2  party or non-party contends should remain under seal, the declaration of a person with knowledge

3  justifying the sealing.  The chart should also indicate whether plaintiff agrees or objects to the

4  sealing of the portions of the information identified in the chart.

**CONCLUSION**

6  Plaintiff's motion for class certification is GRANTED.  Defendant's motions to exclude

7  are DENIED.  The following class is certified:

> Consumers who purchased any Glock pistol designed to shoot the
> following calibers: (1) 10mm, (2) 40 S&W, (3) 9mm, (4) 45 ACP, (5)
> 45 GAP, (6) .380, and (7) .357 Sig. in the State of California since
> introduced into the stream of commerce by Defendants.

Within thirty (30) days of the date of this Order, the parties shall meet and confer on the

text of a Notice and Notice Plan to be disseminated.  Any objections or disputes over the text of

the Notice or Notice Plan shall be submitted to the Court for resolution within forty five (45) days

of the date of this Order.

**IT IS SO ORDERED.**

Dated: September 30, 2024

William H. Orrick
United States District Judge