# EXHIBIT B

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEVEN C. JOHNSON, an individual, on behalf of himself and all others similarly situated,<br>Plaintiff,<br>vs.<br>GLOCK, INC., a Georgia Corporation; GLOCK Ges.m.b.H, an Austrian entity; JOHN and JANE DOES I through V; ABC CORPORATIONS I-X, XYZ PARTNERSHIPS, SOLE PROPRIETORSHIPS and/or JOINT VENTURES I-X, GUN COMPONENT MANUFACTURERS I-V<br>Defendants. | CASE NO.: 3:20-cv-08807-WHO<br><br>**DECLARATION OF DEREK WATKINS**<br><br>**Judge**: Hon. William H. Orrick<br><br>**TAC Filed**: June 7, 2021<br>**Trial Date**: None Set |

1. Under the penalty of perjury, I, Derek Watkins, on this day of February 20, 2024, declare as follows:

2. I submit this Declaration in support of the defendants' opposition to plaintiff's motion for class certification in Steven C. Johnson v Glock, Inc., et al., in the United States District Court of Northern District of California (CASE NO.: 3:20-cv-08807-WHO).

3. My investigation has included a review of documents supplied, including depositions and document production in this case, review of relevant standards, inspection and measurement of exemplar items and pistols, and inspection and measurement of exemplar brass shells and brass shells claimed by the plaintiff to have ruptured per the claimed defect. A full list of documents and materials I reviewed is attached as Exhibit B.

## INTRODUCTION

4. The plaintiff has made the claim that multiple models of Glock pistols (G17, G19, G26, G43, G34, G17L, G22, G23, G27, G35, G24, G20, G29, G40, G21, G30, G30SF, G36, G41, G37, G38, G39, G25, G28, G42, G31, G32, and G33) constitute a class of defective consumer products. Said class is claimed defective by plaintiff because every "Glock Class Gun is purposely designed and manufactured with an 'unsupported chamber.' The 'Unsupported Chamber Defect' ('UCD') is

caused by the lack of complete support for an ammunition casing when it is fully seated in the firing chamber. The UCD allows the gun to erratically explode when the consumer uses the gun exactly as Glock instructs. Glock has known its guns explode since at least 1992. Glock admits it never disclosed this design feature to consumers, and, in fact, now admits it has actively worked to conceal it for decades". (See Motion for Class Certification Pg. 1)

5. In short, the plaintiff is claiming industry compliant ammunition, ammunition conforming to the standards put forth by the Sporting Arms and Ammunition Manufacturer's Institute (SAAMI), will rupture when discharged through the claimed class of Glock pistols when "certain conditions" are present in the ammunition.

6. The defendants' counsel retained me in this matter as an expert in firearms and ammunition, with respect to the design, manufacture, and expected reasonable use of said products in the field. I was asked to review the claims of defect being made by the plaintiff, Mr. Johnson, and his consultants, David Mr. Bosch (Mr. Bosch) and John Mr. Nixon (Mr. Nixon); and determine via the scientific method (utilizing verifiable analytical analysis and empirical testing) if said claims of defect can be substantiated. My review of the testimony and material provided by the plaintiff's consultants revealed said consultants have never observed the claimed defect, have never been able to reproduce the claimed defect via testing, and cannot identify a single verifiable instance of claimed defect occurring. Correspondingly, all efforts to independently verify the existence of the claimed defect have failed. The methodologies utilized in the investigation are detailed in this Declaration and the Declaration of Mr. Jiranek.

7. My analyses and opinions adhere to the scientific method and are based upon my experience, education, and training in the fields of mechanism design, firearm design and manufacture, ammunition design and manufacture, interior ballistics, and exterior ballistics. My opinions expressed herein are based on what can be scientifically proven and what can be independently verified. I hold Bachelor of Science and Master of Science degrees in Mechanical Engineering. I have been professionally employed as an engineer for 28 years and hold 27 patents in the fields of mechanical design, system design, thermodynamics, heat transfer, controls logic, safety enhancement and reliability enhancement. A full copy of my CV is attached as Exhibit A. I began my professional design experience in firearms and ammunition in 1995, when I was hired by

Remington Arms as a design engineer in their Research and Design center. While employed with Remington, I received advanced training in finite element analysis (Ansys), dynamic and kinematic analysis (Working Model and MCS ADAMS) and computer aided design (CADS 5 & Pro Engineer). My focus at Remington was on fire control designs for bolt action rifles, but I also gained experience in the design of many different platforms, as young engineers would often work on multiple platforms at the same time. I received my first patent at Remington for the development of a new gas piston system used in the 1100 and 1187 shotguns. In my last year with Remington, I was given the opportunity to design an entirely new rifle platform form. After three years of firearm component, subsystem system, and system design with Remington, I then moved to General Electric (GE).

8. I began working for GE (appliances division) in late 1998 for eleven years, working my way up from design engineer to systems engineer, to design manager, and then senior design engineer. As a design engineer at GE, I designed and put into production individual components and small assemblies. My systems engineer responsibilities graduated me to full product design. I was promoted to design manager to lead a team of eight engineers in putting into production a new $16,000,000 model line of washers and dryers that I had designed. When I was promoted to senior design engineer, I was assigned to the innovations group where I designed completely new products from the ground up and also served on "tiger teams" for programs of different GE companies around the US. When programs become late, over budget and the design is not working, "tiger teams" are assigned to rectify the issues. While at GE I received advanced training in computer aided design (SolidWorks); advanced certificates in dynamic analysis and design simulation (DADS) and statistical simulation and analysis (Six Sigma). I received 24 of my 27 patents while at GE.

9. In 2009, I returned to Remington as an executive and managed engineers designing products, managed the intellectual property, provided litigation support, ran "tiger teams," and participated in the product reviews for all new products. During my second stent at Remington, I received training in interior ballistics simulation (QuickLOAD) to support my field investigation efforts. In late 2013 Remington announced it was closing its R&D facility in Elizabethtown Kentucky and was moving it to Huntsville, Alabama. In early 2014 I made plans to leave Remington and start my own

company. In April of 2014 my field investigation efforts proved a safety issue existed in a small percentage (less than 3%) of trigger mechanisms used in some of Remington's most popular firearms. The discovery led to the largest recall in Remington's history. I was asked to postpone my departure from Remington and head the task of coming up with and implementing the design fix to address not only the recalled firearms, but also the large portion of the factory that had been shut down. To Remington's credit, during the six weeks of shut down, not a single person working the assembly lines was laid off. With the aid of many skilled men and women, the factory was first brought back online to implement the fix and service the recalled firearms. Once a significant portion of the recalled back log had been updated and returned to their owners, the factory restarted the production of new product.

10. In July of 2014, I finished my plans to leave Remington and started Nth-Level, where I provide product liability support and engineering contract services for the entire firearms industry. For the full years of 2018 and 2019, I was part owner of the Atlas Development Group. Atlas was founded by several of the Department of Defense engineers at Remington that also left Remington's R&D facility shortly after I exited. Atlas provides engineering services for the firearms industry, and also manufactures precision brass cartridge casings (shells) as an OEM supplier and services the competition and shooting enthusiast market. Multiple world titles have been won with Atlas Development Group's cartridge casings. During this time Nth-Level was a wholly owned subsidiary of Atlas Development Group.

11. In 2020 I dissolved my ownership of Atlas Development Group and took back the full ownership of Nth-Level. In 2022 I split the engineering services function into its own company, Next Level Designs, LLC. Next Level Designs focuses on new product and subsystem design engineering. Two fire control/trigger mechanism patents have been issued under Nth-Level. See Exhibit A for my CV, as referenced above.

12. Utilizing my education and extensive firearms industry experience, my opinions are stated to a reasonable degree of engineering and scientific certainty.

## OVERVIEW OF THE CONTRIBUTORY SYSTEMS

13. The plaintiff's claimed defect has two contributory systems: the ammunition and the firearm. I address each of these systems in turn below.

### I. The Glock Pistol




**Figure 1: Glock Pistol Loading a Cartridge Into the Chamber and Claimed Unsupported Shell Area (UCD)**

14. The Glock firearms in the claimed class are semiautomatic pistols that are fed by a detachable magazine and are discharged once with each pull/actuation of the trigger. Figure 1 outlines the basics of how a Glock pistol cycles ammunition. The pistol's magazine houses the ammunition until it is ready to be discharged by the pistol. The magazine is detachable and is located in the grip of the pistol. The magazine can be removed from the pistol to facilitate easy loading and unloading of the ammunition. Pulling the slide assembly rearward will allow the pistol to strip a cartridge of ammunition out of the magazine and push it up the feed ramp and into the chamber of the barrel.

15. Once the cartridge is loaded into the chamber, it can be discharged by actuating the trigger. When the loaded cartridge is discharged, the slide is propelled rearward, extracting the spent shell from the pistol's chamber, and facilitating the loading of the next cartridge from the magazine when the slide closes. Per this cycle, the pistol will continue to discharge each time the trigger is actuated until the magazine is empty. When the magazine is empty, it can be removed from the pistol, reloaded with ammunition, and reinserted into the pistol to restart the discharge cycle.

16. The claimed class of Glock pistols are short recoil-operated, locked-breech semi-automatic pistols that are fed by a removable magazine of ammunition located in the grip of the pistols. Expanding on the description of Glock functionality, each pull of the pistol's trigger initiates the discharge of the cartridge of ammunition loaded into the chamber of the pistol's barrel. The firearm's locking mechanism uses a linkless, vertically tilting barrel with a rectangular breech that locks into the ejection port cut-out in the slide. During the recoil stroke, the barrel moves rearward initially locked together with the slide until the bullet leaves the barrel and the chamber pressure drops to a safe level. A ramped lug extension at the base of the barrel interacts with a tapered locking block integrated into the frame, forcing the barrel down and unlocking it from the slide. This camming action terminates the barrel's movement while the slide continues back under recoil, extracting and ejecting the spent cartridge casing.

17. When the spent shell has been fully extracted, the main spring closes the slide on the next cartridge of ammunition presented by the magazine. As the slide strips the cartridge from the magazine, the nose of the bullet is guided by the feed ramp of the barrel into the chamber. Once the cartridge is fully seated into the barrel, the barrel locks into place with the slide and the discharge process can be repeated by another actuation of the trigger until the magazine is empty. Glock pistols are designed to reliably function with SAAMI compliant ammunition.

## II. The Ammunition




**Figure 2: Components of a Centerfire Ammunition Cartridge**

18. The ammunition a semiautomatic pistol discharges has significantly less components than the pistols in which it is employed, but these components have very precise tolerances and require high levels of quality control. In the firearms industry, a single round of ammunition is called a cartridge. Three basic types of small arms cartridges exist today: rimfire, centerfire and shot shell. Cartridges with their primers located in the center of the base of the shell are called centerfire cartridges. The proposed class of Glock pistols shoot only centerfire cartridges. Centerfire cartridges are composed of four basic components: the shell, the bullet, the propellant, and the primer. See Figure 2.

19. The shell is the foundation of a cartridge because it holds all the components together. The shells of centerfire cartridges are primarily made of brass (USA) and are one piece, although some hybrid shells (steel base and brass body) are used in some military rifles. Pistol brass shells are typically made through a progressive drawing operation. The brass is pressed and deformed through a series of dies to form the geometry of the shell. By controlling the quality of the raw brass material, and because the laws of Newtonian physics are not intermittent, the progressive draw process for manufacturing brass is very consistent and has been in use since the 1800s. See Mr. Jiranek's declaration for more details about this process.

20. The primer of a cartridge is the component that initiates the discharge when the trigger is actuated. When the pistol's trigger is actuated, the firing pin/striker (which is under spring force) is released. When released, the firing pin's tip strikes the primer and crushes the primer mix it contains (the green material in Figure 2). The primer mix is an explosive designed to detonate when impacted with enough focused energy. When the primer detonates, its explosive properties are focused through the flash hole of the shell and into the propellant, igniting the propellant. As the propellant burns, it produces gas at a very accelerated rate. As the pressure from the propellant gasses increase, the bullet is pushed out of the shell and down the barrel of the pistol. The peak pressure produced by the combusting propellant gasses is in the tens of thousands of pounds per square inch.

21. Many factors affect the peak pressure developed by a cartridge, including: bullet type, bullet weight, propellant type, and propellant amount, to name just a few. The diameter of the bullet defines the bullet's caliber. Cartridges are grouped by caliber. Nine-millimeter cartridges have bullets with a diameter of approximately 9 mm, 10 mm cartridges have bullets with a diameter of approximately 10 mm, 45 Auto cartridges have bullets with a diameter of approximately .45 inches, and so on. The caliber of a cartridge does not tell you the weight of the bullet, and weight of the bullet is a variable that can significantly impact the bullet's performance characteristics. Cartridges of each caliber are typically available in many weights and shapes and this descriptive information is located on the packaging for the cartridges.

22. Just as bullets come in many shapes and sizes, there are many different propellants available. The rate at which different propellants combust can vary significantly, allowing engineers to tailor the

pressure curve specifically for each caliber and bullet combination. When combined with the dependency of how much propellant is combusted, the propellant load for a cartridge must be controlled very tightly. Loading a cartridge with excessive propellant and compressing said propellant when seating the bullet in the shell can cause the pressure to exponentially jump to catastrophic levels. The size of the bullet can also have a dramatic effect on the peak pressure a propellant produces in a cartridge when discharged. Therefore, while the part count of a cartridge may be significantly less than a pistol's part count, the manufacture of cartridge components and their assembly must be a precision process.

## III. Combining the Contributory Systems

23. For the shooting experience to be accomplished safely, it is essential that these two interacting systems be designed to work together. Specifically crafted to facilitate a safe and reliable shooting experience, an association of American firearms and ammunition manufacturers convened in 1926 to form the Sporting Arms and Ammunition Manufacturers' Institute (SAAMI). SAAMI has formulated and published many performance and dimensional standards widely recognized and adopted by the firearms industry, such as cartridge and chamber dimensions, acceptable chamber pressures and other safety and performance metrics. The SAAMI standards are intended to aid in the safe and consistent performance of firearms paired with ammunition of the same caliber and shell designation. For example, all 45 Automatic caliber firearms that are SAAMI compliant should be able to operate safely with SAAMI compliant 45 Automatic ammunition.




Figure 3: 45 Auto Pistol Cartridge

24. In the interests of safety and interchangeability, SAAMI provides pressure, velocity and dimensional characteristics for centerfire pistol, revolver, rifle, and shotgun sporting ammunition. Figure 3 is an example of the physical dimension specifications SAAMI provides for recognized cartridges and their corresponding chambers. SAAMI does not specify the interior dimensions of cartridge shells, or the feed ramp geometry of chambers. It is the responsibility of the ammunition manufacturer to design and produce shells that can reliably contain the SAAMI specified pressures and fit within the specified dimensional envelope for the loaded cartridge.

| | | Velocity (fps) | | Transducer Pressure (psi/100)(1) | | |
|---|---|---|---|---|---|---|
| Cartridge | Bullet Weight (gr.) | Nominal Mean Instrumental @ 15' Vented Bbl.(2) | Nominal Mean Instrumental @ 15' Test Bbl. | Maximum Average Pressure (MAP) | Maximum Probable Lot Mean (MPLM) | Maximum Probable Sample Mean (MPSM) |
| 45 Automatic | 120 | (3) | 1,200 | 210 | 217 | 227 |
| | 155 | | 1,125 | | | |
| | 165 | | 1,065 | | | |
| | 170 | | 1,050 | | | |
| | 175 | | 1,020 | | | |
| | 185 | | 915 | | | |
| | | | 995 | | | |
| | 230 | | 830 | | | |
| | | | 870 | | | |
| | | | 915 | | | |

**Figure 4: 45 Automatic SAAMI Pressure Specifications**

25. Figure 4 shows the collective SAAMI pressures and velocities for the variants of 45 Auto ammunition, a caliber of ammunition within the claimed class of Glock pistols. The maximum average pressure (MAP) for 45 Auto cartridges is 21,000 psi. The maximum average pressure is determined by sampling a minimum of 10 cartridges and averaging the peak pressures they produced when discharged. Ammunition manufacturers typically target the peak pressure of their cartridges to be well below the SAAMI MAP to ensure their average pressures are within limits. SAAMI also specifies other statistically relevant variations, such as maximum standard deviation and extreme variation as part of the characteristics controlled for each caliber cartridge.

| CALIBER | MAP | MPSM | PROOF MIN | PROOF MAX |
|---|---|---|---|---|
| 9mm Luger | 33,000 | 35,600 | 52,000 | 55,500 |
| 10mm Auto | 37,500 | 40,500 | 50,500 | 54,000 |
| 357 Sig | 40,000 | 43,200 | 54,000 | 57,500 |
| 380 Auto | 21,500 | 23,200 | 29,000 | 31,000 |
| 40 S&W | 35,000 | 37,800 | 47,000 | 50,500 |
| 45 GAP | 23,000 | 24,800 | 31,000 | 33,000 |
| 45 Auto | 21,000 | 22,700 | 31,000 | 33,000 |

**Figure 5: SAAMI Pressure Specifications for the Calibers Contained within the Class**

26. Proof rounds of ammunition are specialty-built cartridges that purposefully produce pressures greater than the SAAMI consumer-oriented pressure standards (typically between 30% and 50% above MAP, depending on the cartridge caliber). See Figure 5. For example, SAAMI specifies the

maximum average proof pressure for the 45 Auto cartridge as 33,000 psi (57% above MAP). Proof cartridges are test cartridges only, and are not commercially available to the public. Proof cartridges are intended to aid firearm manufacturers in confirming the integrity of their products. The purpose of proof testing firearms is that, if a flaw existed in the firearm, the proof round will cause the firearm to fail. It is not uncommon for a firearms manufacturer to discharge a proof cartridge in each newly constructed firearm, before it is allowed to be shipped. For example, Glock discharged two proof rounds from Plaintiff's firearms before they were allowed to leave the factory.

## GLOCK PISTOLS SET THE STANDARD FOR RELIABILITY & EXCEED INDUSTRY STANDARDS FOR SAFETY

27. Glock is a firearms manufacturer that is a member of SAAMI. The name, "Glock" means reliability and robustness for many firearm users. Originally developed for the Austrian military in 1982, Glock pistols were designed to be used in some of the harshest environments and under the most demanding conditions in which a malfunction could cost a life. In the late 1980s, the adoption of Glock pistols by US law enforcement began. Today, more than 65% of US law enforcement issues or authorizes Glock pistols to its officers.

28. The consultants for the plaintiff are critical of the feed ramp angle of the claimed class of Glock pistols, claiming the feed ramp encroaches excessively into the chamber and facilitates the rupture of industry compliant ammunition. See Figure 1. Notwithstanding there is no support for this claim, the plaintiff's consultants do not temper their criticisms with the reliability tradeoffs associated with changing the feed ramp angle, or burden themselves with the consequences of a firearm stoppage when human lives are in the balance. In my professional experience in firearm design and development, feed ramp angles dramatically affect the malfunction rate and stoppages of a firearm. My former employer, Remington Arms, conducted reliability studies on competitor products when designing new pistol platforms. Those reliability studies showed that the Glock platform had the fewest stoppages over the broadest range of ammunition (manufacturer and bullet variants for a given caliber). Therefore, the Glock platform set the reliability standard by which the new pistol platforms were judged. Additionally, throughout the thousands of rounds of

ammunition by multiple manufacturers used to formulate the reliability studies, not a single shell rupture occurred.

29. In addition to the tens of thousands of rounds of ammunition Glock (Austria) fires during the course of new product development to prove reliability and function, the integrity of each Glock pistol is verified before it reach consumers, Glock discharges proof rounds of ammunition through each pistol, as well as several standard SAAMI compliant rounds of ammunition before shipping firearms from the factory. In Europe, the pistol is subjected to a second proof round by an independent proof house to verify the integrity of the pistol. If the feed ramps of the claimed class of Glock pistols were overly aggressive, as claimed, it should be inducing shell ruptures during the proof functionality testing at a rate commensurate with the criticisms of the plaintiff's consultants, yet this does not occur.

30. Since 1982, Glock Inc. has produced in excess of 22,000,000 of the claimed class pistols. Conservatively estimating only two boxes of ammunition (100 rounds) fired through each pistol, a minimum of 2.2 billion rounds of ammunition have been discharged through the claimed class of pistols. If the claimed defect was experienced as little as 0.0045% of the time a round of ammunition was discharged through the claimed class, a minimum of 100 thousand Glock pistols would have failed in the field (assuming only one failure per pistol). A failure rate that would represent approximately 0.45% of Glock's production, or an average of 2,703 failed pistols for each year Glock has been manufacturing firearms. The plaintiff and his consultants have produced no failure rate models to support their claim that Glock pistols fail at a higher rate than any other manufacturer's pistol or taken into consideration competing manufacturer's market share. The exposure must be accounted for to calculate an accurate failure rate comparison.

31. The state of California requires each model of pistol to be offered for sale within its borders to be certified before it can be offered for sale. The certification process requires three exemplars of each model to be tested and a minimum of 600 rounds of ammunition be discharged through each exemplar with the first 20 rounds discharged without a malfunction that was not due to a faulty magazine or ammunition; and the full 600 rounds discharged with no more than six malfunctions that were not due to a faulty magazine or ammunition and without any crack or breakage of an operating part of the handgun that increases the risk of injury to the user. This means, of the 93

pistols tested, 55,800 rounds of ammunition were discharged without issue. In fact, the law enforcement and government related entities of the state of California have such high confidence in the Glock pistol platform they have issued at least 66,710 Glock pistols to its employees.

32. Glock pistols have also been adopted by the FBI, which also has a rigorous solicitation and testing regiment. In my time at Remington multiple types of firearms and ammunition were developed and submitted for FBI consideration. It is my experience the FBI independently certifies all firearm and ammunition combinations with respect to performance and reliability.

33. In engineering, a safety factor expresses how much stronger a system is than is required for an intended stress/load. Many systems are intentionally built much stronger than needed for normal usage to allow for emergency situations, unexpected loads, misuse, or degradation. SAAMI specifies a firearm must withstand the effects of the pressures generated by a proof round of ammunition (approximately 130% to 150% of the max average pressure, or a 130% to 150% safety factor). Per the deposition of Mr. Kroyer, and as supported by Glock's design and manufacturing records, the chamber and feed ramp design of all Glock pistols is designed to withstand 200% of the SAAMI specified maximum average pressure or has a 200% safety factor. For example, SAAMI specifies the maximum average pressure for a 45 Auto caliber cartridge to be 21,000 psi and the maximum proof pressure to be 33,000 psi (157% SAAMI MAP); but Glock has designed the feed ramp and chamber of their 45 caliber pistols to contain a minimum of 42,000 psi (200% SAAMI MAP). Therefore, Glock's self-imposed safety factor margin is 43% (200%- 157%) greater than the SAAMI recommendation for 45 Auto caliber pistols.

34. To independently verify Glock's claimed safety margin, I had 45 Auto cartridges progressively loaded with increasing amounts of propellant and discharged through an exemplar Glock 41, Gen 4 pistol. The exemplar Glock fully contained discharge pressures up to and including 270% of the SAAMI specified maximum average pressure, independently verifying Glock's claimed 200% safety factor. Mr. Nixon, consultant for the plaintiff, also progressively loaded test cartridges and demonstrated a safety factor greater than 230% for the 40 S&W caliber Glocks. Lastly, a proof house in Vienna, Austria independently verified Glock's 200% safety factor. A safety factor of +200% in a mission critical/duty firearm with industry leading reliability (as established by the

Remington reliability studies) is more than acceptable in my professional opinion and by industry standards.

## THE SAFETY VALVE FEATURE

35. Glock's feed ramp designs and adoption of a 200% safety factor serves as the foundation for their passive pressure management safety system referred to as the Safety Valve (SV) feature. This type of passive structural safety system is used in multiple products, in multiple industries. An example of such a passive deformation safety system is crumple zones. Crumple zones are a structural safety feature often used in vehicles to increase the time over which a change in velocity (and consequently momentum) occurs from the impact during a collision by a "controlled" deformation. By controlling the location and order in which structures deform/fail, the ultimate energy transferred to operator can be reduced. With respect to firearms, if a cartridge's discharge pressure exceeds 200% of the maximum average pressure established by SAAMI, Glock's SV employs the feed ramp and chamber geometry of the barrel to control the location of the shell's deformation/rupture and focus the escaping propellant gases down the magazine well and out the bottom of the pistol, reducing the energy transferred to the operator.

36. To be clear, Glock did not invent the engineering principles of the SV. Every pistol manufacturer that produces a pistol that has a feed ramp that encroaches into the chamber of the barrel has a Safety Valve feature, including but not limited to: Colt, Smith & Wesson, Remington, Ruger, SIG Sauer, Beretta, Walther, Canik, and Glock. By definition, the unsupported area of the chamber created by the feed ramp, which almost every semi-automatic pistol chamber has (regardless of manufacturer), will dictate where the shell will fail due to pressure. An ammunition cartridge's shell, barring defect, will fail in an extreme pressure event where it is unsupported before it will fail in the chamber supported area because the support of the chamber provides additional strength to the shell. Therefore, because almost every pistol caliber chamber has a feed ramp and a corresponding unsupported area in the chamber, almost every semi-automatic pistol manufactured since the late 1800s is equipped with a SV. The claim by the plaintiff's consultants that Glock is the only manufacturer that employs a SV is false.

37. The difference between the different pistol manufacturer's pistols in the unsupported chamber created by the feed ramp (SV) correlates to the pressure containment safety factor of the shell of the cartridge being discharged. The higher the safety factor, the higher the pressure required to rupture the shell. Unfortunately, the higher the safety factor and rupture pressure, the higher the energy release and the greater the opportunity for personal injury. The feed ramp geometry also effects the ability of the pistol to feed ammunition and cycle reliably. In engineering and design, every decision has multifaceted consequences. Glock chose to design its feed ramps and chambers with no less than a 200% shell pressure safety factor.

38. By adopting the 200% safety factor, the Glock SV attempts to limit the maximum pressure developed by a defective high-pressure cartridge. I use the word "attempts" because if a person has loaded a cartridge to produce four or five times the normal pressure, the SV will have little effect, just as if a person runs a car into a reinforced concrete wall at 100 miles per hour, the effectiveness of the crumple zones will be significantly limited. Passive structural safety systems have practical limits of effectiveness. When the shell of a discharging cartridge ruptures, the peak pressure is typically established at the point of rupture. As pressure escapes through the rupture, the rate of pressure decay exceeds the burning propellant's rate of pressure generation, and the discharge pressure begins to fall. Therefore, if a cartridge loaded to produce 300% of the maximum average pressure specified by SAAMI is discharged in a Glock with a 200% safety factor, the peak pressure developed by the discharge should not be much more than 200% of the maximum average pressure specified by SAAMI, reducing the energy released relative to a rupture that would have occurred at a higher pressure, as the defective cartridge was originally loaded to do.

39. Additionally, if a cartridge that is assembled with a physically defective shell that is predisposed to rupture at pressures at or below the peak pressures specified by SAAMI is loaded and discharged in a Glock pistol, the feed ramp and chamber of the SV will serve to control the location of the shell's deformation/rupture and focus the escaping propellant gases down the magazine well and out the bottom of the pistol, reducing the energy transferred to the operator.




Figure 6: Comparison of Unsupported Shell Areas of the Glock G19 and the Beretta 92A1.

40. Mr. Bosch and Mr. Nixon's claim that no other handgun manufacturer designs pistols with a comparable "safety valve" is false. As an example, the Beretta 92A1 has an equivalent "Safety Valve" to the Glock G19. See Figure 6, the area between the yellow lines is the unsupported area. The Beretta M9 is a variant of the Beretta 92 family and was the US Army issued side arm from 1985 to 2017. Chambered in 9mm, the Beretta M9 shot 9mm NATO, which is considered an over pressure variant (+3,500 psi) of the civilian 9mm Luger. The US Military has discharged millions of rounds through the M9 and its variants. It stands to reason that if the US Military was experiencing cartridge shell ruptures with NATO ammunition, the US Army would not have ordered an additional 100,000 units in 2012. Military and law enforcement firearms must function in adverse environments or lives can be lost. As a result of such high reliability demands, feed ramps and chamber designs have been optimized to maximize functionality while maintaining or enhancing safety. Plainly stated, the real-world exposure of Glock pistols and other manufacturers' equivalent SVs does not support Mr. Johnson's claim of defect.

## ANALYSIS OF PLAINTIFF'S DEFECT CLAIM

41. Mr. Bosch and Mr. Nixon claim the SV of the claimed class of Glock pistols creates an "Unsupported Chamber Defect" (UDC) that facilitates a SAAMI compliant cartridge rupturing when discharged. The SV is an extension of the feed ramp into the chamber of the pistol's barrel and promotes reliable feeding of live ammunition during the function of the pistol and facilitates passive pressure management. Mr. Bosch and Mr. Nixon claim that Glock designed SVs are defective, compared to the SVs of other manufacturers.

42. The SV feature cannot cause the catastrophic failure of the Glock pistol and cannot cause injury to the pistol's user when used in conjunction with SAAMI compliant cartridges.

### I. Weaknesses in Case Shells that Cause Firearm Failure are Defective Ammunition

43. Mr. Bosch and Mr. Nixon opine the claimed defect (rupture of industry compliant cartridges fired through a claimed class Glock pistol) happens "erratically" because for the shell to rupture the SV must be combined with a cartridge that has a "weak" shell. Although Mr. Bosch and Mr. Nixon do not readily admit the shell is defective, they describe the shell as having a manufacturing irregularity that weakens the shell to the point it cannot contain SAAMI pressures when discharged in a Glock pistol. The American Heritage Dictionary of the English language, 5th edition, defines the word "defect" as, "an imperfection or lack that causes inadequacy or failure; a shortcoming or deficiency". Neither Mr. Bosch nor Mr. Nixon have provided an explanation of why a shell would not be considered defective if it contained a manufacturing irregularity that significantly compromises its performance relative to the vast majority of other shells made by the same manufacturer with the same processes.

BY MR. RENZULLI:
Q Any other ways the cartridge could be defective?
MR. LEWIS: Form and foundation.
A Just what I've said. You can have grain structure defects or cracks. It's generally a weakening of the material due to the cold working that it has when it's manufactured.
BY MR. RENZULLI:
Q Tell me what manufacturers of ammunition have defective cases like you just described.
MR. LEWIS: Form and foundation.
A Potentially all of them. I couldn't tell you any specifically. But if you look in Dr. Bosch's report, he does have some images of them in there.

Figure 7: Excerpt from Mr. Nixon's Deposition (Johnson v Glock, Page 135)

44. For a large part of his deposition, Mr. Nixon properly called the weakening of a shell as a "defect". See Figure 7. That is, until his attorney attempted to redefine them as a "natural variance" in ammunition manufacturing and not a "defect". See Figure 8.

Q Mr. Renzulli asked you a number of questions, and he would use the word "defect in ammunition." Do you recall the hours of questioning about using the word "defect in ammunition"?
A Yes.

Page 269

Page 270

BY MR. LEWIS:
Q There can be a natural variance in ammunition; correct?
MR. RENZULLI: Objection to form.
A Everything that's manufactured has a tolerance, so that would be the variance.
BY MR. LEWIS:
Q We just spoke about that. I mean, you can have a variance where there is a hotter load in one round; correct?
A (Indiscernible)

Page 270

BY MR. LEWIS:
Q Let me back up and ask it again because I don't know that I got it out, and I don't know if there's an objection or whatever.
One variance that can occur in factory ammunition is you might have a hotter load in

Page 271

one round as opposed to the next; is that a correct statement?
MR. RENZULLI: Objection to form.
A Yes, that would be correct.

Figure 8: Excerpt from Mr. Nixon's Deposition (Johnson v Glock, Pages 269, 270, & 271)

45. All manufacturing processes have variation to one degree or another. This is why tolerance ranges are specified on technical drawings of parts, assemblies and performance specifications. The tolerances specify the amount a variation that is ideally allowed. With respect to ammunition, SAAMI has specified the acceptable pressure performance range of each and every caliber of ammunition that it recognizes. While Mr. Nixon is correct in his assertion that an ammunition manufacturer can make a high-pressure cartridge (peak discharge pressures above SAAMI specification), there is nothing natural about that variance occurring. If this occurs, it means something went out of tolerance in the manufacturing process. The wrong propellant could have been used, the propellant could have been contaminated, and/or the wrong bullet could have been used. Whatever the reason for the out of specification high-pressure cartridges, they are by definition defective because they perform outside of the specification and pose a safety risk.

46. Per Mr. Bosch and Mr. Nixon, the extreme and rare hypothetical variation that causes the rupture is located in the shell of the cartridge, not the pistol. If Mr. Bosch and Mr. Nixon's hypothetical variation were to exist in the shell of a cartridge, such that it caused the shell to rupture when discharged in a Glock pistol while producing a SAAMI compliant discharge pressure, then the root cause of the rupture is the shell. Hypothetically, if an ammunition manufacturer makes a million rounds of a single type of ammunition and all of that ammunition is discharged through a family of identical Glocks and only one shell ruptures, logic dictates the shell would be considered defective because it experienced a failure at an operating point where the other shells did not. Additionally, Mr. Bosch and Mr. Nixon can't prove such an extreme variation in a shells has ever existed in production, as they have never identified one or quantified the size, shape or location of the extreme variation that would be required to induce a shell failure at SAAMI compliant discharge pressures. What Mr. Bosch and Mr. Nixon omit is that if you accept their hypothesized shell rupturing as being a connected to a "natural variation" in brass shell manufacturing, then such a hypothetical shell rupturing variation could exist for every firearm manufactured. The size, shape and location of the hypothetical flow fold/"weakness" is unquantified and by leaving said "weakness" undefined, such hypothetical case "weakness" (i.e., shell defect) could cause failure in any cartridge in any firearm.

## II. Flow Folds Do Not Cause Case Ruptures in Glock Pistols

47. One variation of ammunition that Mr. Bosch and Mr. Nixon claim can cause a rupture in Glock pistols is the presence of "fissures." Mr. Bosch describes flow folds as a manufacturing imperfection that takes the form of “cracks” and “fissures” in a brass of a shell. The presence of flow folds in casings is a normal occurrence in the brass shell manufacturing process for ammunition.




Figure 9: A Flow Fold Shown by Mr. Bosch’s Destructive Technique and Watkins’ Nondestructive CT Technique

48. Brass shells are typically manufactured via a progressive draw process. The process is described in great detail in Mr. Jiranek's declaration. The body of the shell is formed by extruding the brass through a die, while the head is formed by compressing the brass. As the brass is deformed, the brass flowing through the base of the shell can change directions and fold in on itself at the head of the extruder. To help the reader visualize the formation of flow folds, imagine a cloth napkin laying flat on a table and you try to move the napkin by only pushing on one edge of the napkin. As you push the napkin it will move/flow across the table, but parts of the napkin my bunch up in folds. The napkin has not cracked, it simply contains folds. The bases of properly manufactured brass shells do not contain cracks, they contain flow folds in a circular array in the shell's base. See Figure 9.

49. The flow folds of brass ammunition shells are very small and do not compromise the shell's pressure containment characteristics due to their location in the base of the shell. Because the laws of Newtonian physics are constant, the size, shape, and location of the flow folds lies within a consistent band that does not reduce the strength of the shell to the point of defect in properly manufactured shells. Additionally, if one were to mischaracterize a flow fold in brass as a crack, cracks in brass are self-blunting and do not propagate in the same manner as cracks in steel. This is why flow folds in shells are not prone to growth and shells that have not been abused (not excluding excess pressure) can be reloaded. See Mr. Jiranek's declaration for details.

50. There is nothing natural about a shell of a discharged cartridge rupturing at SAAMI specified pressures. The laws of Newtonian physics are not intermittent. We live in a world of cause and effect. If a shell manufacturing process was to start to make shell compromising flow folds, something in the shell manufacturing process shifted out of tolerance. Furthermore, such shifts in quality are not intermittent and would be regularly found in ammunition made with the same tooling. See Mr. Jiranek's declaration for more on this issue.

Q. Have you ever looked? Did you ever put a round of ammunition inside a CT scan and see what you see?
A. No, I haven't.
Q. All right.
A. But I wouldn't, because I know from experience in trying to use a CT scan in similar instances that's just a waste of my time.

**Figure 10: Excerpt from Mr. Bosch's Testimony (Evidentiary Hearing, Grosso v Glock Inc. p 233)**

51. Mr. Bosch's claim that his flow folds theory cannot be tested is false. In a previous litigation brought in Arizona, Grosso vs Glock Inc., Mr. Bosch testified at an evidentiary hearing that he understands flow folds are part of the brass drawing process used to manufacture cartridge shells (pages 30, 31, & 34), and flow folds are in all cartridge shells (pages 82, 83, & 89). Mr. Bosch claims there is no way to test his theory of a flow fold compromising the structural integrity of a cartridge shell (pages 179 and 184) because size and shape of the flow folds cannot be quantified. When asked if the flow folds could be detected via a CT scan, Mr. Bosch not only claimed that a CT scan was incapable of detecting a flow fold, but also declared it would be "a waste of time" to try. See Figure 10.




Figure 11: High Resolution CT Image of a Flow Fold in a Brass Cartridge Shell

52. Modern industrial CT scanners can penetrate most metals and resolve details as small as 8 microns (0.000315 inches). Figure 9 shows a comparison of a CT imaged flow fold compared to a flow fold Mr. Bosch recorded using his destructive process. Figure 11 shows an image from a high-resolution CT scan with a measured flow fold width of 0.0014 inches. Not only can modern CT technology detect flow folds, it can quantify their size, shape and location. I have been taking high resolution CT scans of metal components and assemblies since 2010. Despite Mr. Bosch's claim that there is no way to test his theory, the technology exists and has existed for many years.

## TESTING AND ANALYSIS DISPROVING PLAINTIFF'S DEFECT THEORY

### III. Characteristics of Claimed Incident Cartridges




Figure 12: Comparison of Ms. Hofstetler and Mr. Grosso's Ruptured Shells

53. I have performed detailed examinations of the shells from two individuals, Mr. Grosso and Ms. Hofstettler (a non-party deposed in the Grosso case), who claimed their ammunition ruptured at factory compliant pressures, and claimed the fault was with Glock and not their ammunition. Mr. Grosso (represented by plaintiff's counsel in this case) specifically alleged the "unsupported chamber" caused the failure. Mr. Bosch also opined Mr. Grosso's shell rupture was not a high-pressure event and had failed due to an "unsupported chamber" defect. Figure 12 shows side-by-side comparisons of the ruptured shells produced by Mr. Grosso and Ms. Hofstettler. The characteristics of these ruptures all indicate failures caused by over-pressurized ammunition.

54. Ms. Hofstettler had two shells rupture and claimed they were from different manufacturers. This was the basis of her belief that the ammunition was not to blame. However, her deposition testimony and my physical examination of the shells revealed that both of her rounds of ammunition were from the same Serbian manufacturer, PPU. This indicates a potential problem with the ammunition and shows the essential nature of investigating each incident. Importantly,

the damage to the three shells compared in Figure 12 is extensive and appears nearly identical. Additionally, the extent of the damage doesn't appear to be the result of crack propagation, as Mr. Bosch and Mr. Nixon contend that flow folds initiate when aligned with a Glock's feed ramp when chambered.




**Figure 13: The Thinned and Stretched Edges of Mr. Grosso's Ruptured Shell**

55. The 45 Auto cartridge has a maximum average peak operating pressure of 21,000 psi, which is a relatively low pressure when compared to modern cartridges like the 357 SIG that operates at 40,000 psi. The left and right sides of Mr. Grosso's rupture were thinned to a sharp edge, which is consistent with the metal being pushed out by pressure and not a crack originating at the base of the shell (flow fold) and then propagated up into the body of the shell and across the area where the feed ramp transitioned to the chamber. See Figure 13. When a shell rupture first starts to open, the internal pressure of the shell immediately begins to bleed off and drop. When a cartridge is discharged, the peak pressure is not produced instantly.

56. When the internal pressure of a firearm's barrel is measured during a cartridge discharge, a plot of the pressure data takes the form of a curve. When the discharge is initiated, the pressure starts to

climb, it then hits a peak and starts to fall and when the bullet exits the muzzle of the barrel, the pressure then falls rapidly to zero. The pressure builds up as the propellant combusts and peaks when the rate of propellant combustion and the subsequent production of propellant gas is exceeded by the rate of volume expansion created by the bullet moving down the barrel. If the side wall of a 45 Auto shell is designed to normally hold 21,000 psi (SAAMI), and a rupture is initiated by a flow fold/"weakness" in the shell's base (plaintiff's hypothesis), the initial rupture opening will release pressure and stunt the growth of the rupture's size. In contrast, the shells of Figure 12 have a large portion of the shell's side wall ripped away, indicating the rupture's growth was never stunted, which also indicates a high level of pressure, and a large volume of propellant gas was produced. Therefore, the rupture morphologies presented in Figure 12 are inconsistent with a material flaw/weakness induced failure.

## IV. <u>Testing the Case "Weakness" Theory</u>




Figure 14: Simulated Localized Defect Live Fire Testing

57. In the Grosso v Glock Inc. case, I conducted a detailed investigation to establish root cause, following the scientific method. To investigate the ramification of a material flaw induced shell rupture at normal operating pressure, an array of shells were purposefully compromised with localized flaws in the side wall. See Figure 14. The localized flaws were introduced in varying locations along the shell's side wall. Changing the depth of the localized flaw allowed for the assessment of the severity of flaw required to facilitate a failure of the shell wall in these locations. The indentions in the side wall were milled with a 0.0625 inch diameter cutter and were cut at different depths, but never fully through the side wall. The side wall was only weakened and never fully compromised. Because Mr. Grosso had admitted that he had hand-loaded his failed shell and Mr. Bosch opined that the rupture had not occurred at high pressures, the test shells were loaded with Mr. Grosso's hand load recipe. This enabled an apples-to-apples comparison between the damage observed in the test shells and Mr. Grosso's ruptured shell.

58. The testing showed the depth of the indentions had to penetrate approximately half the thickness of the shell wall to induce failure, i.e. to induce failure the indention/defect had to be large in scale. Each time the simulated localized defect failed a test shell, the escaping gas expanded the simulated defect in diameter but did not blow out the shell's sidewall and vented down the feed ramp, as Glock intended. See Figure 14. The ruptured test shells also did not damage the exemplar Glock 41 from which they were discharged. The trigger assembly and frame were not damaged. The magazine was also not ejected or damaged. The simulated and localized shell wall material defect testing proved that SAAMI compliant 45 Auto cartridges will not fail in a manner similar to Mr. Grosso or Ms. Hofstetlers' shells at normal pressure. This is easily seen if one compares the failed test shells of Figure 14 with the failed shells of Ms. Hofstetler and Mr. Grosso, shown in Figure 12.

59. This proves that hypothetical ammunition defects, or "variations" as they are referred to by plaintiff's consultants, do not cause the complete displacement of shell material adjacent the feed ramp, as did occur in Mr. Grosso and Ms. Hofstetlers' shells. Those incidents must have been caused by high pressure exceeding 200% SAAMI maximum average pressure.

60. Because Mr. Grosso had loaded his own failed cartridge, I was afforded the opportunity to examine his loading equipment. Mr. Grosso utilized a Dillon RL 550B hand crank press in his loading practice.

This particular press requires the operator to manually advance the shell through the press. If a shell is not advanced through the press after propellant is added, a cartridge could be double loaded with propellant. This created an opportunity for Mr. Grosso's cartridge to be double loaded, producing high-pressure when discharged. The pressure produced by pistol propellant increases nonlinearly with the amount of propellant used. A double charge of pistol propellant can produce over three times the pressure produced with a single charge.




Figure 15: Comparison of the Hofstetler and Grosso Ruptured Shells to the High-Pressure Test Shell Rupture

61. The test shell was loaded with 10.4 grains of Bullseye propellant, twice Mr. Grosso's maximum ammunition loading recipe. Doubling the propellant in the test cartridge pushed the peak pressure to approximately 71,400 psi, which is 340% of the allowable SAAMI maximum pressure and over twice the maximum proof pressure. These peak pressures were calculated using QuickLOAD. However, it is doubtful the test cartridge reached the calculated peak pressure because as soon as the shell ruptured, the pressure was being released. The discharge of the high-pressure test round duplicated the shell damage observed in Mr. Grosso's (and Ms. Hofstettler's) shells. See Figure 15. Additionally, the test pistol was damaged in a manner similar to Mr. Grosso's pistol; the trigger was split in half and multiple internal components were damaged.

62. Ms. Hofstettler claimed her cartridges were factory made, but the examination of the shells revealed each shell had multiple extractor marks around its rim (evidence of multiple discharges/loadings) and ejector marks on the case head that were from pistols other than her Glock G41 (evidence the shells had been discharged in other pistols and then reloaded). Therefore, the opportunity for the use of excessive or improper propellants producing a high-pressure discharge was present for her cartridges, further indicating a high-pressure failure.

## III. Anatomy of Shell Ruptures in the Field




Figure 16: Overlay of Glock 41 Chamber and CT Slice of Bulged High-Pressure Shell

63. To more fully characterize how the shells ruptured in the Mr. Grosso and Mr. Hofstettler's pistols, cartridges were progressively loaded in propellant and discharged until shell deformation was observed, but the shell had not ruptured. Figure 16 shows a CT slice through the test shell as it would have sat in the Glock's barrel at the time of discharge. The peak pressure developed was approximately 57,700 psi (270% of SAAMI maximum average pressure). This is significant because a peak pressure produced by the test shell exceeded 200% of SAAMI MAP (Glock's minimum safety factor) did not rupture the shell. The excessive pressure caused the shell to stretch outward until it made contact with the feed ramp. Where the shell deformed the most was where it was thinnest, which was the transition area from the feed ramp to the chamber. Therefore, if the pressure was to continue to climb (extreme high-pressure event), the rupture would originate at

the thinnest point in the shell and not at the base where the flow folds are located (as hypothesized by Mr. Bosch). See Figure 16.

64. By employing the scientific method with rigorous real-world testing, I was able to disprove Mr. Bosch's hypothesis that a defective ammunition casing combined with the SV caused Mr. Grosso's shell rupture. The testing further established that the most probable root cause of their shell ruptures was high-pressure ammunition far exceeding SAAMI standard pressures.

## IV. Disproving Mr. Nixon's Rebuttal of Testing

Q Can you tell me what authority you can point to
that says that a circular hole in a pressure
vessel will prevent it from rupturing?
MR. LEWIS: Form and foundation.
A In this case we're talking about propagation of
cracks or defects in a case. It's standard
engineering practice across the whole of
engineering that if you have a crack in
something, you drill a hole at the end of it and
it stops the crack propagating.
BY MR. RENZULLI:
Q And that's what you think that Mr. Watkins did,
he drilled a hole at the end of the crack and it
stopped it?
MR. LEWIS: Form and foundation.
A By definition, you won't know if there was a
crack there or not. But if there was a crack
that would normally have caused it to fail, by
drilling the hole, he's prevented that from
happening. He's actually making the situation
better, not worse.

Figure 17: Excerpt from Mr. Nixon's Deposition (Johnson v Glock, Page 253)

65. Mr. Nixon is critical of my pressure testing of cartridges with defects intentionally created in the side wall of the shell. In testimony, Mr. Nixon stated the defects I created by milling into the shell's

side wall served to blunt any growth of the flow folds/"cracks" that would have been created by the discharge of the cartridge and the resulting pressure. See Figure 17.




**Figure 18: Hole Size Relative to Crack Mitigation**

66. Mr. Nixon is incorrect in multiple ways. Putting a hole through the tip of a crack doesn't blanketly stop crack propagation. The ability of a hole to stop the propagation of a crack is dependent on how the cracked part is loaded/stressed, where the crack is located, the location of the hole and the size of the hole. Figure 18 shows a finite element analysis (FEA) of a "crack" and two attempts at mitigating the stress with the addition of a hole. Image 1 of Figure 18 is of a standard "V" notch plaque being loaded with equal and opposite forces at the top of the notch (the load forces are acting to pull the notch apart/open). A small area of high stress can be seen at the root of the notch. Image 2 of Figure 18 shows the stress concentration has been mitigated by the addition of a small hole at the root of the notch and represents the claimed ideal situation for stunting crack growth Mr. Nixon was referring to in his testimony. Image 3 of Figure 18 shows how adding a hole that is too large didn't mitigate the stress, it actually increased the stress area and promoted two new crack initiation sites. Therefore, simply adding a hole of any size to the end of a crack will not mitigate crack propagation.




Figure 19: High Stress's Effect on Crack Mitigation

67. The way the part is being loaded/stressed and the crack's location relative to stresses in the part can make it impossible to mitigate a crack. Figure 20 shows the same "V" notch stress analysis that was conducted in Figure 18, but the load on the part has been increased. Image 1 of Figure 19 shows the high stress area at the root of the notch has increased with the increased loading at the top of the notch. Image 2 of Figure 19 shows adding the hole that alleviated the stress in Image 2 of Figure 18 only served to increases the stress area and increasing the opportunity for crack growth. Image 3 of Figure 19 shows making the hole bigger only increases the size and intensity of the stress field. This exercise proves cracks exist that cannot be mitigated by drilling a hole. Unfortunately, in the real world, most cracks cannot be mitigated by drilling a hole because the material removed by drilling the hole only serves to further reduce the strength of the part that was already compromised by the crack.

68. While it can be said that placing a hole at the end of a crack can blunt the cracks growth, it is only true for a limited number of very specific use cases. For example, if the structural member of an airplane's wing is inspected and found to have a crack or cracks, the first step of maintenance is not to just send a guy out and start drilling holes in the wing, as Mr. Nixon would have you believe.

69. It is a fact that drilling/milling into the side of a pressure vessel increases stress, it doesn't reduce it. By using a square endmill to create the indentions (simulated defects), I created a stress concentration around the entirety of the indention. Therefore, the indentions/defects I created in the sides of the test shells created a stress concentration under discharge that promoted crack initiation and the ultimate failure of the shells side wall.




Figure 20: Stress Riser Caused by Making a Indention in a Pressure Vessel

70. To illustrate how cutting indentions in the side of the test shells did not reduce or blunt the stress concentration, a simple pressure vessel FEA analysis was constructed, using the same indention dimensions that were used in the test shell. Images 1 and 2 in Figure 20 show the simple pressure vessel, with indention cut in the side wall and the ends of the vessel held rigidly. Image 3 of Figure 20 shows the stress concentration in the wall when the indention has not been cut. Images 1, 2 and 4 of Figure 20 shows how cutting the indention creates a localized stress riser, with the color red showing the highest stress. As the vessel is pressurized, the side wall of the vessel deforms most in the area of the cut indention. Image 3 shows how the stress is concentrated around the corners of the base of the cut. It is these stress concentrations that will cause crack initiation and the ultimate failure of the pressure vessel's side wall as the pressure is increased.

71. Beyond the shell material defect testing I conducted, a series of reload tests were conducted with 45 Auto caliber cartridges to evaluate the effect reloading has with SAAMI compliant pressures. A total of 12 test cartridges were loaded and fired a total of ten times each through a Glock 41 test pistol. None of the test shells that had been loaded and discharged 10 times failed, excessively deformed, or exhibited any characteristics that were in any way similar to Mr. Grosso or Ms. Hofstettler's shell failures. Despite Mr. Nixon's testimony and implications, the testing I conducted was valid and did show the standard pressures of a 45 Auto does not have the energy to create a safety hazard in a manner consistent with the ruptured shells of claimants in the field relied upon by plaintiff.

## V. <u>Mr. Bosch and Mr. Nixon Ignore Essential Data, Including The Results of Their Own Testing</u>

72. In addition to ignoring the data gathered from the live fire testing I conducted in Grosso v Glock Inc., Mr. Bosch and Mr. Nixon ignore the data from their own testing. Mr. Bosch and Mr. Nixon have discharged many factory loaded rounds through Glock pistols, and I personally witnessed them discharge at least 100 cartridges, from an assortment of manufacturers) through two of the plaintiff's Glock pistols at the Scottsdale Gun Club (6/28/2023, Phoenix, Arizona) without issue. Mr. Nixon testified he had discharged at least 14,000 rounds through Glock pistols in his lifetime without a single failure (Johnson v Glock, page 194). It appears that they find this data irrelevant simply because it does not support their desired hypothesis.

73. We recently learned that additional live fire testing was conducted by Mr. Nixon and Mr. Bosch after they submitted declarations in this case. Mr. Nixon was over loading test shells and discharging them in three different Glock pistols. Mr. Nixon's goal was to continue to increase the propellant load until he got the test shell to rupture when it discharged, using Bullseye and TiteGroup propellants. Mr. Nixon was reportedly successful in getting shells loaded with 8.225 grains of TiteGroup propellant to rupture in the Glock pistols. When asked in deposition how much pressure his test rounds were producing, he admitted he had no idea (Johnson v Glock, page 82). Internal ballistics software exists that can estimate the peak pressures a cartridge will generate when discharged. QuickLOAD, an internal ballistics software package used by Remington ammunition engineers to aid in the development of new ammunition cartridges, was employed to analyze Mr. Nixon's test loads to determine the peak pressures to which he was subjecting the ammunition and test Glock pistols. Mr. Nixon's test cartridges loaded with 7.05 grains of TiteGroup propellant did not rupture and were producing approximately 81,189 psi (232% of the SAAMI allowed maximum average pressure). The test cartridges loaded with 8.225 grains of TiteGroup propellant did rupture and were producing approximately 121,104 psi (346% of the SAAMI allowed maximum average pressure). See Figure 21.

Nixon Tests using QuickLOAD

| | | |
|---|---|---|
| SAAMI MAP | 35000 | |
| SAAMI Proof (max) | 54000 | |
| Bullet | Speer TMJ 4402 | (Equivalent to the Win 180gr FMJ TC Nixon Specified) |
| Bullet Weight | 180 grain | |
| Cartridge Overall Length | 1.12 | From Speer Hand Loading Manual |


WIN 180gr FMJ TC


Speer 180gr TMJ

| Multiplier | TiteGroup Propellant (grains) | Pmax (psi) | Pmax % of SAAMI MAP | % Filled | Delta vs SAAMI MAP | Delta vs SAAMI Proof (max) | Note |
|---|---|---|---|---|---|---|---|
| 1 | 4.7 | 32968 | 94% | 65.20% | -2032 | -21032 | |
| 1.25 | 5.875 | 53217 | 152% | 81.40% | 18217 | -783 | Over SAAMI MAP |
| 1.5 | 7.05 | 81189 | 232% | 97.60% | 46189 | 27189 | Over SAAMI Proof |
| 1.75 | 8.225 | 121104 | 346% | 113.90% | 86104 | 67104 | Ruptured Shell, Compressed Load and Highly Volitile (over SAAMI Proof) |
| 2 | 9.4 | 179274 | 512% | 130.10% | 144274 | 125274 | Not Discharged, Compressed Load and Highly Volitile (over SAAMI Proof) |

Figure 21: Evaluation of Mr. Nixon's Hand Load Pressures using QuickLOAD's Design Software

74. Mr. Nixon's live fire testing verified that Glock successfully designed its pistols with a minimum of the 200% safety factor.

75. Per Mr. Nixon's specified loaded cartridge length of 1.12 inches, many of the claimed propellant charge weights indicated significant compression in the load. Compressing a propellant load occurs when the propellant charge in a cartridge exceeds the available internal volume of the

cartridge when the bullet is seated to a specified loaded cartridge length. When the propellant volume exceeds the available volume, the propellant must be compressed for the bullet to seat to the proper cartridge length. Compressed loads are highly volatile and can produce extremely high pressures. The test loads Mr. Nixon got to rupture were compressed. However, propellants are not infinitely compressible and some of Mr. Nixon's test loads would have been compressed beyond their physical limit. Therefore, the condition of some of the test cartridges Mr. Nixon claims to have discharged is highly suspect, as Mr. Nixon testified he did not load the cartridges himself (page 124-125).

Q Would you expect it to withstand two times the maximum average pressure?
MR. LEWIS: Form and foundation.
A Again, I wouldn't expect it, but it would be nice if it did.
BY MR. RENZULLI:
Q Would you expect it to handle 1.75 times the

Page 68

maximum average pressure?
MR. LEWIS: Form and foundation.
A Same answer.
BY MR. RENZULLI:
Q You wouldn't expect it, but it's nice if it would?
A Right.
Q What about 1.5 times SAAMI maximum average pressure? Would you expect a semiautomatic pistol would be able to withstand that?
MR. LEWIS: Form and foundation.
A Yes, I would.

**Figure 22: Excerpt from Mr. Nixon's Deposition with Respect to What Maximum Pressure Generated by a Dischai Cartridge a Firearm should Handle (pages 67 & 68).**

76. When questioned about how much peak pressure generated by a discharged cartridge a firearm should be able to handle, Mr. Nixon testified the pistol should be able to handle "about 1.5 time SAAMI maximum average pressure". See Figure 22. SAAMI's minimum proof pressures for the claimed class compliant cartridges is already 1.3 to 1.5 times the SAAMI maximum pressure and

Mr. Nixon's own testing, shown in Figure 22, proved the Glock pistol he tested would not only handle 2 times the SAAMI maximum average pressure, but handle it multiple discharges at 2 times SAAMI maximum average pressure. Per Mr. Nixon's testing, Glock pistols in the claimed class already out perform his own high-pressure performance metric. This comports with my testing, as well as Glock's testing.

77. During the evidentiary hearing in Grosso vs. Glock Inc., Mr. Bosch testified that test firings and comparisons of Glock pistols with other manufacturer's pistols in the field has no relevance to his theory of defect (page 138- 144). The FBI, State of California, and numerous law enforcement agencies have collectively discharged millions, if not billions, of factory loaded cartridges through Glock pistols. The independent proof houses of Europe have discharged millions of factory loaded proof rounds (30 to 50% over pressure) through Glocks pistols. This available data is clearly relevant to the credibility of plaintiff's defect theory. Neither Mr. Bosch nor Mr. Nixon has provided a scientifically sound reason for rejecting the verifiable factory loaded field data. They do not even address it at all in their declarations.

78. Furthermore, Mr. Bosch contradicts his own opinion as to what constitutes a defectively designed Glock SV. In Grosso v Glock Inc. (Case Number: FE14-3107), Mr. Bosch represented in a report that Mr. Grosso's Glock 41 (a 45 Auto caliber and part of the current claimed class) experienced a catastrophic failure when a claimed cartridge producing industry standard pressures was discharged. Opinion 10.5 of that report stated: "If the Glock 41 chamber design was like the chamber designs used by Glock for its 9 mm and .357 SIG caliber pistols, the subject pistol would not have failed and Mr. Grosso would not have been seriously and permanently injured". In 2017, Mr. Bosch had not started calling his claimed defect the "UCD/SSV" and was just calling it a defective chamber design that was compromised by the feed ramp. In this case (Johnson v Glock Inc.), Mr. Bosch has apparently lost his previous love for the chamber designs of the Glock 9mm and 357 SIG model pistols and now claims all 9mm and 357 SIG model Glock pistols are defective and should be included in the claimed class.

PLAINTIFF'S RELIANCE ON FALSE FIELD CLAIMS

79. The plaintiff and his consultants have cited complaints from a few individuals claiming the discharges of Glock pistols that yielded ammunition ruptures as support for their theory/hypothesis of defect that factory loaded ammunition generating industry compliant pressures can rupture in the claimed class of Glock pistols. During the Grosso v Glock Inc. case three such claimants, Jeff Searles, Thomas Hanley and Dennis Crabill admitted during deposition they had been less than honest with Glock with respect to their warranty claims and the type of ammunition they were using at the time they experienced their shell ruptures. Plaintiff only attached excerpts from these depositions to his motion, but a full reading of the transcripts confirms their testimony revealed ammunition issues not initially told to Glock.

80. Per Mr. Searles service order, he reported to Glock that he experienced a failure in his Glock G36 that allowed propellant gases to be vented (cartridge shell rupture). During Glock's inspection it was concluded that damage was mainly cosmetic, and the pistol was repaired the pistol under warranty. In testimony Mr. Searles admitted he had been using reloaded ammunition, and that he did not tell Glock the ammunition was reloaded, as he suspected that Glock would not have repaired the pistol under warranty if the event had been caused by hand loaded/reloaded ammunition.

81. Mr. Hanley's service order reported to Glock that he experienced a failure in his Glock G30S and included the spent cartridge casing with the pistol when he sent it in for service. Glock concluded that damage was mainly cosmetic and was caused by an overpressure round discharge. Glock repaired the pistol under warranty. During his deposition, Mr. Hanley testified that he was using reloaded ammunition at the time of the incident and he did not include this information when he submitted the service order.

82. In the service order submitted by Mr. Crabill, the kind of ammunition he was using at the time of his incident was never stated, and he did not send the spent cartridge casing or photographs of the ammunition to Glock. During his initial correspondence with Glock, Mr. Crabill claimed he was using 45 Auto ammunition, manufactured by Aguila Ammunition, at the time of the rupture and

he sent Glock the ammunition specifications. Mr. Crabill later testified that he was given the ammunition at a gun show and was told that they were factory reloads.

83. Mr. Searles, Mr. Hanley and Mr. Crabill confessed that they had withheld information from Glock that would have brought the integrity of the ammunition into question. Glock's manuals warn against shooting reloads and informs that shooting hand loaded or reloaded ammunition will violate the terms of the Glock warranty. This is an example of why each claim of shell rupture must be evaluated on its own merits.

> All,
> Update to current. Our evaluation so far has shown that not only were the primers in the ammo sent to us not a match to the production records, the powder type and charge weights not a match, but additionally, the projectiles do not match. Our production records show the lot of ammunition that should have been in that ammunition box loaded was loaded with conventional jacketed projectiles. The projectiles in the sample were totally metal jacketed (plated projectiles) not conventionally jacketed projectiles.
>
> Further, our production records show that the brass that we loaded that lot with was Starline brand brass. There were several loaded rounds in the returned ammunition however that were loaded in Underwood headstamp brass. My research and recollection from being in this business for 41 years shows that Underwood did not exist in 1998 when that lot number indicates the ammunition would have been produced.
>
> My conclusion is that it is not our ammunition and we can prove it. I believe that someone fired the ammunition we loaded, then reloaded the casings (or other Starline brass)refilling our ammunition box which was then eventually sold at a Gun show to Mr. Brown.

**Figure 23: Black Hills Ammunition Correspondence Regarding the Gary Brown Claim (BH Production 000225)**

84. The plaintiff and his consultants cite a field claim involving Gary Brown and Black Hills Ammunition's (an ammunition manufacturer) "determination" that the cause of a rupture was a "probably weak brass in the unsupported area". Mr. Brown claimed a factory loaded cartridge manufactured by Black Hills Ammunition had ruptured when discharged in his Glock pistol. The plaintiff's motion cites their Exhibit Y for this information but did not include the entirety of the correspondence that was produced with respect to Black Hills Ammunition. This "weak brass" statement was made by Black Hills Ammunition prior to any investigation. Black Hills Ammunition's investigation determined the ruptured ammunition was not manufactured by Black Hills Ammunition and the rupture was initiated by a high-pressure event caused by a double charge of propellant from whomever loaded the ammunition. While the box of ammunition was labeled "Black Hills Ammunition" the cartridges within the box were constructed/loaded with the incorrect

primers, propellant, propellant amount and bullet (BH Production 000225). This information is conveniently missing from Exhibit Y of the plaintiff's motion. See Figure 23.

85. The plaintiff's motion additionally misrepresents the findings of the Vienna Proof-House testing that was completed on a series of Glock pistols. The motion states the Vienna Proof-House found that cartridge case material could contribute to the ammunition failures due to lack of support in the chamber. The plaintiff's motion omits the statements made by the Vienna Proof-House were made in relation to discharging ammunition loaded to produce double the maximum allowable peak pressure, per industry standards. During the Vienna Proof-House testing, no issues were identified with respect to discharging cartridges that developed industry standard peak pressures and proof pressures (1.3 to 1.5 times the allowable maximum average pressure for a cartridge). The Vienna Proof-House statements relative to shell rupture are only relevant to ammunition that is significantly over pressure and dangerous to fire in any firearm, yet the plaintiff misrepresents the statements as evidence that it is possible for a discharged cartridge's shell to rupture under normal industry standard pressure conditions, which it is not.



**Figure 24: (GINC007609) Out of Battery Discharge**

86. In plaintiff's Exhibit W of the motion for class certification, *Chart Exhibits of First Hand Kaboom Accounts & Corresponding Docs*, images of a ruptured shell from bates number GINC007608-GINC007618 are presented. Figure 24 shows the claimed shell rupture, but the rupture isn't

limited to the SV area of the pistol, the entire base of the shell has been blown away, even in the areas where the chamber provided full support for the cartridge. It also appears the end of the shell is visible at the entrance of the chamber, which suggests the possibility of an out of battery detonation. Out of battery discharges can be caused by multiple reasons, one of which is a cartridge constructed with "high primer". If the primer is not fully seated to a flush or slightly recessed position in the base of the shell, the act of the firearm closing up during the loading of a cartridge into the chamber could compress the primer and discharge it before the pistol's barrel lockup may have occurred. A cartridge assembled with a high-primer is considered a defective cartridge and all semiautomatic pistols, regardless of manufacturer, are susceptible to an out of battery detonation due to a high primer defect in the ammunition.




Figure 25: (GINC007619) Split Barrel

87. Figure 25 shows an image from Exhibit W depicting a Glock pistol with not only a ruptured shell casing, but also a split barrel and extreme damage to the pistol's other components. The rupture depicted is not located in the Glock's SV, the shell has ripped open along its side and correspondingly split the barrel in the same location. It is not possible for a shell developing industry compliant pressures to split a barrel. This is an obvious high-pressure event of such an extreme nature that it exceeded the ability of the SV to mitigate.



Figure 26: (GINC007636) Extreme Over Pressure Event

88. Figure 26 shows an image from Exhibit W depicting a Glock pistol that experienced a cartridge discharge that ripped the shell's case head (blue arrow) completely away from the shell's body and significantly damaged the pistol. The thickness of the shell case head that was ripped away in combination with the level of damage observed in the pistol's components indicates the incident was not an out of battery discharge, but rather an extreme high-pressure event that exceeded the ability of the SV to mitigate.




Figure 27: Image from Complaint vs Firearm User's Explanation in Reddit

89. The plaintiff has even gone as far as to misrepresent failures in non-Glock aftermarket parts as evidence of their claimed defect in the claimed class of Glock pistols. At the top of page 11 of the third amended complaint from the plaintiff, a heavily damaged Glock pistol is represented as an example of the claimed defect. However, when the original source image was verified using Google (the plaintiff did not supply the source of the image), it was discovered the image came from a reddit entry (https://www.reddit.com/r/Glocks/comments/38vh1g/goodbye_g21/?rdt=47390) and it can be clearly seen that the split barrel in the image is etched with the logo of an aftermarket supplier. See Figure 27, left image. Because the rupture was experienced in a non-Glock barrel, it is impossible for the incident to be representative of the claimed class hypothetical defect. Furthermore, the author of the reddit article clearly states the ammunition being used was not original factory ammunition, but rather "re-manufactured ammo" that he/she theorized was "double charged". See Figure 27, right image. Not only is the damage observed in the firearm consistent with an extreme over pressure event, the operator says it is a high-pressure event by identifying the ammunition as "double charged", i.e. the shell contained at least twice the propellant it should have.

NSPE®
NATIONAL SOCIETY OF PROFESSIONAL ENGINEERS

## Preamble

Engineering is an important and learned profession. As members of this profession, engineers are expected to exhibit the highest standards of honesty and integrity. Engineering has a direct and vital impact on the quality of life for all people. Accordingly, the services provided by engineers require honesty, impartiality, fairness, and equity, and must be dedicated to the protection of the public health, safety, and welfare. Engineers must perform under a standard of professional behavior that requires adherence to the highest principles of ethical conduct.

## I. Fundamental Canons

Engineers, in the fulfillment of their professional duties, shall:

1. Hold paramount the safety, health, and welfare of the public.
2. Perform services only in areas of their competence.
3. Issue public statements only in an objective and truthful manner.
4. Act for each employer or client as faithful agents or trustees.
5. Avoid deceptive acts.
6. Conduct themselves honorably, responsibly, ethically, and lawfully so as to enhance the honor, reputation, and usefulness of the profession.

**Figure 28: Excerpt from the National Society of Professional Engineers Code of Ethics for Engineers**

90. Compounding the multiple misrepresentations of the plaintiff's consultants related to field complaints and their rejection of verifiable live fire testing data from institutions like the State of California or the adoption of Glock pistols as duty weapons by institutions that perform their own qualification testing such as the FBI, is at best a flawed methodology and, at worst, a breach of engineering ethical rules. See Figure 28. The Glock pistol platform has been in production for over 40 years and the population of the claimed class of pistols exceeds 22 million units. If the plaintiff's claimed defect was real, they should be able to scientifically prove it with verifiable data. To the contrary, all testing performed establishes that their defect theory is unsupported and invalidated by the scientific method.

<u>INDEPENDENT INVESTIGATION IS REQUIRED TO DETERMINE THE ROOT CAUSE OF A FIREARM FAILURE</u>

91. To determine the root cause of a shell rupture event, sometimes called catastrophic firearm failure, each event must be evaluated independently. There are many factors that can induce a shell rupture. Without root cause analysis, a determination of the mechanism for failure cannot be determined. Some of the various factors that can influence a firearm failure include:

1. Physical condition of the firearm
   a. Use of damaged or altered parts.
      i. Example: over boring a chamber can compromise the strength of the barrel and the cartridge being discharged,
   b. Use of inappropriate aftermarket parts.
      i. Example: a compromised barrel in a firearm may not be the barrel made by the firearm's manufacturer.
   c. Contaminates in the firearm.
      i. Example: lead buildup in the barrel can retard the bullet's ability to exit the barrel and induce a high-pressure condition.
      ii. Example: objects on the breech face can induce an out of battery discharge.
   d. Obstruction(s) in the barrel.
      i. Example: foreign objects partially or fully plugging the barrel, such as mud, ice and snow, can prevent the bullet from exiting the barrel and induce a high-pressure event.

2. Cartridge defects

   a. Cartridge(s) loaded with excessive propellant.

      i. Example: excessive propellant can cause a high-pressure event.

   b. Cartridge(s) loaded with less than 50% propellant.

      i. Example: low pressures can cause a bullet to become plugged in the barrel.

      ii. Example: peak pressures can fluctuate significantly.

   c. Cartridge(s) loaded with the wrong propellant.

      i. Example: Peak pressures developed during discharge are extremely sensitive to propellant type and the incorrect propellant can cause a high-pressure event.

   d. Cartridge(s) loaded with a defective propellant due to contaminants, excessive age (degraded stabilizers), or recalled propellant.

      i. Example: Peak pressures are heavily influenced by the condition of the propellants. Unstable propellants can produce a high-pressure event.

   e. Cartridge(s) loaded with compressed propellant (bullet seated too deep).

      i. Example: the effect of compressing a propellant affects its combustion propagation and can produce a high-pressure event.

   f. Excessive cartridge loaded length.

      i. Example: the length the bullet must “jump” to engage the rifling is reduced or eliminated, which

changes the rate of combustion volume growth, which can cause a high-pressure event.

g. Cartridge(s) loaded with improper bullet.

   i. Example: excessive bullet weight can cause a high-pressure event.

   ii. Example: excessive bullet diameter can prevent the bullet from exiting the barrel and cause a high-pressure event.

h. Cartridge(s) loaded with multiple bullets (I have only observed in rifle ammunition currently).

   i. Example: effectively doubling the mass of the projectile can cause a high-pressure event.

i. Improperly manufactured cartridge shell(s).

   i. Example: each stage of the draw process used to make brass shells induces work hardening into the shell, which is eliminated by an annealing process in the manufacturing. Failure to anneal can cause shells to split in the shoulder and neck area (where the most work is done) and allow propellant gas to vent. This is a shell defect.

j. Use of weakened and/or deformed cartridge shell(s) due to excessive reloading.

   i. Example: excessive reloading can cause the shell walls to become thin, hard and brittle and incapable of retaining pressure. Again, a shell defect.

k. Use of weakened and/or deformed cartridge shell(s) due to damaged or improper loading equipment.

i. Example: reloading shells that have previously been exposed to excessive pressure that compromised the shell can render the shell incapable of retaining pressure.

ii. Example: damaged loading dies can crease or gouge the brass and render the shell of being incapable of retaining pressure.

## THE INSPECTION OF PLAINTIFF'S GLOCK PISTOLS




**Figure 29: Non-Glock Factory Part in Mr. Johnson's Glock G36.**

92. Mr. Johnson's Glock G30SF and G36 were inspected by the experts for the defense and Mr. Bosch on March 15, 2023. Mr. Johnson's pistols are an excellent example as to why each pistol must be examined and the proposed class denied. Both Mr. Johnson's pistol's contained non-factory Glock parts. See Emanuel Kapelson's disclosure for a detailed list of the non-factory components. One of the more interesting changes made to the pistols was the trigger pivot pin of Mr. Johnson's G36 had been replaced with an aftermarket captured

pivot pin for an AR15 rifle. See Figure 29. The replaced pin was not even for a pistol, much less a Glock. How a firearm owner maintains or abuses their firearm can significantly affect how the firearm performs.



The white and light gray colored deposits were identified via SEM as consisting of lead.

**Figure 30: Lead Deposits in the Rifling of Mr. Johnsons' Glock G30SF's Barrel**

93. Mr. Johnson's Glock G30FS was found not only to contain aftermarket parts, but also to be in an abused state with significant lead deposits throughout the pistol. The deposits were identified as

consisting of lead via a scanning electron microscope (SEM). This is highly atypical for a Glock pistol and the amount of lead that was observed was sufficient to cause cycling malfunctions and a high-pressure event (shell rupture). A camera and video bore scope was used to memorialize the lead deposits in the barrel and throughout Mr. Johnson's pistol. Figure 30 shows the lead buildup in the barrel was to such a degree that all the "grooves" in the rifling were full.



**Figure 31: Lead Deposits in the Chamber of Mr. Johnsons' Glock G30SF**

94. Figure 31 shows the lead deposits continued from the rifling of the barrel and into its chamber.



**Figure 32: Large Deposit of Fibers at the Muzzle End of the Barrel of Mr. Johnsons' Glock G30SF**

95. Moreover, the video bore scope revealed the lead that was in the barrel was what remained after someone had ran a cleaning patch through the barrel. The muzzle end of the barrel was heavily coated in cloth fibers, which typically occurs after someone uses a cheap cleaning patch in a barrel. See Figure 32. As a cleaning patch is inserted in the barrel, the majority of the loose fibers are stripped off the patch and deposited on the barrel. Fibers were observed throughout the barrel.



Figure 33: Lead Deposits in the Extractor Recess of Mr. Johnsons' Glock G30SF

96. The heavy lead deposits were not just limited to the barrel. Figure 33 shows significant lead deposits in the extractor recess of the slide.




Figure 34: Lead Deposits in the Striker Assembly Recess of Mr. Johnsons' Glock G30SF

97. Even the striker assembly recess within the pistol's slide was contaminated with lead. See Figure 34.

98. Lead deposits are typically formed in barrels by people shooting homemade lead cast bullets or open heeled commercial bullets. Commercial bullets from major manufacturers typically have a copper or brass jacket laminated to a lead core. Full metal jacketed bullets cover the lead core of the bullet completely and don't leave lead deposits of any kind because the lead is fully encapsulated. Open heeled bullets don't cover the bottom/heel of the bullet core and typically don't leave lead deposits because only the jacketed parts of the bullet contact the barrel. However, if a person is shooting high-pressure rounds of ammunition, with discharge pressures well above SAAMI specifications, the excess heat can partially atomize the lead directly exposed to the discharged and burning propellant. Most of the lead laden discharge gas will follow the bullet out of the barrel, but when the slide cycles and extracts the spent brass, the lead laden discharge gas will also permeate through the pistol and the atomized lead will solidify on the cooler surfaces of the gun it came in contact with.

99. The large amount of lead contamination in Mr. Johnson's Glock G30SF indicates a significant number of high-pressure rounds of ammunition had recently been shot through it. Lead buildup in a pistol poses a significant safety risk. If lead significantly builds up in a barrel, the lead deposits can retard a discharged bullets ability to exit the barrel. The greater the retardation in the bullet's velocity, the greater the discharge pressures will become, which causes the temperature of the discharge gases to elevate, which causes more lead to be atomized and subsequently more lead to be deposited. Ultimately, if this cycle is continued, the end result will be the discharge pressure will elevate to the point of inducing a shell rupture/catastrophic failure.

100. The condition of Mr. Johnson's G30SF was a safety hazard due to the excessive lead build-up in the barrel. The pistol was in an unsafe condition, and it was too dangerous to fire until the lead deposits were removed from the barrel. To be clear, if plaintiff's pistol was discharged before cleaning the barrel and a shell rupture occurred, it would have been caused by a high-pressure event induced by lead build-up as a result of poor gun care and/or improperly loaded ammunition.

Q Okay. You saw it? You saw?

A Indeed. I looked down the barrel.

Q So you eyeballed it?

A Yes.

Figure 35: Excerpt from Mr. Nixon's Deposition (Johnson v Glock, Page 172)

101. In deposition, Mr. Nixon disagreed with my assessment of the condition of Mr. Johnson's G30SF. When asked if he had seen the deposits in the barrel he stated he had seen them. See Figure 35.




Figure 36: SEM Analysis of Barrel Sample Analyzed

102. Mr. Nixon also stated the amount of buildup observed in the barrel was minimal, "there was some lead and some other materials that were consistent with gunshot residue". Figures 30, 31, 32 and 34 clearly show the residue buildup was significant and inconsistent with gunshot residue and the SEM analysis showed the deposits primarily consisted of lead. See Figure 36. This amount of lead is not typically found in gunshot residue from ordinary use and proper maintenance of a firearm.

Q Maybe. Maybe some more.
Would you have fired that pistol? You, sir, would you have fired that pistol without removing that lead?
A Yes, I would.
Q You would. Okay.

Page 172

You wouldn't be concerned with firing that pistol with all that lead in it, huh?

Figure 37: Excerpts from Mr. Nixon's Deposition (Johnson v Glock, Page 171 & 172)

103. Mr. Nixon was asked if he would have fired the pistol without removing the lead, he stated he would have discharged the pistol. See Figure 37. Putting aside Mr. Nixon's apparent inability to recognize obvious abuse of a firearm and an unsafe condition, the Glock G30SF is a member of the claimed class of firearms Mr. Nixon is saying are unsafe for public use. Yet, Mr. Nixon testified he was willing to shoot the pistol with significant lead deposits present. The rationale Mr. Nixon is using to justify shooting a firearm he deems unsafe, regardless of its condition (lead deposits or not), is not based in science or engineering principles.

[redacted]

Figure 38: [redacted]

104. [redacted]

[redacted]







**Figure 39: Mr. Bosch's Improper Comparison of the Claimed UCD/SSV of a 45 Auto Caliber Glock to a Heckler & Koch VP40**

105. As an example of how these differences affect the analysis, Figure 39 shows a chamber comparison presented in Mr. Bosch's Declaration, page 119. Mr. Bosch improperly compares the chamber and feed ramp geometry of a 45 Auto caliber Glock chamber (SV) to a 40 S&W caliber design of a Heckler & Koch VP40. What Mr. Bosch omits from his report is the feed ramp and chamber designs are not similar because the operating peak pressures generated by the two very different calibers are significantly different. Per SAAMI, the peak discharge pressure of a 40 S&W is allowed to be 66% greater than a 45 Auto (MAP of 35,000 psi vs 21,000 psi, respectively). It is logical that a 14,000 psi average peak pressure difference would warrant a different feed ramp and geometry

designs. Reduced pressure cartridges typically don't require the short depth feed ramps their high-pressure counter parts require. Glock pistols of different calibers and models were designed taking these factors into account.

106. Mr. Bosch presented in his materials for deposition in this case an Excel spreadsheet with pressure calculations for each of the caliber and chamber combination in the claimed class of Glock pistols. The issue is the stress calculations presented don't show the claimed defect. Not a single calculation shows industry compliant cartridges will experience a shell rupture in a Glock pistol. Additionally, the analysis does not take into consideration the transient nature of the loading. The peak pressure a shell develops is not steady state, it's an impulse by nature and that requires a dynamic FEA analysis. The most one can take from Mr. Bosch's analysis is less chamber support potentially means more stress in the shell, but this relationship doesn't mean excessive stress. Furthermore, Mr. Nixon's live fire testing (discussed earlier) showed the Glock pistols he was testing had a chamber pressure safety factor of 200%, which exceeded his own specification of 150%

107. Because each caliber of ammunition contained within the claimed class produces a different peak discharge pressure, and the feed ramp to chamber designs not only differ between calibers and model, the potential for a catastrophic failure also necessarily differs for each model pistol. For example, using Mr. Bosch's flow fold (or "fissure") theory of "weakness", a hypothetical flow fold that could cause failures in 9mm cartridges would not fail in a 357 SIG cartridge because the peak pressures produced by a 9mm are less than a 357 SIG (33,000 psi vs 40,000 psi), and the feed ramps and chamber designs are different.




Figure 40: Mr. Bosch's Heckler & Koch VP40 Feed Ramp, Chamber and Cartridge Illustration

108. Mr. Bosch's hypothetical weakened shell "natural variation" has not been proven to exist. However, if one accepts it as true, it would be impossible to set a standard by which a firearms manufacturer can design their feed ramps and chambers because every feed ramp and chamber design would theoretically have a hypothetical flow fold that could cause the shell to rupture during discharge. The Heckler & Koch VP40 feed ramp and chamber Mr. Bosch deems non defective has a non-supported chamber area. See the yellow circle in Figure 40. Given that Mr. Bosch has not identified the parameters of a weakened cartridge shell that supposedly causes a failure, it could be said that the Heckler & Koch VP40 has a UCD/SV defect as well. Remember, Mr. Bosch once opined Glocks chambered in 9mm and 357 SIG were not defective (Grosso v Glock Inc.), but Mr. Bosch now opines the same Glock pistols are now defective. Who is to say in time Mr. Bosch will not opine the Heckler & Koch VP40 is defective. Based on Mr. Bosch's hypothetical weakened shell "natural variation" theory, it is also possible to have a cartridge in a full supporting chamber fail because a large natural variation flow fold could exist that would compromise the shell. This hypothesis of an unquantifiable defect is a very "slippery slope". Essentially, Mr. Bosch and Mr. Nixon are claiming every firearm that shoots brass shell cartridges is defective because unquantified "natural variations" in the ammunition could cause them to fail.

## IT MAKES SENSE NOT TO ADVERTISE THE SAFETY VALVE FEATURE

109. Mr. Bosch and Mr. Nixon claim the Glock SV is not a safety system and if it were a safety system Glock would advertise it as such. Despite Mr. Bosch and Mr. Nixon's claim, passive structural safety systems are not commonly advertised. I don't recall ever reading an advertisement by an auto manufacturer that detailed the functionality of the vehicle's crumple zones. One reason for this is manufacturers do not want their customers to misconstrue the information and less rigorously adhere to safety practices. Just because your car is equipped with a crumple zone, it doesn't mean you don't need to wear your seatbelt.

110. While I was an owner of Atlas Development Group, a manufacturer of precision brass shells for ammunition, we never told customers they could reload the shells they purchased from us, even though we had an internal quality control metric of a minimum of ten reloadings. Loading a shell after it has been through a discharge one or more times is called "reloading". The precision brass shells Atlas manufactured are primarily used by competition shooters or the shooting enthusiast who hand load their own cartridges with commercially available components (bullets, propellants, primers and shells). Multiple world titles have been won by shooters who used Atlas brass shells. The reason Atlas did not tell customers they could reload the shells they purchased is because Atlas had no control over what peak pressures the customer's custom hand load would develop. Atlas's internal quality metric peak discharge pressure for a loading was SAAMI's specified maximum average pressure for the caliber in question. Atlas Development Group is a member of SAAMI. If a customer was unknowingly hand loading their cartridges to produce a peak pressure equivalent to proof pressures, which does happen, then the expectation of ten reloads is unreasonable and unsafe. Therefore, despite Atlas's internal quality metric, the company stance was Atlas's shells have no guarantee or reasonable expectation to be reloadable, as Atlas has no control over the condition of the shell after it shipped from the factory. Mr. Bosch and Mr. Nixon's claim that failure to advertise a safety feature is admission of an inherent defect is false.

## Summary of Opinions

111. Based on my education, training, and experience in product design and firearm and ammunition design, manufacture and function, my review and study of the information provided, my inspection and testing of various pistols and cartridge cases rifle, I offer the following opinions to a reasonable degree of engineering and scientific certainty:

1) Glock's safety valve (SV) is not a "defect" or a safety hazzard.

2) Glock's safety valve (SV) enhances user safety.

3) The Beretta M92A1 (9mm) has a feed ramp and chamber design equivalent to the Glock G19 and G17.

4) The claim by the plaintiff and his consultants that other firearms do not employ safety valves equivalent to the claimed class of Glock pistols is false.

5) Glock has manufactured over 22,000,000 of the claimed pistols during the past 40+ years, yet Mr. Bosch and Mr. Nixon (consultants for the plaintiff) cannot scientifically prove their claimed defect exists.

6) The claimed defect is strictly hypothetical as Mr. Bosch and Mr. Nixon, nor anyone else, has proven it to exist.

7) The consultants for the plaintiff have not quantified the shell parameters which will yield their claimed defect.

8) The consultants for the plaintiff have not quantified design parameters within a Glock pistol firearm which will yield their claimed defect.

9) The consultants for the plaintiff have not quantified the shell design and manufacturing parameters by which any shell manufacturer can verify their product does not contain the defect.

10) The consultants for the plaintiff have not quantified the firearm design and manufacturing parameters by which any firearm manufacturer can verify their products do contain the claimed defect.

11) An imperfection of a cartridge case that causes inadequacy or failure is the definition of a defect and not a "natural variation".

12) No evidence exists that shows a Glock pistol equipped with a safety valve will facilitate a cartridge shell rupture with SAAMI compliant peak pressures.

13) The claimed hypothetical defect affects all firearms that shoot brass cartridge ammunition.

14) Mr. Bosch and Mr. Nixon have claimed that all firearms are defective by not quantifying the parameters that define their hypothetical defect.

15) Factory Glock pistols are designed with a safety valve that will maintain the integrity of factory ammunition developing pressures up to 200% of the SAAMI maximum average pressure.

16) Mr. Bosch and Mr. Nixon fail to take into account the extensive field testing data related to Glock pistols that contradict their claim.

17) Consumer ammunition that develops peak pressures above the SAAMI standards is defective.

18) Mr. Bosch is guilty of flip flopping with respect to his opinion of what constitutes a defective Glock pistol. In 2019, Mr. Bosch testified that Glock pistols chambered in 9mm and 357 SIG were safely designed and manufactured. Today, Mr. Bosch has opined that Glock pistols chambered in 9mm and 357 SIG are defectively designed and manufactured.

19) Mr. Bosch's statement that, "Glock pistol chamber designs include an excessive portion of the feed ramp within the chamber wall" indicates an acceptable amount of feed ramp penetration into the chamber wall is acceptable, but neither Mr. Bosch nor Mr. Nixon and quantified what that acceptable amount is or provided any data to support such a quantification.

20) The plaintiff and his consultants do not acknowledge in their declarations the relationship between feed ramp to chamber design as heavily affecting the firearm's ability to reliably feed ammunition from multiple manufacturers in multiple environments.

21) A duty weapon that experiences a feed jam due to a poorly designed feed ramp and chamber could cost a life.

22) Mr. Bosch provides no quantitative data or calculations to support his claim, "No competitors' pistols are known to have the rate of Kabooms that Glock products are known to produce". Mr. Bosch doesn't identify another firearm manufacturer that has produced over 22,000,000 firearms that could be compared to the claimed class of Glock pistols.

23) The Glock pistols of the claimed class all meet and or exceed the industry performances standards specified by SAAMI.

24) Mr. Bosch has misrepresented that "ammunition manufacturers, such as Black Hills and Grace Ammunitions, have concluded that explosions involving their ammunition were caused by the presence of the 'special safety valve'" by the omission of documents that clearly state the defect was with the ammunition and not the Glock pistols.

25) No ammunition manufacturer warns against using their ammunition in Glock pistols.

26) The peak pressure, feed ramp design and chamber design for each caliber within the claimed class of Glock pistols is unique and as such would require a unique version of Mr. Bosch's hypothetical and unquantified shell "weakness" to yield a shell rupture. Therefore, each field failure must be analyzed on its own merits and the proposed class should be denied.

27) Given the plaintiff and his consultants have failed to prove their hypothetical defect has ever occurred or distinguish their hypothetical defect from a high-pressure event, the proposed class should be denied.

112. I reserve the right to change and supplement my opinions and conclusions following my examination of any additional case materials presented, including depositions.

113. Exhibits which the author may use to explain or support the opinions expressed at trial include the aforementioned materials along with competitive firearms, models, cutaways, computer simulations, videos, and other demonstrative exhibits. The opinions stated in this report are opinions developed by the author of this report based upon the documents and evidence provided to the author at the time of drafting the report and these opinions are to a reasonable degree of engineering and scientific certainty. The author reserves the right to change or supplement the opinions and conclusions following the examination of any additional case materials presented, including depositions.

114. I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this __23__ day of February, 2024.

Derek L Watkins
President & Chief Engineer
Nth-Level. LLC.

## Exhibit B

## Materials & Items Reviewed

During my review and investigation of the Johnson v Glock matter and in preparation of this report, I have reviewed the following:

III. Defenant's production from Glock Ges.m.b.H;
IV. Defendant's production from Glock Inc.;
V. Mr. Johnson's Glock G30SF;
VI. Mr. Johnson's Glock G36;
VII. SEM results;
VIII. Exemplar Glock pistols;
IX. Exemplar Beretta, HK, Sig Sauer, Walther and other firearms;
X. Exemplar ammunition;
XI. Plaintiff's Exhibits A through QQ;
XII. Evidentiary hearing of Dr. Mr. Bosch (07/11/2019);
XIII. Johnson's Initial Disclosure (04/20/2021);
XIV. Plaintiff and defendant Reponses to Interrogatories;
XV. Deposition of Steven Johnson (09/07/2023);
XVI. Deposition of Josef Kroyer (09/13/2023);
XVII. Deposition of Carlos Guevara (09/21/2023);
XVIII. Declaration of John Mr. Nixon (10/11/2023);
XIX. Declaration of Dr. David Mr. Bosch (10/12/2023);
XX. Motion for Class Certification (10/12/2023);
XXI. Various Glock, HK, Sig Sauer, and other Exemplar firearms