# EXHIBIT C

# DECLARATION OF MARLIN JIRANEK, II

## Johnson v. Glock, Inc. et al.
## CASE NO.: 3:20-cv-08807-WHO
## United States District Court
## Northern District of California

DECLARANT:
Marlin R. Jiranek, II
Principal Engineer/Metallurgical Engineer, Nth-Level Engineering
COO/Consultant, Atlas Development Group LLC

### SECTION 1: BACKGROUND & OVERVIEW

1. Under the penalty of perjury, I, Marlin Jiranek, II, on this day of February 20, 2024, declare as follows:

2. I was retained to analyze and render an opinion of the manufacturing process of brass ammunition casings and the failure mechanism of ammunition and firearms due to overpressure or defects in ammunition as they relate to Glock firearms that contain the Safety Valve (SV) feature. More specifically, to render an opinion pertaining to a motion for class certification filed by Steven Johnson.

3. My investigation has included a review of documents supplied, including depositions and document production in this case, review of relevant standards, inspection and measurement of exemplar items and pistols, and inspection and measurement of exemplar brass cases.

4. I am a degreed metallurgical engineer with 28+ years of experience in firearms and ammunition product development, production, and testing. Based on my education, training, and experience, I can provide expert insight into all issues with regards to the design, development, failure analysis, testing, and analysis of firearms and ammunition designs and manufacturing technologies. My analyses and opinions are based upon my background, education, and experience in the fields of firearm design, ammunition component design, and firearm failure mechanisms. Prior to stating my opinions, the following is a brief outline of my education, training, and experience with firearm and ammunition design.

5. I received a Bachelor of Science degree in 1993 followed by a Master of Science degree in 1995 in the field of Metallurgical Engineering. During the pursuit of my master's degree, I worked for a failure analysis company performing component failure analysis and accident reconstruction. After completion of my master's degree, I was employed by Remington Arms Company, Inc. as an Engineer at the Research & Development facility located in Elizabethtown, Kentucky. My initial job duties included material selection and failure analysis of components that failed during the development of products. I was involved with the failure analysis and material selection of firearm and ammunition components at Remington Arms company for all products developed from 1995 through 2013. This included the development and commercialization of over 26 firearms products and 10 ammunition products. In 2013, I moved laterally to a staff level design engineering position in the Defense Products Group. Through my history at Remington, I was involved

with ongoing material research into new and emerging technologies, material selection and design for firearms and ammunition products, failure analysis of any and every type of firearm and ammunition component, production engineering support and implementation of production processes, measurement system development, the development of functional production layouts, product testing in all stages of development, and product mechanical design. During my time at Remington, I developed and was granted 6 patents on firearm components. During the same timeframe, I developed numerous material and design technologies that were not patented but retained as trade secrets within Remington Arms Company.

6. In January of 2015 I left Remington and started the company Atlas Development Group LLC (ADG) which remains in operation today. My job title is Chief Operating Officer. Within ADG, I have two primary functions. In my first role, I manage and conduct product development consulting and testing services for over 57 firearms companies and oversee the manufacture of ADG products, including precision rifle cartridge brass. These consulting and testing services include product design, development, failure analysis, implementation of corrective actions, and production development for handguns, rifles, and shotguns throughout the firearms industry. In my second role, I oversee the manufacture of rifle cartridge brass, specifically targeted to the performance minded and competition long range shooter. Last year, our brass was used by 17 of the top 20 finishers in the F-Class world championships held in South Africa. I was responsible for the development of our manufacturing processes required to consistently produce the world's most consistent rifle brass in production today. We currently manufacture 29 different calibers, including our own headstamp (70% of production) and 3 private headstamps for ammunition manufacturers (30% of production).

7. In November of 2017, I became a Principal Engineer at Nth Level LLC. In this role, I work for attorneys and insurance companies to provide consulting and expert witness services to our clients. This includes accident and incident examinations, reconstructions, data analysis, and testing to confirm theories based on the available physical evidence. The approach we utilize is to examine the evidence of a failure and compare the physical evidence to the claims to determine what actually occurred. During these analyses, I will conduct failure analyses, material identifications, failure mode identification, and conduct testing and data acquisition. This information is used to render expert opinions regarding firearm and/or ammunition designs and failures based upon the evidence and laws of physics. A copy of my resume is attached as Exhibit A.

8. The question in this case concerns a claim that Glock's incorporation of a feature in the feed ramp region of certain firearms, referred to as the Safety Valve (SV), creates a condition that allows ammunition conforming to standard industry specifications for dimensions and pressure to fail, resulting in injury to the user. In addition, plaintiff's consultants, Dr. Bosch and Mr. Nixon, claim that stress cracks, porosity, or fissures that are naturally produced in pistol caliber brass cartridge cases during the manufacturing process can sometimes align with the feed ramp and SV feature in the Glock pistol and that when this occurs, the cartridge case may swell to deform plastically or rupture under industry standard pressures (NIXON para. 34).

9. Dr. Bosch claims that stress cracks and fissures are formed by drawing (forming) the cartridge case routinely and provide documentation of these defects in specific Winchester manufactured ammunition cases (BOSCH p. 91-103). Furthermore, he claims that when these stress cracks or fissures are large enough and align with the feed ramp area, specifically in Glock pistols with the SV feature, the cartridge cases are prone to sudden overload failure in which the case swells and ruptures, resulting in injury to the operator of the firearm. Dr. Bosch and Mr. Nixon further claim that the stress cracks or fissures are impossible to detect without sectioning the brass cases and therefore it is not possible to test for these conditions nor align them with the feed ramp and SV feature of a Glock pistol (NIXON para. 29) for evaluation.

10. In this declaration, I explain why the plaintiff and his consultants' theory is incorrect and not supported by evidence based on testing and evaluation, and application of the scientific method.

## SECTION 2: CONCLUSIONS

11. The following opinions are stated to a reasonable degree of engineering and scientific certainty:

- The Safety Valve function created by the geometries of Glock feed ramps and incorporated into many Glock pistol designs is safe and does not create any possibility for spontaneous case failures of ammunition when loaded within normal industry standard pressure levels when those cartridge cases contain flow fold manufacturing artifacts.
- The manufacturing artifacts commonly called flow folds, referred to as "stress cracks" and "fissures" by plaintiff and his consultants, are common artifacts, uniformly distributed around the entire circumference of cartridge cases, and do not contribute to pistol caliber case failures in any way.
- The size of flow folds are extremely consistent within a tooling set, and a single tooling design is used to produce millions of cartridge cases for any given caliber by any given manufacturer.
- The location of flow folds are ALWAYS aligned with the feed ramp of any pistol that they are utilized within due to their circumferential nature.
- All of the failures presented in the plaintiff's declarations show classic signs of high-pressure overload failures and do not show any indications of case failures occurring at or below industry standard pressures.
- The Glock Safety Valve feature provides adequate support for all ammunition cartridges fired in an unmodified Glock pistol that includes all known brands of 45 Auto, 380 Auto, 10mm, 40 S&W, 45 GAP, .357, and 9mm calibers.
- Each caliber of the identified models of Glock pistols have different design geometries and pressure tolerances, which means they cannot all be treated as the same.

## SECTION 3: SHELL MANUFACTURING PROCESS SUMMARY

12. Ammunition cases are typically formed through a progressive draw operation. The raw material for this process is a brass cup, which is stamped (or forged) from a brass plate by the primary brass supplier. At this point, if there was any porosity in the plate, it would have been removed during the stamping process. The cartridge case manufacturing process is comprised of taking the brass cup and then performing at least one draw process following by the formation of the case head. After the drawing operation is completed, the case is headed, meaning the primer pocket and the case head geometry are formed into the case. Subsequent processes to manufacture the cartridge case include cutting the rim geometry, adding the primer flash hole, trimming the cartridge to length, and in some cases, annealing the mouth along with various washing operations.

13. During the drawing and heading operations specifically, the cartridge material is subjected to significant amounts of plastic deformation, followed by annealing. During these processes, there is an internal punch and an exterior die. When the material is pushed through the die, it is plastically compressed around the punch. Depending on the tooling geometry, this may result in a small fold, or crease of material, that is created at the junction of the punch tip and the base of the cartridge case as the material is displaced. These flow folds are referred to as "stress cracks" and "fissures" by Dr. Bosch and Mr. Nixon in their declarations.

Figure 3-1 presents an illustration of the drawing operation. Figure 3-2 presents an illustration of the heading operation in which the interior of the case is supported by a punch and a bunting die deformed the bottom of the cartridge case tube to form the head and primer pocket of the cartridge case.



**Figure 3-1. An illustration of the drawing process of a cartridge case during its manufacture.**



**Figure 3-2. An illustration of the heading process of a cartridge case during its manufacture.**

14. The formation of creases, folds, or flow folds during the process are specifically related to the tooling geometry. The shape and size of the flow folds may vary based on the tooling geometry. It is important to understand that the formation of the flow folds will be extremely consistent with regard to shape, size, and distribution within any given set of tooling. <u>In other words, if flow folds are created, they will be present in nearly identical size and shape in virtually 100% of the cartridge cases manufactured using that specific tooling combination</u>. This is due to the high levels of consistency that are required to fabricate cartridge cases, using any current method of manufacture.

15. The brass cartridge case is cylindrical in shape, therefore, during the draw and heading operations the brass flows in a circular pattern from the center of the cup out toward the edges/mouth of the case. This expanding circular flow causes the folds to be centered circularly around the center of the shell's base. The flow folds are continuous in nature and extend completely around the circumference of the case when they are formed. This means <u>that flow folds will always be aligned with any feed ramp, regardless of the orientation of the cartridge case in the chamber of the firearm</u>. This is true due to the nature of the process that is used to manufacture any cartridge case in any caliber.

16. The formation of flow folds always occurs at the junction between the punch tip and the side wall of the cartridge case. Because of this, the flow folds are always located in the same region around the circumference of the cartridge case, specifically shown in Figures 6-2 and 6-3 of this declaration as the locations highlighted in red. This location, at the base of the sidewall of the cartridge case, is generally unsupported in all autoloading handgun designs if they have a feed ramp in any geometric configuration.

## SECTION 4: INTRODUCTION TO THE FLAWS OF PLAINTIFF'S THEORY

17. Plaintiff claims "a brass ammo cartridge case wall, by itself, is not designed to support the internal pressures when a round of ammunition fires" (PLAINTIFF'S MOTION 4:15-16). This is only partially true and varies greatly based on the pressure requirement for a particular caliber. For example, lower pressure cartridges can contain the operating pressure with less case support. The higher the pressure requirements, the more case support will be required. This is especially true when the pressures get into rifle pressure levels such as 60,000 psi MAP levels. In the case of rifle pressure levels, the brass material can flow under normal operating pressures, so the case must be contained by the chamber and bolt nearly 100%. In the case of "low pressure" cartridges, generally under 25,000 psi, there can be relatively large areas of unsupported case that will function without any noticeable deformation.

18. The case head region, the area that contains the rim of the cartridge, is always unsupported in the radial direction. This area is generally very thick as it only contains the primer. As you move up past the primer flash hole, the case wall thickness will be relatively thick at the base and get progressively thinner towards the mouth of the cartridge. Figure 4-2 presents an image of a sectioned 45 Auto cartridge case detailing this internal geometry. If a cartridge case fails due to an unsupported area, it will always fail at the thinnest portion of the cartridge case. This will be the region that exhibits the maximum amount of plastic deformation. As the service pressure of any cartridge is decreased, the distance from the base of the cartridge that can be unsupported will increase accordingly without resulting in any type of failure of the cartridge. Essentially, the "brass ammo cartridge case wall" is supporting the internal pressures when the round is fired.



**Figure 4-2. An image of a sectioned 45 Auto pistol cartridge pistol caliber cartridge case showing the general characteristics of the case wall geometry.**

19. In this case of Johnson v. Glock, a sample of approximately 150 rounds of ammunition was fired through one of Mr. Johnson's Glock pistols chambered in 45 Auto caliber (further detailed in Section 7 of this declaration). These included 10 rounds of Remington ammunition, 35 rounds of Federal ammunition, 35 rounds of GLD ammunition, 35 rounds of Speer ammunition, and 35 rounds of nickel plated Speer

ammunition. Upon inspection, none of these fired cases exhibited any observable plastic deformation. If plastic deformation was to occur, it would occur in the unsupported region of the cartridge case and at pressure levels in excess of the industry standard pressure levels.

20. Mr. Watkins, firearm expert for Glock, conducted high pressure ammunition evaluations through a Glock G41 chambered in 45 Auto (further detailed in Section 7 of this declaration). During this evaluation, he fired improperly loaded ammunition that generated pressures in excess of 56,000 psi. The result was a bulged casing using Winchester Ammunition cartridge cases. Figure 4-3 presents an image of CT scan of one of these fired high pressure rounds of ammunition. The bulge, easily observed in the lower left portion of Figure 4-3, occurred at the area of the feed ramp, in the location of the SV. This pressure level was 2.7 times MAP and 1.7 times maximum PROOF pressure levels for 45 Auto caliber. The greatest amount of plastic deformation occurred at the feed ramp to chamber wall junction, which is the thinnest and most forward portion of the unsupported shell wall.



**Figure 4-3. A CT scan image of a high pressure 45 Auto cartridge case intentionally fired through a Glock G41 pistol with pressures in excess of 56,000psi, 2.7 times the industry standard maximum pressure for this caliber.**

21. It is important to note that the results of the high-pressure testing demonstrate not only that the feed ramp design is adequate and appropriate for the 45 Auto Glock pistol, but also that IF this geometry was a product design defect, the cartridge case would have failed. In fact, the cartridge case did not fail at 2.7 times the maximum allowable pressure. It merely plastically deformed and safely functioned despite the extreme excessive pressure.

## SECTION 5: IMPROPERLY CREATING COMMONALITY BETWEEN DIFFERENT CALIBERS

22. The plaintiff and his consultants fail to draw important distinctions between Glock model pistols and calibers. They try to compare one set of design features of one caliber to all other calibers. This is impossible. Each pistol caliber named in the motion has a distinct set of performance criteria with regards to pressure standards. Table 5-1 presents a list of the calibers listed in the plaintiff's motion and their industry standard pressure criteria. There are four pressure levels listed in Table 5-1 for each caliber. These include the SAAMI MAP, MPSM, Minimum Proof, and Maximum Proof pressures. SAAMI MAP is the "Maximum Average Pressure" for a 10-shot sample of any manufactured ammunition. Normally, the loads are developed so that the pressures are less than this level because it is the maximum allowable average. Based on the data collected during ammunition testing at the factory, the Maximum Probable Sample Mean is calculated. This is the maximum expected average pressure that may be observed in the testing of product subsequent to its manufacture. The minimum and maximum proof pressures are the pressure level range to which proof ammunition is loaded. This is the pressure level that is used to test fire each manufactured firearm prior to releasing it into the commercial product stream for sale to the end consumer. Every Glock firearm is tested to proof pressure levels prior to moving it into commerce.

23. All of the ammunition specifications, testing, and qualification methods are detailed in the American National Standards published by the Sporting Arms and Ammunition Manufacturers Institute (SAAMI) performance standards (SAAMI Z299-3-2022). SAAMI was formed in 1926 and has formulated and published performance and dimensional standards recognized and adopted by the firearms industry. Glock is a SAAMI member and as such manufactures its products so that they will conform to the requirements set forth therein.

**Table 5-1. A caliber listing with the U.S. industry standard SAAMI pressures listed.**

| CALIBER | MAP | MPSM | PROOF MIN | PROOF MAX |
|---|---|---|---|---|
| 9mm Luger | 33,000 | 35,600 | 52,000 | 55,500 |
| 10mm Auto | 37,500 | 40,500 | 50,500 | 54,000 |
| 357 Sig | 40,000 | 43,200 | 54,000 | 57,500 |
| 380 Auto | 21,500 | 23,200 | 29,000 | 31,000 |
| 40 S&W | 35,000 | 37,800 | 47,000 | 50,500 |
| 45 GAP | 23,000 | 24,800 | 31,000 | 33,000 |
| 45 Auto | 21,000 | 22,700 | 31,000 | 33,000 |

24. A firearm is designed to function with properly loaded ammunition. Properly loaded ammunition will not have a maximum pressure above the listed MAP pressure. However, firearms are generally designed to withstand multiple instances of PROOF level pressures or even higher. Because each caliber has a different pressure requirement, each of the calibers listed have a differently designed chamber and feed ramp geometry. The SV feature in certain Glock pistols is very different for each caliber, sometimes different for models within the same caliber.

25. [redacted]

[redacted]

26. [redacted]

[redacted]

**Figure 5-1.** [redacted]

## SECTION 6: THE "FISSURE" THEORY DISPROVEN

27. Dr. Bosch claims that the feed ramp feature, creating the Glock SV, does not properly support the cartridge case wall (BOSCH 16.17) and infers that the real cause of these types of failures is a combination of the Glock safety valve and the presence of flow fold manufacturing artifacts present in pistol cartridge cases (BOSCH P91-103).

28. In Dr. Bosch's declaration, he sections a Winchester 45 Auto cartridge case and finds "laps that in turn create stress raisers where the case failure initiates" (BOSCH 98:7.21). These "stress raisers," or "fissures," as Dr. Bosch and Mr. Nixon call them, are actually manufacturing artifacts commonly called

"flow folds" that are present on nearly all ammunition casings being manufactured. Flow folds are manufacturing artifacts that are located at the bottom of each shell manufactured. These manufacturing artifacts are small regions of material that fold on top of one another during the drawing process, specifically located at the interior radius junction between the cartridge side wall and the cartridge case head. The size and depth of these artifacts will be dependent of the tooling geometry and specific forming process utilized by each specific manufacturer of the cartridge brass.

29. Figure 6-1 presents a CT scan of a fired Winchester cartridge case, the same type of cartridge case Dr. Bosch uses to describe so-called "fissures" (BOSCH p. 91-103). The image shows the circumferential nature of the artifact. Because they are circumferential, these manufacturing artifacts are <u>always</u> aligned with the feed ramp of all firearms that they are fired from.




**Figure 6-1. A CT scan of a Winchester 45 Auto cartridge case, clearly showing the nature and location of the flow fold manufacturing artifact. These are the "stress cracks" and "fissures" referred to by the plaintiff experts and in the plaintiff's motion.**

30. The flow folds are found at the base of the propellant cavity. They occur at the thickest junction between the base and side wall of the cartridge case. Figure 6-2 presents an image of a sectioned 45 Auto cartridge case. In Figure 6-2, a red highlighted area shows the location of flow folds, or "laps," that are created during the manufacturing process. The presence of these flow folds are normal to all pistol cartridge cases and do not impact the strength of the cartridge case due to several factors including:

- Their location at the base, and thickest, part of the cartridge case
- The plasticity of cartridge brass naturally blunts crack tips and prevents crack propagation
- When pressurized, this region is under compressive loading against the breech face



**Figure 6-2. An image of a sectioned 45 Auto cartridge case with the area that would contain flow folds, or "laps" as described in Dr. Bosch's declaration, in nearly all manufactured pistol cartridge cases.**

31. Dr. Bosch goes on to state that flow fold propagation can be a catalyst to Glock casing ruptures. It is important to understand that the SV feature in the Glock pistol is only active if the pressure is in excess of normal operating pressures by a minimum of 2X. Additionally, the flow folds that Dr. Bosch identifies in section 7 of his declaration are not located near the point of failure if the SV were forced into operation due to excessive pressures.

32. Figure 6-3 presents a CT scan of a 45 Auto cartridge case that was fired at approximately 56,000psi, the same base image presented as Figure 6-1. In this image, the cartridge case bulged, but did not rupture during the high-pressure firing event that was over 2.5 times higher than the industry standard peak pressure for the 45 Auto cartridge design. The location where the rupture would have initiated is indicated with a red arrow. The red band is the location of the flow folds in the cartridge case, referred to as laps or fissures by Dr. Bosch. It is evident that the flow folds are nowhere near the vicinity of the actual rupture initiation location. This also means that the presence of flow folds, regardless of size, do not impact the strength of the cartridge case as they relate to the SV feature in the Glock pistol design.



**Figure 6-3. An image of a 45 Auto cartridge case fired at a pressure of 56,000psi (2.7X maximum industry pressure for the cartridge) through a Glock pistol showing the bulging that occurs at this pressure level. Had the case ruptured, the rupture would have initiated at the location of the red arrow. The red band represents the location of the flow folds formed during the manufacturing process.**

33. Mr. Nixon describes the formation of fissures due to work hardening of the brass during the forming process (NIXON 31-34). He then cites Dr. Bosch's work in sectioning a shell that revealed some of these "fissures". This culminates with a statement that "if the fissures or stress crack aligns with the feed ramp in a Glock pistol. . . the internal pressures in the cartridge may cause the case to swell to the point where it will achieve plastic deformation, or even a complete rupture." (NIXON 34). In his deposition, Mr. Nixon defers questions about fissure to Dr. Bosch (NIXON Depo 216:5-9).

34. As shown above, the "fissures" that Mr. Nixon is describing are flow folds that are located at the interior base of the cartridge case and are present on nearly all pistol cartridge cases manufactured through the industry standard process of drawing brass. These manufacturing artifacts are generally continuous in nature and are present around the entire circumference of the cartridge case. As such, the flow folds are ***always*** aligned with the SV feature and feed ramp area of any pistol.

35. A failure of a brass cartridge case will always occur at the weakest and thinnest portion of the cartridge case. As shown in Figure 6-3 and 7-2 of this declaration, this failure initiation location is significantly forward of the location of the flow folds or "fissures". The flow folds are not in the proximity of the location that a rupture would occur if the cartridge case was subjected to a sufficiently high-pressure during firing.

36. Flow folds are not defects but there are cartridge case defects that could cause an ammunition failure. Due to the significant level of drawing required to form a cartridge case, any material defect will manifest itself as a fracture in the part during the drawing process. The manufacturing process itself becomes a quality control check for material defects in the cartridge case wall. Defects in cartridge cases are typically formed

in the field. They can be nicks or damage to the exterior or thinning of the cartridge case along its base due to reloading it too many times.

37. Once the rupture occurs in a cartridge case that contains a defect, the pressure can no longer build and is vented through the firearm. In the case of most pistols, including Glock pistols, this simply vents the gases through the breech face/barrel intersection, outward and down toward the magazine well. There is normally no damage that occurs to the firearm with the possible exception of a damaged or missing extractor depending upon where the rupture occurs. My experience is the same as the experiences of Mr. Kroyer in that generally no damage occurs to the firearm when case failures occur at normal operating pressures (KROYER Depo 105:1-4). This is because at normal operating pressures the vented gasses are simply vented and do not deform/damage the material of the firearm. Only when pressures are in excess of industry standard pressures, the cartridge case will be deformed and impact against the other components of the firearm, resulting in component damage and failures. Incidentally, most "weaknesses" of cartridge cases are external damage or internal thinning of the cartridge case wall / case head intersection from being reloaded too many times. This is not normal variation of the manufacturing process, it is a defect that makes the cartridge case inappropriate for use.

38. The SV in the Glock design only comes into play when there is an overpressure condition and allows the pressure to be released earlier than it would without the feature. While the intent, and result, is to prevent and limit injury to the user, the degree of overpressure plays a role in proper function, as it would in any firearm.

## SECTION 7: ADDITIONAL TESTING – CT SCANNING / HIGH PRESSURE EVALUATION

39. Testing was conducted by firing 500 rounds of Winchester factory ammunition through a Glock G41 pistol and then firing a high-pressure round through the same pistol that produced approximately 2.7 times the SAAMI MAP pressure, around 56,000psi. Some of the fired casings were scanned using computed tomography, commonly referred to as a CT scan. The non-destructive CT scans clearly depict the size, shape, and location of the flow folds that are created during the manufacturing process. Using CT technology, these manufacturing artifacts can be clearly observed, characterized, and quantified. Figure 7-1 presents a CT scan image of one of the normally fired casings with the flow folds indicated with red arrows. None of the rounds of ammunition fired within normal operating pressures exhibited any indications of bulging, cracking, or tearing.



**Figure 7-1. A CT scan of a standard round of ammunition after firing through a Glock G41 pistol. The flow folds, manufacturing artifacts, are clearly visible in the bottom of the fired cartridge case and continue completely around its circumference.**

40. When an <u>improperly loaded</u> cartridge was fired through the pistol, generating pressures in excess of 2X the industry maximum pressure for the cartridge, the cartridge case developed a prominent bulge in the region of the feed ramp, or SV feature in the pistol. The material of the bulged cartridge case was very near failure (rupture) that would have initiated at the most forward part of the feed ramp. Figure 7-2 presents an image of the CT scan of the bulged cartridge case and indicates both the location of the near rupture and the location of the flow folds.




**Figure 7-2. An image of the bulged case that was improperly loaded to create a high-pressure condition and fired in a Glock G41 pistol, resulting in a bulged case.**

41. It can be clearly observed that the flow folds are not in proximity of the material failure initiation location. Also, the material failure initiation location of the brass case is occurring at the thinnest portion of the case wall, at the most forward edge of the feed ramp cut. There are no additional cracks, crack propagation, or any widening of the flow folds in this brass cartridge case. This evidence directly refutes the claims by both Dr. Bosch and Mr. Nixon that the flow folds ("fissures" or "stress cracks") contribute to failures of brass cartridges cases loaded to industry standard pressures when fired in Glock pistols.

## SECTION 8: ADDITIONAL TESTING – JOHNSON MODEL G30SF FIRING EVALUATION

42. Additional testing was completed using the plaintiff's Glock Model G30SF firearm chambered in 45 Auto caliber. A series of approximately 150 rounds of various brands of factory loaded ammunition was fired through his firearm. During this live fire evaluation, no malfunctions occurred. After firing these rounds through his firearm, 149 of these fired casings were examined visually for the presence of flow folds. The examined casings included five different ammunition brands: 35 Federal casings, 10 Remington-Peters casings, 34 GFL casings, 35 Speer casings, and 35 Speer Ni-plated casings. In 100% of the examined casings, flow folds were identified visually and present continuously around the circumference of the cartridge cases. These flow folds are large enough to be visibly observed through a stereoscope with low magnification. Figures 8-1 through 8-5 present representative images from each of the five brands of casings indicating the presence and location of the flow folds in the fired cases.




**Figure 8-1. A representative image of the Federal fired casing of a round of ammunition fired through Mr. Johnson's Glock Model G30SF firearm. The blue arrows show the location of the flow fold that was created during the manufacturing process.**




**Figure 8-2. A representative image of the Remington (R-P) fired casing of a round of ammunition fired through Mr. Johnson's Glock Model G30SF firearm. The blue arrows show the location of the flow fold that was created during the manufacturing process.**




**Figure 8-3. A representative image of the G.F.L. fired casing of a round of ammunition fired through Mr. Johnson's Glock Model G30SF firearm. The blue arrows show the location of the flow fold that was created during the manufacturing process.**




**Figure 8-4. A representative image of the Speer fired casing of a round of ammunition fired through Mr. Johnson's Glock Model G30SF firearm. The blue arrows show the location of the flow fold that was created during the manufacturing process.**




**Figure 8-5. A representative image of the Ni-Plated Speer fired casing of a round of ammunition fired through Mr. Johnson's Glock Model G30SF firearm. The blue arrows show the location of the flow fold that was created during the manufacturing process.**

43. A representative sample of each of the brands of fired casings was sectioned in order to examine the depth and size of the flow folds within the fired casings. Figure 8-6 presents an image of the cross section of a Federal 45 Auto casing with a region identified with a red square that represents the relative size of the flow folds and their location. It should be understood that these manufacturing artifacts are generally not visible in cross section with the naked eye and require magnification to observe. Figures 8-7 through 8-17 present images of the flow fold cross sections.



**Figure 8-6. An image of a Federal 45 Auto case with a red square showing the approximate size and location of the flow folds documented in Figures 8-7 through 8-17.**




**Figure 8-7. 50X magnification cross-section image of a Federal 45 Auto casing that was fired through Mr. Johnson' Model G30SF pistol showing flow folds present on both sides of the cross section. A higher magnification image of the green highlighted region is presented as Figure 8-8.**



**Figure 8-8. 250X image of the flow fold highlighted in Figure 8-7 of a Federal 45 Auto shell fired through Mr. Johnson's Model G30SF pistol.**




**Figure 8-9. 50X magnification cross-section image of a Remington (R-P) 45 Auto casing that was fired through Mr. Johnson' Model G30SF pistol showing flow folds present on both sides of the cross section. A higher magnification image of the green highlighted regions are presented as Figures 8-10 through 8-12.**



**Figure 8-10. 250X image of the flow fold (1) highlighted in Figure 8-9 of a Remington (R-P) 45 Auto shell fired through Mr. Johnson's Model G30SF pistol.**



**Figure 8-11. 250X image of the flow fold (2) highlighted in Figure 8-9 of a Remington (R-P) 45 Auto shell fired through Mr. Johnson's Model G30SF pistol.**



**Figure 8-12. 250X image of the flow fold (3) highlighted in Figure 8-9 of a Remington (R-P) 45 Auto shell fired through Mr. Johnson's Model G30SF pistol.**




**Figure 8-13. 50X magnification cross-section image of a G.F.L. 45 Auto casing that was fired through Mr. Johnson' Model G30SF pistol showing flow folds present on both sides of the cross section. A higher magnification image of the green highlighted regions are presented as Figures 8-14 through 8-15.**



**Figure 8-14. 250X image of the flow fold (1) highlighted in Figure 8-13 of a G.F.L. 45 Auto shell fired through Mr. Johnson's Model G30SF pistol.**



**Figure 8-15. 250X image of the flow fold (2) highlighted in Figure 8-13 of a Federal 45 Auto shell fired through Mr. Johnson's Model G30SF pistol.**




**Figure 8-16. 50X magnification cross-section image of a Speer 45 Auto casing that was fired through Mr. Johnson' Model G30SF pistol showing flow folds present on both sides of the cross section.**




**Figure 8-17. 50X magnification cross-section image of a Ni-plated Speer 45 Auto casing that was fired through Mr. Johnson' Model G30SF pistol showing flow folds present on both sides of the cross section.**

44. The flow folds were consistent in size, shape, and location for each specific manufacturer, but varied between manufacturers. This is due to the tooling design that is utilized by each manufacturer independently from the others when manufacturing the 45 Auto cartridge cases. The location of these manufacturing artifacts are such that they do not compromise the integrity of the cartridge case when being fired because this region is under compressive loading against the breech face (or slide face). It is important to note that during the course of firing these rounds (and another approximately 100 rounds of ammunition fired by the plaintiff):

- No bulges or ruptures occurred on any of the fired cases;
- The circumferential nature of the flow folds means that they were always aligned with the SV feature of Mr. Johnson's G30SF pistol;

45. The reason that no ruptures of bulges occurred is because the SV feature only becomes relevant when a high-pressure condition is present in the firearm. The pressures required for the SV feature to allow the failure of the cartridge case, rather than the failure of the firearm, are over 2 times the SAAMI and industry standard pressure for 45 Auto caliber.

## SECTION 9: EXAMINATION OF 40 S&W, 10mm, 9mm Luger, .380 Auto, 357 Sig, and 45 GAP CARTRIDGE CASES

46. A visual examination was conducted using a low magnification stereoscope to view the internal geometry at the bottom of a number of exemplar cartridge cases. The purpose of the examination was to document the evidence of flow folds in various calibers of ammunition and to provide a subjective rating of the visual prominence of the flow folds at the bottom of each cartridge case.

47. It was found during this examination that the nature and location of the flow folds mirrored that of the 45 Auto cartridge cases with the visual prominence being the same level within a headstamp cartridge case family. In all cases, the flow folds were located completely around the circumference of the cartridge cases, which means that they will always be aligned with the feed ramp of any pistol that they are fired from.

Table 9-1 presents a complete table of the caliber, headstamp, finish, visual prominence, and the figure reference (in this declaration) for the images. A single sample of each headstamp examined is provided for direct comparison and identification of the flow folds across all cartridge calibers.

48. The presence and visually prominent variation of the flow folds is simply a means for identifying the manufacturing artifacts existence in every pistol caliber case manufactured using the standard drawing processes utilized by most ammunition manufacturers today. When the cartridge case is pressurized under normal firing conditions, these artifacts are put into compression against the breech face. There is no amount of pressure that will cause these manufacturing artifacts to become an initiation location for a case head rupture. The case head rupture can only occur when there is a failure of the firearms locking mechanism, there is a defect present in the case at the juncture of the case head and the case sidewall, or very high-pressure event occurs. The cartridge case will always fail initially at the thinnest section, which is the most forward portion of the feed ramp, far removed from the flow fold manufacturing artifacts.

**Table 9-1. A summary table of a visual examination conducted to document the presence of flow folds in various cartridge calibers.**

| VISUAL EXAMINATION FOR FLOW FOLDS | | | | |
|---|---|---|---|---|
| CALIBER | HEADSTAMP | FINISH | VISUAL PROMINENCE | FIGURE REFERENCE |
| 40 S&W | WMA | BRASS | HIGH | Figure 9-1 |
| 40 S&W | WINCHESTER | NICKEL | HIGH | Figure 9-2 |
| 40 S&W | WINCHESTER | BRASS | HIGH | Figure 9-3 |
| 40 S&W | WIN | BRASS | MEDIUM | Figure 9-4 |
| 40 S&W | SPEER | BRASS | MEDIUM | Figure 9-5 |
| 40 S&W | S&B | BRASS | LOW | Figure 9-6 |
| 40 S&W | R-P | BRASS | HIGH | Figure 9-7 |
| 40 S&W | G.F.L. | BRASS | MEDIUM | Figure 9-8 |
| 40 S&W | FEDERAL | BRASS | MEDIUM | Figure 9-9 |
| 40 S&W | CBC | BRASS | HIGH | Figure 9-10 |
| 40 S&W | BLASER | BRASS | LOW | Figure 9-11 |
| 10mm | BUFFALO BORE | BRASS | LOW | Figure 9-12 |
| 10mm | SIG | BRASS | MEDIUM | Figure 9-13 |
| 10mm | UNDERWOOD | NICKEL | LOW | Figure 9-14 |
| 9mm LUGER | WMA | BRASS | HIGH | Figure 9-15 |
| 9mm LUGER | WINCHESTER | BRASS | MEDIUM | Figure 9-16 |
| 9mm LUGER | SIG | BRASS | LOW | Figure 9-17 |
| 9mm LUGER | S&B | BRASS | HIGH | Figure 9-18 |
| 9mm LUGER | PMC | BRASS | MEDIUM | Figure 9-19 |
| 9mm LUGER | HERTERS | BRASS | MEDIUM | Figure 9-20 |
| 9mm LUGER | G.F.L. | BRASS | LOW | Figure 9-21 |
| 9mm LUGER | FEDERAL | BRASS | LOW | Figure 9-22 |
| 9mm LUGER | CBC | BRASS | MEDIUM | Figure 9-23 |
| 9mm LUGER | BLASER | BRASS | LOW | Figure 9-24 |
| 9mm LUGER | AGUILA | BRASS | MEDIUM | Figure 9-25 |
| 380 AUTO | WINCHESTER | BRASS | MEDIUM | Figure 9-26 |
| 380 AUTO | S&B | BRASS | LOW | Figure 9-27 |
| 380 AUTO | R-P | BRASS | LOW | Figure 9-28 |
| 380 AUTO | POBJEDA | BRASS | HIGH | Figure 9-29 |
| 380 AUTO | PMC | BRASS | LOW | Figure 9-30 |
| 380 AUTO | PERFECTA | BRASS | MEDIUM | Figure 9-31 |
| 380 AUTO | HORNADY | NICKEL | HIGH | Figure 9-32 |
| 380 AUTO | G.F.L. | BRASS | MEDIUM | Figure 9-33 |
| 380 AUTO | FEDERAL | BRASS | HIGH | Figure 9-34 |
| 380 AUTO | BLASER | BRASS | MEDIUM | Figure 9-35 |
| 357 SIG | R-P | BRASS | LOW | Figure 9-36 |
| 357 SIG | R-P | NICKEL | LOW | Figure 9-37 |
| 45 GAP | SPEER | BRASS | HIGH | Figure 9-38 |
| 45 GAP | R-P | BRASS | MEDIUM | Figure 9-39 |




**Figure 9-1. 40 S&W WMA headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-2. 40 S&W Winchester headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-3. 40 S&W Winchester headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-4. 40 S&W WIN headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-5. 40 S&W Speer headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-6. 40 S&W S&B headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-7. 40 S&W R-P (Remington) headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-8. 40 S&W G.F.L. headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-9. 40 S&W Federal headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-10. 40 S&W CBC headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-11. 40 S&W Blaser headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-12. 10mm Buffalo Bore headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-13. 10mm Sig headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-14. 10mm Underwood headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-15. 9mm Luger WMA headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-16. 9mm Luger Winchester headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-17. 9mm Luger SIG headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-18. 9mm Luger S&B headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-19. 9mm Luger PMC headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-20. 9mm Luger Herters headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-21. 9mm Luger G.F.L. headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**



**Figure 9-22. 9mm Luger Federal headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**



**Figure 9-23. 9mm Luger CBC headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**



**Figure 9-24. 9mm Luger Blaser headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-25. 9mm Luger Aguila headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-26. 380 Auto Winchester headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-27. 380 Auto S&B headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-28. 380 Auto R-P (Remington) headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-29. 380 Auto Pobjeda headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-30. 380 Auto PMC headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-31. 380 Auto Perfecta headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-32. 380 Auto Hornady headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-33. 380 Auto G.F.L. headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-34. 380 Auto Federal headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-35. 380 Auto Blaser headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-36. 357 Sig R-P (Remington) headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-37. 380 Auto R-P (Remington) Nickel Plated headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-38. 45 GAP Speer headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**




**Figure 9-39. 45 GAP R-P (Remington) headstamp brass cartridge case. The left image shows the entire bottom of the cartridge case and the right image shows a close-up of flow fold location and geometry.**

## SECTION 10: ADDRESSING MISREPRESENTATIONS

49. Plaintiff and his consultants cite multiple incidents of firearm failure and claim they all were caused by the SV feature. However, each of the cited examples presented by Plaintiff, Dr. Bosch and Mr. Nixon show all of the normal indications of a high-pressure condition that results in an overload failure of the cartridge case. This is evidenced by the fact that all of the failed cartridge images they present initiate the failure from the most forward portion of the unsupported cartridge case within the feed ramp region (thinnest wall thickness). The cartridge failure then propagates by deforming materials rearward to the base. This leaves a region of removed material that is in the same shape as the feed ramp geometry transferred to the cartridge case. This same fracture characteristic are present in NIXON Exhibits N, O, Q, NIXON para. 41, and Bosch Figures 7-8, 7-9, 7-10, 7-11.

50. Figure 10-1 presents an image of the failed cartridge case from NIXON Exhibit O, in which the failed case material failed at the thinnest section and deformed rearward towards the case head. In this figure, the red arrows depict the surface where the fracture initiated and the blue arrows represent the failure path. This failure occurs at the thinnest portion of the case and deforms the material rearward. Note that if the cartridge case failed at the flow fold location, it would have fractured along the forward portion of the rim area of the shell and deformed downward rather than backwards. This would leave material at the most forward portion of the cartridge (where the red arrows are located). Figure 10-2 presents images from NIXON Exhibits N and Q, Nixon para. 41, and Bosch figures 7-8, 7-9, 7-10, and 7-11 for comparison. They all fail in exactly the same manner as Figure 10-1 and none of them failed at the location of the flow folds at the base of the cartridge case, adjacent to the rim.



**Figure 10-1. An image of the cartridge case presented as NIXON Exhibit O showing the fracture initiation location (red arrows) and the propagation direction of the failure (blue arrows).**




**Figure 10-2. Examples of failed cases used by Mr. Nixon and Mr. Bosch that all exhibit the same failure that initiates at the thinnest portion of the shell and NOT the flow fold region of the shell.**

51. Plaintiff and his consultants do not present any incidents where the evidence available indicates the failure occurred below SAAMI or industry standard pressure levels.

52. Plaintiff and his consultants misrepresent testimony from Mr. Kroyer regarding firearms allegedly exploding "with standard ammunition pressures if there is a weakness in the cartridge case wall". Mr. Kroyer was specifically referring to cartridge cases that had been reloaded many times or damaged during previous firings. In the case of damaged cases, there are two type of failures that occur in cartridge that have been reloaded too many times. These include mouth splits and case head ruptures. Mouth splits occur due to residual stresses building up at the case mouth and eventually crack through the material grains. Case head ruptures also occur over several reloading cycles where the case wall material stretches forward and thins out the bottom of the case wall, at the junction between the case head the side wall. The cases are trimmed during the reloading process, removing the material at the mouth and allowing the side wall to stretch forward with each firing. After firing the same piece of brass several times, this will create a thinned ring at the base of the sidewall. The case head will then split, or rupture, at this location. This is commonly known as a case head rupture and it occurs when any cartridge case is reloaded too many times. This is a created defect of the cartridge case.

53. The plaintiff and his consultants misrepresent statements from Mr. Kroyer, a design engineer for Glock, stating that he admits the "the guns can explode even with standard ammunition pressures if there is a weakness in the cartridge case wall". Mr. Kroyer actually states (KROYER 104:7-105:4, 107:15-107:22, NIXON Decl 38-39) that if a weakness was present in a cartridge case that only created standard operating pressures, the cartridge case would fail at the weak spot (not necessarily the SV), gas would be vented, and no damage would occur to the firearm. This is consistent with the author's experience in testing pistols of all types and designs.

*Misrepresenting/Concealing Brown & Hussar Case Results*

54. The plaintiff and his consultants reference the case of Gary Brown and his 10mm G29 Glock pistol incident (PLAINTIFF MOTION 5:8-13). Plaintiff and his consultants represent that Black Hills Ammunition determined the cause of the failure had nothing to do with over-pressured ammunition, and it was "probably week brass in unsupported area". They then cite JOHNSON 001808, 001811 which is the product claim system report regarding a different 40S&W incident. The motion also includes in Exhibit Y emails from Jeff Hoffman, the owner of Black Hills Ammunition, to Ken Hussar regarding the 40 S&W incident – unrelated to the Gary Brown incident. Exhibit Y is an incomplete and specifically selected set of documents from the Black Hills Ammunition production.

55. After the investigation of the Gary Brown incident by Black Hills Ammunition, it was determined that the ammunition was not manufactured by Black Hills Ammunition and was a high-pressure event likely resulting from a double-charge of propellant from whomever reloaded the ammunition (BH PRODUCTION 000225). This information is conveniently missing from the motion filing and is omitted from Mr. Nixon's declaration. The plaintiff and his consultants misrepresent that the cause of the injury to Mr. Brown was a standard pressure round of ammunition that failed due to a weak spot in the ammunition casing. The actual facts were that Mr. Brown's injuries were found to be related to a high-pressure round of ammunition that was not manufactured by Black Hills Ammunition. Additionally, Mr. Hussar experienced no injuries, and his incident was believed by Black Hills Ammunition to be caused by a firing out-of-battery condition.

*Hundreds of Incidents of SSV "Exploding"*

56. Glock has produced millions of pistols and 10's if not 100's of millions of rounds of ammunition have been fired through them. The Plaintiff's claims that Glock admits that it's SV feature has "exploded" hundreds of times, but claims that the explosions are almost always from overloaded or over-pressurized ammunition without noting that its design causes the explosion (PLAINTIFF MOTION 5:15-18). Plaintiff's motion misrepresents the testimony of Mr. Guevara, a representative of Glock, Inc., to support this claim. Mr. Guevara explained that the SV only operates, controlling the failure point of the brass casing, when the cases are over-pressurized either by misloaded ammunition, bore obstruction conditions, or other conditions creating over pressure that are out of the firearm manufacturer's control.

57. As discussed above, the only time that the feed ramp geometry (or "SV") allows a cartridge to burst is when there exists an over-pressure condition, period. The SV feature allows for the ammunition case to fail in a controlled location, forcing gases downward through the magazine well and away from the shooter, only when a significant over-pressure condition exists. The SV feature cannot cause the failure of a round of ammunition loaded to industry standard SAAMI pressure levels. Mr. Watkins presents a statistical analysis of the theoretical failure rates that would be expected in Glock pistols if cartridges loaded to industry standard pressured would occasionally fail in Glock pistols containing the SV feature.

*Glock Testing Misrepresentations*

58. [redacted]

*Vienna Proof-House Misrepresentations*

59. The plaintiff and his consultants go on to state that the Vienna Proof-House reported to Glock in 1993 that cartridge case materials could contribute to blowouts "due to lack of support [in the chamber]" (PLAINTIFF MOTION 7:22-8:2). What they fail to clearly state is that the findings were "the barrels used in firearms of Fa. Glock will resist loads up to the double standard gas pressure and 25-fold repetition without change of their structure. Further testing carried out by the Vienna Proof-House have shown that demolition of the barrels is only possible when using extremely and inadmissibly large quantities of powder exceeding all recommendations for loading" (GGES 000150).

60. The paragraph cited in plaintiff's motion (PLAINTIFF MOTION 7"26-28) only pertains to a specific test conducted on 40S&W chambered Glock pistol sample. In this test, a single round was fired that generated 6,623 BAR (96,058psi) (GGES000149). This is a pressure level almost 2 times the PROOF pressure level for the 40 S&W caliber cartridge. The results of this specific test are not relevant to this matter due to the level of high-pressure that was evaluated. It is in these extremely high-pressure conditions that damage could occur to the frame and/or barrel of any firearm.

*Misrepresented Reference Material*

61. Figure 10-3 presents two figures from Dr. Bosch's declaration, Figure 7-30 and Figure 14-4. In Figure 7-30, the artifact resembles a crack, but it is actually two material fronts being pushed together during the forming process. The grain structure can clearly be observed to flow along the direction of the artifact, which is how the flow-folds are created. This structure can also be observed in Dr. Bosch's Figures 7-31 and 7-34. Then, in Section 14 of Dr. Bosch's declaration, he compares a failure analysis conducted on cartridge brass by Mr. Yagoob as being representative of what is being shown in Section 7 of his declaration. The failure cracking that is presented as Figure 14-4 in Dr. Bosch's declaration, taken directly out of Mr. Yagoob's report, is cracking in the cartridge case that resulted from insufficient annealing. In this case, the crack formed and propagated *through* the grain structure. This is easy to observe by the fact that the sharp crack is "cutting" the grains in half. This is in contrast to the images presented on the left side image, Figure 7-30 from Dr. Bosch's declaration, in which the material grains appear to flow along the direction of the flow-fold.

62. The failure analysis results of Mr. Yagoob's report has nothing to do with the flow folds that are present in almost all pistol cartridge case brass. Dr. Bosch's reliance on Yagoob only serves to create unneeded confusion in the analysis. While Dr. Bosch does not provide a side-by-side comparison of the images in his declaration, and separates the images by 49 pages, the two images are presented for direct comparison in Figure 10-3.



Figure 7-30. Exemplar Case #3 – Mag. = 200X

Figure 14-4. Ref.: Yagoob, Failure Analysis of Cartridge Brass Shell, Engineering Failure Analysis, (2022)

**Figure 10-3. An image comparing Figures 7-30 and 14-4 of Dr. Bosch's declaration in which he infers that these two types of failure modes are similar and contribute to the cartridge case failures that have occurred in Glock pistols.**

*<u>Misrepresenting the Portland Police Matter</u>*

63. Mr. Nixon states that bulges are formed when firing industry standard pressure rounds of ammunition which results in plastic deformation of the rounds, or bulged rounds. Mr. Nixon references bulged cases from a Portland Police matter (Exhibit N). When examining the images of the Portland Police matter, this specific failure was a barrel failure in which the barrel split through the entire chamber wall. This was then attributed to a possible faulty heat treatment of the barrel (JOHNSON 000572). Figure 10-4 presents an image of the failed pistol from this referenced matter that produced the bulged cases. This image clearly shows a barrel failure as a split through the chamber region along the side wall of the barrel. These incident failures had nothing to do with the SV feature and the matter concerned allegations of a metallurgical issue with the barrel in conjunction with a high-pressure event.




**Figure 10-4. An image of the Portland police matter failures. The lower portion of the barrel can be observed to be bent as a result of a barrel fracture (yellow circled region). This incident involved allegations of faulty heat treatment of the barrel and an overpressure discharge and did not concern the SV feature in the Glock pistol.**

## SECTION 11: GLOCK PISTOL DESIGN

64. Based on my experience in the firearms industry, specifically in the realm of pistol design and testing, the performance of the Glock pistol design in modern auto loading pistols is second to none.

65. Glock has set the benchmark by which all other pistols are measured. This is directly analogous to the Remington 870 shotgun in regard to pump-action shotgun performance and the Remington Model 700 and Winchester Model 70 rifles in regard to bolt action rifle performance. The safety valve system results in more reliable feeding and extraction of cartridges during the function of the pistol. Failure of a cartridge through plastic deformation will always occur at the thinnest portion of the case wall. This is always the most forward portion of the feed ramp in all pistols. Additionally, unless there is a failure of the locking system of the pistol (i.e., out of battery event), this type of failure will always require a firing pressure far in excess of the maximum design pressure for the cartridge. Over pressure events have multiple causes as addressed by Mr. Watkins. Once a cartridge case ruptures, the internal pressure of the system will cease to increase as it is vented out of the case and barrel.

66. The SV system will only become active in situations where there is excessively high pressure in the barrel. The case will bulge and rupture at the most forward portion of the feed ramp to chamber intersection. This is shown in the testing and presented in Figure 7-2 of this declaration. There is some dependence on the material and material conditions of the cartridge casing, meaning that the pressure level at which the SV becomes active, while intended to be around 200% of SAAMI MAP, may actually be slightly below or above 200% of SAAMI MAP depending on slight tolerance variation. However, in all conditions, the pressure in the chamber must be grossly in excess of standard operating pressure for a failure to occur. The cartridge cases manufactured and used by reputable ammunition manufacturers are developed per SAAMI/CIP performance standards.

## Section 12: REVIEW OF CASE MATERIALS

67. During my review and investigation of the Johnson v Glock matter and in preparation of this declaration, I have reviewed the following:

- Defendant production from Glock Ges.m.b.H
- Defendant production from Glock Inc.
- Examination of Mr. Johnson's Glock pistol barrel contents (remote)
- Plaintiff Exhibits A through QQ
- Evidentiary hearing of Dr. Bosch (07/11/2019)
- Johnson's Initial Disclosure (04/20/2021)
- Plaintiff and defendant Reponses to Interrogatories
- Deposition of Steven Johnson (09/07/2023)
- Deposition of Josef Kroyer (09/13/2023)
- Deposition of Carlos Guevara (09/21/2023)
- Declaration of John Nixon (10/11/2023)
- Declaration of Dr. David Bosch (10/12/2023)
- Motion for Class Certification (10/12/2023)
- Various Glock, HK, Sig Sauer, and other Exemplar firearms

68. Exhibits which the author may use to explain or support the opinions expressed at trial include the aforementioned materials along with competitive firearms, models, cutaways, computer simulations, videos, and other demonstrative exhibits. The opinions stated in this declaration are opinions developed by the author of this declaration based upon the documents and evidence provided to the author at the time of drafting the declaration and these opinions are to a reasonable degree of engineering and scientific certainty. The author reserves the right to change or supplement the opinions and conclusions following the examination of any additional case materials presented, including depositions.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 22nd day of February, 2024.

Marlin Jiranek, II



Marlin R. Jiranek, II
Principal Engineer - Nth-Level Engineering / marlin@nth-level.com

*Marlin R. Jiranek II*
**Chief Operating Officer**
marlin@atlasdg.com / marlin@nth-level.com

P.O. Box 1895
Elizabethtown, KY 42702

## PROFILE

- 27+ years experience in the firearms and ammunition industry
- Product development and testing
- Product implementation
- Product design coupled with significant materials selection, design, and root-cause failure analysis experience
- Certified Six-Sigma Blackbelt
- Problem solving and team building skills
- Proficient at test design and analysis capability
- Record of product innovation and integration of new and emerging technologies into market leading products

## EMPLOYMENT HISTORY

**11/2017 – Present:** **Principal Engineer**
***Nth Level LLC*, Elizabethtown, KY**

Provide expert services regarding firearms and ammunition design, related failure analysis, material selection, design, and failure mode expertise, and test design/data acquisition. Render expert opinions regarding firearms design and failures based on disclosed case materials and personal examination of physical evidence.

**1/2015 - Present:** **Chief Operating Officer / Consultant**
***Atlas Development Group LLC***, Elizabethtown, KY

Coordinate the company activities within each business segment to best apply the company resources and achieve the short and mid-term company deliverables. Manage the consulting contracts and coordinate the company resources required to efficiently complete any contract requirements.

Oversee sales, distribution, and marketing aspects of brass cartridge case manufacturing business unit.

Consult to firearms and ammunition companies with specific expertise in mechanical design, material selection and processing, failure analysis, DOE-based problem solving, lean-process analysis and implementation. Provide expert services to legal firms regarding failure analysis, material expertise, and test design/data acquisition to support and/or prove expert and legal theories.

**3/2013 - 1/2015:** **Staff Engineer – Defense Products Development**
***Remington Arms Co.***, Elizabethtown, KY

New product design, technical data package creation, design validation testing, direct interface with sales, supply chain, vendors, and manufacturing teams to develop and bring to market new products within the Remington Defense brand. Responsibilities include direct interaction with key customers for troubleshooting and resolving customer issues.

- Principal contributor to the R4 production process development through a Kaisen event which improved to product quality and secured a $72MM contract with the Philippine government for R4 rifles.
- Designed, managed, and conducted the Pre-Delivery Inspection testing for representatives of the Philippine Army and government.
- Provided Six-Sigma based test support to identify and resolve final development issues with the LVAW systems. The methods developed and utilized have been used a model and benchmark for critical timeline design and product issue resolution.
- Developed a test data assimilation process within MS Excel to relay the critical test information to executive levels. This process and format has been largely adopted as the standard for data collection and formatting.
- Lead trouble-shooting and product performance problem solving engineer across all Defense and Commercial products evaluated at the Remington Arms Co. R&D Technical Center.

**3/2008 – 3/2013:** **Staff Engineer – Materials and Test Laboratory**
**3/2002 – 3/2008:** **Senior Research Engineer – Materials and Test Laboratory**
**3/1998 – 3/2002:** **Research Engineer – Materials and Test Laboratory**
**8/1995 – 3/1998:** **Engineer – Materials Engineering**
***Remington Arms Co.***, Elizabethtown, KY

Previous responsibilities included material selection and support, failure analysis of test and field returned product, legal team engineering support, product testing and evaluation, application of six-sigma methodologies to product design issues and plant production issues, product design refinement based on directed analysis data, and research into existing or immerging materials technologies and their applicability to product integration. These responsibilities can be divided into 6 primary categories: Product Testing, Production Support, Failure Analysis, Material Selection, Material Design, and Materials Research.

**Product Testing**

- Developed the testing protocols used to determine product capabilities in comparison to new product proposal (NPP) documents and existing military standards or product solicitations.
- Created new product test plans to evaluate or benchmark specific performance metrics within a product category, including the use of DOE to identify and quantify the effects of primary factors that influence specific performance attributes of developing and existing products.
- Design sampling plans to validate that changes in design have addressed the specific product performance metrics without adversely affecting other performance attributes.
- Design DOE's and sampling plans to investigate potential product recalls and provide data to show the implemented solution addresses the area of concern.
- Design and execute testing for outside sponsored research including DARPA and CAG facilities.
- Extensive experience and knowledge of high speed video usage and motion analysis of high speed video data. Has become the go-to person for difficult high speed video requirements at ROC. Extensive knowledge of Photron video equipment and Xcitex motion analysis software.

**Plant (Production) Support**

- Directly support the manufacturing facilities in selection of materials for existing products, tooling, and product manufacturing variances.
- Worked directly with ROC component suppliers to resolve production or product manufacturing issues.
- Create and analyze DOE and Sampling plans to investigate various manufacturing issues relating directly to product performance.
- Perform failure analyses on part or product failures identified in initial product evaluation and on product returns through Arms Service.

**Failure Analysis**

- Conduct failure analyses of product issues occurring during product development, manufacturing, and field returns to determine the root cause of the issue.
- Examination and documentation of the product design as well as the component issues to correctly identify the failure mechanism (root cause) of complex mechanical systems.
- Extensive experience with overload and fatigue type failures with significant expertise in fracture mechanics and fractography to understand and communicate to non-technical personnel the origin, progression, stress analysis and morphology of existing fractures.
- Direct Analysis Engineers (CAE, FEA, Kinematic) to create computer models and estimates of the cause of the failure and comparative analysis of potential design solutions.
- Refine product designs based on failure analysis results to address specific product concerns or meet changing product performance metrics.

**Material Selection**

- Standardized material callout and processing specifications on drawings across all FGI branded products.
- Responsible for selection of materials and processes for all metallic components of new and existing ROC products through April 2013. Significant working knowledge of specifying and processing carbon steels, alloy steels, tool steels, tungsten alloys, titanium alloys, aluminum alloys, brasses, bronzes, lead, MIM & P/M materials, carbon-fiber composites, adhesives, injection molded polymers (nylon & polypropylene) in all manufacturing forms.
- Creation of material, coating, and finishing specifications both supplied to vendors and used in-house. In-depth working knowledge of process specifications and usage including ASTM, SAE-AMS, SAAMI, AISI, ANSI, MIL, and MPIF.
- Directly responsible for the material selection of nearly all products released from ROC since 1997 from initial concept to final production:
    - Remington M597, M504
    - Remington M710/770, M700 EtronX, M700 Composite
    - Remington NAS, M99, Interex (Non-Introduced Development Models)
    - Remington VersaMax, M105CTi/105CTi2
    - Bushmaster ACR
    - DPMS G2
    - AAC Ranger / Mk13 Suppressors
    - Remington R1 (1911), R51, RP9
    - Remington Defense R4, RGP, MSR/PSR/PSR2, CSR, ACR


marlin@atlasdg.com
marlin@nth-level.com

**Material Design**

- Developed new materials and application of non-standard processing techniques to address specific material design criteria to enhance product performance.
- Development of novel processing techniques that allowed for improved product quality and consistency during the development of the Remington Ultra Magnum cartridge.
- Extensive experience managing and direct operation of all equipment associated with a full materials characterization laboratory including metallurgical preparation equipment, cut-off saws, Instron servo-hydraulic testing systems, scanning electron microscope, energy dispersive x-ray analysis, image analysis systems, dye-penetrant, magnetic particle inspection, corrosion and weather testing systems, and various ancillary equipment.

**Materials Research**

- Developed and managed a research effort focused on identifying new materials, processing, and coating technologies outside of the firearms and ammunition industry that could be implemented to develop a competitive advantage.
- Developed test strategies to evaluate the potential integration of new materials technologies into new or existing product lines to gain competitive advantage in the marketplace.
- Maintained contact and observation of published materials research occurring through government funded laboratories and universities in the U.S.
- Disseminate new technology information to the Marketing and Sales functions in a manner that accurately explains the technology and advantages to non-technical personnel, customers, and consumers.

## PATENTS & AWARDS

- 11,385,009, "Firearms Trigger Assembly". July 12, 2022
- 9,464,865, "Hand Guard Installation Mechanism". October 11, 2016
- 7,866,079, "Modular Barrel Assembly". January 11, 2011
- 7,814,695, "Composite Receiver for Firearms". October 19, 2010
- 6,189,431 B1, "Small Caliber Gun Barrel". February 20, 2001
- 5,740,516, "Firearm Bolt". April 14, 1998
- Best Presentation Award, Composites Division, Society of Plastics Engineers Annual Conference, "*Application of Composite Technology to Firearms: A Rifle Barrel*". May 1999.
- Best Paper Award, AFS Engineering Division, "*Influence of Mold Coating on Heat Transport in Permanent Mold Casting Process*". August, 1997

## EDUCATION

M.S. Metallurgical Engineering — May 1995
*University of Missouri at Rolla*
B.S. Metallurgical Engineering — May 1993
*University of Missouri at Rolla*
Passed Engineer In Training Exam (E.I.T.) — April 1993


marlin@atlasdg.com
marlin@nth-level.com

## PROFESSIONAL DEVELOPMENT

- ASME Y14.5-2009 GD&T
- Solidworks Essentials (5/2013)
- Six-Sigma Certified Blackbelt (Cooper & Sanders, LLC) (10/2009)
- High Speed Video and Photography, Massachusetts Institute of Technology (06/2009)
- Bushmaster Certified Armorer (04/2008)
- ThermoNoran System Six (EDS) Training (03/2007)
- Remington LE Armorer Course (08/2006)
- Instron Bluehill Operators Course (06/2005)
- NACE Corrosion Inspection, Level 1 Certification (10/2003)
- ThermoNoran Microanalysis Course (06/2002)
- Practical Fracture Mechanics & Fractography, ASM (05/2000)
- Effective Public Speaking, Elizabethtown Community College (06/1997)
- Instron 8500 Servohydraulic Load Fram / Series IX Operator's Course (08/1996)
- LEO 440 Sigma SEM Operator Training (02/1996)

## PERSONAL

**Community Involvement**

Elizabethtown Police Foundation Board Member 2015 – Present

*Treasurer (September 2018 – Present)*

*President (September 2016 – September 2018)*

Kentucky Workforce Innovation Board Member 2015 - 2017

**Competitive IDPA, USPSA, & Multi-Gun Participant** 2009 – Present

*IDPA Membership Number A50843*

*USPSA Membership Number A-91433*

*Member 3GN*

**6th Dan (Degree) Master Black Belt Instructor**

Sheroan's Taekwondo Academy 1997 – Present

Certified WTF, USTW Instructor. Taekwondo, HolSinSul

Kentucky Taekwondo Won (Board of Directors, Secretary/Treasurer) 2002 - Present

**Severns Valley Baptist Church** 2001 – Present

Member of various teams with regards to day-to-day operation of the Church facility and staff. Currently Serving: Safety/Security Team Leader, Worship Team Member (Bass Guitar) Past Service: Personnel Committee, Stewardship Committee, Trustee Committees, Adult Bible Study Teacher, Student (Middle/High School) Teacher and Volunteer, Ordained Deacon.


marlin@atlasdg.com
marlin@nth-level.com